# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WEST FLAGLER ASSOCIATES, LTD., a Florida Limited Partnership d/b/a MAGIC CITY CASINO, | |
| 540 N.W. 37th Ave<br>Miami, FL 33125, | |
| BONITA-FORT MYERS CORPORATION, a Florida Corporation d/b/a BONITA SPRINGS POKER ROOM, | |
| 401 N.W. 38th Court<br>Miami, FL 33126, | |
| *Plaintiffs*, | |
| vs. | Civil Action No. _____ |
| DEB HAALAND, in her official capacity as SECRETARY OF THE UNITED STATES DEPARTMENT OF THE INTERIOR, | |
| 1849 C Street, NW<br>Washington, DC 20249, | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, | |
| 1849 C Street, NW<br>Washington, DC 20249, | |
| *Defendants.* | |

## COMPLAINT

Plaintiffs West Flagler Associates, Ltd, d/b/a Magic City Casino ("West Flagler") and Bonita-Fort Myers Corporation, d/b/a Bonita Springs Poker Room ("Bonita") bring this Complaint against Defendants Deb Haaland, in her official capacity as Secretary of the United States Department of the Interior ("Secretary Haaland"), and the United States Department of the Interior ("DOI"), to challenge Secretary Haaland's approval of a 2021 Gaming Compact Between the Seminole Tribe of Florida (the "Tribe") and the State of Florida (the "Compact," attached as Exhibit A).  Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this action under the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.* ("APA") and the equal protection guarantee provided through the Due Process Clause of the Fifth Amendment.  It challenges the lawfulness of Secretary Haaland's August 5, 2021 approval by operation of law pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.*, of a 2021 tribal-state gaming compact entered into between the Tribe and Florida that, among other things, purports to authorize the Tribe to operate online sports betting for persons physically located anywhere in Florida.  This authorization of online betting from all locations in Florida, not just from the Tribe's reservations, must be set aside for three reasons:

2.      *First*, the Compact unlawfully permits the Tribe to operate gaming outside of its own reservations, which is not permitted by IGRA.  IGRA authorizes tribal-state gaming compacts—and permits Secretary Haaland to approve such compacts—only to the extent that they concern "gaming *on Indian lands*." 25 U.S.C. § 2710(d)(8)(A) (emphasis added); *see also* 25 U.S.C. § 2710(d)(1) ("Class III gaming activities shall be lawful *on Indian lands only* if" certain conditions are met, including that those activities are "conducted in conformance with a Tribal-

1

State compact . . . . ") (emphasis added).  IGRA strictly defines "Indian lands" as "all lands within the limits of any Indian reservation," as well as certain other lands "over which an Indian tribe exercises governmental power."  25 U.S.C. § 2703(4).  The definition does not encompass Class III gaming in geographic areas governed by a State rather than a tribe.  Because the Compact is not confined to gambling on Indian lands but rather authorizes Internet gambling throughout the state of Florida, approval of the Compact was contrary to IGRA and *ultra vires.*

3.      *Second*, the Compact violates other federal laws by unlawfully permitting internet and bank wire transmission of transactions and payments relating to sports betting between the Tribe's reservations and the rest of Florida, where sports betting is otherwise illegal.  *See* Fla. Const. Art. X, § 30 (prohibiting the expansion of gambling in Florida without approval through a citizens' initiative); *see also* ¶¶ 75–95 below.  Such transactions and payments between a jurisdiction in which sports gambling could be authorized under the Compact (the Tribe's reservations) and a jurisdiction in which sports gambling is prohibited (the rest of Florida) will violate both the Wire Act of 1961, 18 U.S.C. § 1081, *et seq.*, and the Unlawful Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. § 5361, *et seq.*

4.      *Third*, the unlawful and *ultra vires* approval of the Compact additionally violates the Fifth Amendment's guarantee of equal protection by granting the Tribe a statewide monopoly over internet sports gambling throughout Florida even as it remains a serious criminal offense for anyone else to offer it anywhere in Florida.  This express preference for tribal versus non-tribal conduct off of tribal lands lacks the government justification required by the Fifth Amendment.

5.      The Compact unsuccessfully attempts to circumvent the limitations of IGRA, UIGEA, the Wire Act, and the Florida Constitution by including provisions in both the Compact and the Florida legislation ratifying the Compact (the "Implementing Law," attached as Exhibit B)

declaring that bets placed from outside of the Tribe's reservations will be "deemed" to take place on the reservations so long as the bets are received on "servers" and "devices" located on those reservations. This fiction does not render the Compact lawful, but rather contradicts the federal government's prior position and longstanding precedent interpreting applicable federal law and recognizing that betting or wagering occur where the bettor is located, and where the wager is received. *See* Brief for the United States of America as *Amicus Curiae* Supporting Appellee, *AT&T Corp. v. Couer d'Alene Tribe*, 295 F.3d 899 (9th Cir. 2002) (No. 99-35088), 1999 WL 33622333, at *12-14 (attached as Exhibit C) (citing cases);[1] *see also id.* at *13-14 ("It follows that 'wagering,' 'gambling,' or 'gaming' occur in both the location from which a bet, or 'offer,' is tendered and the location in which the bet is accepted or received."); *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 967 (9th Cir. 2018) (holding that "patrons are engaging in 'gaming activity' by initiating a bet or a wager in California and off Indian lands," and "thus not subject to Iipay's jurisdiction under IGRA"). Declaring that betting took place somewhere it did not does not change the meaning of federal law or the unlawfulness of the Secretary's approval of a Compact that provides for gambling outside of Indian lands.

6.     The Compact also violates state law and thus improperly approves of gambling that would be unlawful under UIGEA and the Wire Act. Only very limited forms of "casino gambling" are permitted under Florida law, and the type of "sports betting" at issue in the Compact is not among those exceptions. Florida's Constitution prohibits any further expansion of casino gambling except through a citizens' initiative, Fla. Const., Art. X, § 30(a), and no citizens' initiative (or other constitutional amendment) has authorized sports betting in Florida. The lone

---

[1] The Ninth Circuit Court of Appeals did not reach the merits of the case, as it held the appellant, AT&T, lacked standing to challenge the compact. *AT&T Corp. v. Coeur d'Alene Tribe*, 295 F.3d 899, 901, 909-10 (9th Cir. 2002).

exception in Article X, Section 30(c) of the Florida Constitution is for casino gambling pursuant to Tribal-State compacts adopted and approved under IGRA—which again applies only to gaming on Indian lands. The Compact and Implementing Law may not expand beyond those bounds; a sports bet placed by a person elsewhere in the State and received by the Tribe's server does not occur on "Indian lands" despite the definitions sections saying it is "deemed" to do so, Exhibit A, Part III, Sec. CC.2, Part IV, Sec. A; Exhibit B, at 5.

7. Moreover, the Florida Constitution defines its exception for casino gambling under tribal-state compacts by specific reference to federal law, providing that "nothing herein shall be construed to limit the ability of the state or Native American tribes to negotiate gaming compacts *pursuant to the Federal Indian Gaming Regulatory Act* for the conduct of casino gambling on tribal lands, or to affect any existing gambling on tribal lands pursuant to compacts executed by the state and Native American tribes *pursuant to IGRA*." Fla. Const. Art. X, § 30(c) (emphasis added). By incorporating the terms of IGRA within its own constitution, Florida effectively proscribed its ability to impose state law interpretations on the scope of tribal-state compacts. Florida is bound by the *federal* restrictions of IGRA and cannot "deem" that sports betting occurs on Indian lands when it does not.

8. In short, despite the efforts of Florida officials and the Tribe, the Compact unlawfully authorizes gaming that occurs off Indian land. As such, it violates IGRA, the Wire Act, UIGEA, and the Constitution. It thus was arbitrary and capricious, unlawful, and *ultra vires* under IGRA and the Constitution for Secretary Haaland to approve the Compact.

9. Additionally, it was arbitrary and capricious, unconstitutional and otherwise unlawful for Secretary Haaland to approve a Compact giving the Seminole Tribe a monopoly on online sports betting throughout Florida. Under IGRA, a tribe is an "Indian tribe, band, nation, or

4

otherwise organized group or community of Indians," recognized because of their status as Indians. 25 U.S.C. § 2703(5).  In approving the Compact, the Secretary thus unconstitutionally conferred benefits and privileges to engage in conduct that is criminal for anyone who lacks the requisite status as Indians.

## PARTIES

### A.  Plaintiffs

10.     Plaintiff West Flagler Associates Ltd. is a limited partnership registered in the State of Florida, with its principal place of business located at 401 N.W. 38th Court, Miami, Florida 33126, and is a citizen of Florida.  Since 2009, West Flagler has owned and operated the casino known as Magic City Casino located at 540 N.W. 37th Ave, Miami, Florida 33125.  Magic City Casino is a licensed pari-mutuel[2] facility authorized to operate a jai alai fronton, simulcast betting on dog racing slots and a card room.[3]  Under the name Magic City Racing, West Flagler also sponsors thoroughbred racehorses that compete at local tracks.

11.     Plaintiff Bonita-Fort Myers Corporation is a corporation registered in the State of Florida, with its principal place of business located at 401 N.W. 38th Court, Miami, FL 33126, and is a citizen of Florida.  Bonita operates Bonita Springs Poker Room, which is an affiliate of Magic City Casino.  Bonita Springs Poker Room opened its card room in Bonita Springs, FL in October 2020.  It operates a 37-table live casino-style poker room, a state-of-the-art sports room

---

[2] "'Pari-mutuel' means a system of betting on races or games in which the winners divide the total amount bet, after deducting management expenses and taxes, in proportion to the sums they have wagered individually and with regard to the odds assigned to particular outcomes."  Fla. Stat. § 550.002(22).

[3] Live greyhound racing was banned in Florida as of January 1, 2021.  However, broadcasting greyhound racing for wagering from other locations is still permitted at Florida pari-mutuels.

where patrons can wager on simulcast horse racing and jai-alai, and the Brass Tap restaurant and craft beer bar.

12.     Both West Flagler and Bonita are owned by a Florida corporation called Southwest Florida Enterprises, Inc.

**B. Defendants**

13.     Defendant Deb Haaland is the Secretary of the United States Department of the Interior, and is responsible for approval of gaming compacts under IGRA.  Secretary Haaland maintains an office at 1849 C Street, NW, Washington, DC 20249.  She is sued in her official capacity.

14.     Defendant Department of the Interior is an executive department of the United States, headquartered at 1849 C Street, NW, Washington, DC 20249, and is responsible for implementation of IGRA.

<u>JURISDICTION AND VENUE</u>

15.     Jurisdiction in this Court is grounded upon and proper under: (1) 28 U.S.C. § 1331, because this action arises under the laws of the United States; (2) 28 U.S.C. § 1346, because this action involves claims against the federal government; and (3) 28 U.S.C. § 1361, because this is an action to compel officers of the United States to perform their duties.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b) and (e) because this is a civil action in which Defendants are agencies of the federal government and/or officers of the United States acting in their official capacities, and at least one Defendant maintains its office and conducts business in this judicial district.  Moreover, a substantial part of the events giving rise to the claims occurred within this judicial district.

## FACTUAL BACKGROUND

**A.  Plaintiffs Have Been Engaged in the Florida Gaming Business for Several Decades, Are Competitors of the Tribe, and Have Made Substantial Investments in Their Businesses.**

17.     The Havenick family has owned and operated West Flagler for over 65 years when the patriarch of the family, Isadore Hecht, bought Flagler Greyhound Park in the early 1950s.

18.     For over 50 years, West Flagler held a pari-mutuel permit to conduct greyhound racing at what is now known as Magic City Casino.

19.     In 1996, when Florida legalized both cardrooms and "simulcasting," West Flagler expanded Magic City to permit customers physically present at its location to bet on other jai alai, horse and dog racing taking place around the nation.  It also began operating poker rooms, and currently operates a poker room open seven days a week, with nineteen tables offering the most popular games such as "limit" Texas hold'em, "no limit" Texas hold'em, Omaha, and 7-card stud.

20.     In 2009, after Florida allowed slot machines to be legalized by local referendum and such referenda passed in Miami-Dade and Broward Counties, Magic City became the first casino in Miami to offer Las Vegas-style slot machines.  Today, Magic City Casino offers over 800 slot machines, electronic table games, such as blackjack, roulette, craps and baccarat, poker tables and tournaments, off-track betting and other live entertainment that draws in both in-state and out-of-state visitors.

21.     In 2018, following a successful declaratory judgment confirming that a jai alai permit holder is an "eligible facility" under the state's slot machine law, Magic City Casino added live-action jai alai and a state-of-the-art glass-walled jai alai fronton.

22.     Also in 2018, live greyhound and other dog racing were banned in Florida, but slots and poker were allowed to continue as "grandfathered" businesses.  *See* Fla. Const. Art. X, § 32.

23.     As a result of the ban on greyhound racing, Magic City Casino closed its greyhound track in May 2020, and undertook extensive renovations to build out its casino facilities.  To date, West Flagler has spent over $55,000,000 on capital improvements, and continues to make additional capital improvements to the casino each year.

24.     Magic City Casino has its own jai-alai roster and, prior to COVID-19, was drawing over 1,000 fans per week.  Simulcast betting is open 7 days a week, year-round, and the performances are simulcast to fifteen additional pari-mutuel sites, with a daily viewing audience of over 5,000 people.  In 2020, Magic City Casino also launched the Jai Alai Channel on YouTube.

25.     Magic City Casino has approximately 425 employees, is located less than thirty miles from the Tribe's Hard Rock Hollywood Casino, and competes with the Tribe for gaming patrons.

26.     In addition to the Magic City Casino offerings in Miami, the Havenick family also has owned and operated the Naples-Fort Myers Greyhound Racing & Poker in Bonita Springs for over 50 years.  After closing the greyhound racing portion of the facility in May 2020, Bonita constructed a new 32,000-square foot facility to house what is now the Bonita Springs Poker Room, at a cost of approximately $10,000,000.  Similar to its sister property, Magic City Casino, the Bonita Springs Poker Room offers simulcast of horse racing and jai-alai where patrons can place bets and wagers on the events.

27.     The Bonita Springs Poker Room features such games such as ultimate Texas hold'em, three-card poker, high-card flush, jackpot hold'em and DJ wild, year round.  It is located approximately twenty-one miles from the Tribe's Immokalee Casino, and one hundred and fifty miles from the Tribe's Tampa Hard Rock Casino.

28.     The Bonita Springs Poker Room has approximately 150 employees, and also competes with the Tribe for gaming patrons.

**B.  The Tribe and the History of Gaming Compacts with the State of Florida.**

29.     The Tribe is the only tribe in Florida that has negotiated a gaming compact with the State.

30.     The Tribe has seven gaming facilities on its six reservations: Seminole Indian Casino-Brighton, Seminole Indian Casino-Coconut Creek, Seminole Indian Casino-Hollywood, Seminole Indian Casino-Immokalee, Seminole Indian Casino-Big Cypress, Seminole Hard Rock Hotel & Casino-Hollywood and Seminole Hard Rock Hotel & Casino-Tampa.

1.     The 2007 Compact Was Ruled Illegal by the Florida Supreme Court.

31.     On November 14, 2007, the Tribe signed its first compact with then-Florida Governor Charlie Crist (the "2007 Compact").  The 2007 Compact expanded casino gaming, permitting the Tribe to offer within its reservations slots, and card games, such as blackjack and baccarat, that were otherwise prohibited by law.  The 2007 Compact went into effect on January 7, 2008, upon publication of the DOI's Secretary's approval.

32.     The Florida Legislature, however, had not authorized Governor Crist to negotiate the 2007 Compact, and did not ratify it afterwards.  Accordingly, shortly after the 2007 Compact was signed, the Florida House of Representatives and its Speaker filed a petition for a writ of quo warranto in the Supreme Court of Florida, disputing the Governor's authority to unilaterally bind the state to the 2007 Compact.

33.     In *Florida House v. Crist*, 999 So. 2d 601 (Fla. 2008), the Florida Supreme Court held that, because the 2007 Compact authorized gaming that otherwise was prohibited under state law, Governor Crist had exceeded his authority and could not bind the state to the 2007 Compact. As the Florida Supreme Court aptly noted, "[n]either the Governor nor anyone else in the executive

9

branch has the authority to execute a contract that violates state criminal law." *Crist*, 999 So. 2d at 616.

> 2. Florida Breached its Exclusivity Obligations Under the 2010 Compact, and the Tribe Stopped Revenue Sharing.

34.     In 2010, Florida enacted a statute addressing tribal-state gaming compacts and designating the Governor as the "state officer responsible for negotiating and executing, on behalf of the state, tribal-state gaming compacts with federally recognized Indian tribes located within the state" to authorize "class III gaming, as defined in [IGRA], *on Indian lands within the state*." Fla. Stat. § 285.712(1) (emphasis added).   The statute provides, however, that the Florida Legislature must ratify any compact negotiated by the Governor.  Fla. Stat. §§ 285.712(2)-(3). Thereafter, the Governor must file the ratified, executed compact with the Florida Secretary of State to forward, along with the ratifying act, to the DOI for review and approval by the DOI Secretary.  *See* Fla. Stat. §§ 285.712(3)-(4).

35.     In accordance with this process, on April 7, 2010, then-Governor Crist and the Tribe executed a new compact (the "2010 Compact," attached as Exhibit D).  The Florida Legislature ratified it, and the then-Secretary of the DOI approved it, announcing its approval in the Federal Register on July 6, 2010.  75 Fed. Reg. 38833 (July 6, 2010).

36.     The 2010 Compact had a term of 20 years, ending July 31, 2030, and remained in effect until publication of Secretary Haaland's approval of the Compact in the Federal Register. *See* Exhibit D, Part XVI, Sec. B.

37.     The 2010 Compact allowed the Tribe to operate slot machines, raffles and drawings, and banking or banked card games (such as baccarat, chemin de fer, and blackjack), in exchange for a revenue-share payment in the amount of $12,500,000.00 per month during the first two years of the compact, and in accordance with a sharing cycle after the initial two-year period.

38.     The 2010 Compact contained an "exclusivity" clause providing that if any other entity was authorized to operate Class III gaming or any new forms of Class III gaming or other casino-style gaming not in operation as of February 1, 2010, the Tribe could stop revenue sharing. Exhibit D, Part XII.

39.     In 2011, pari-mutuels, including Plaintiffs, began operating their own designated-player games at cardrooms.  In 2014, state regulators adopted an official rule allowing designated-player games at cardrooms, thereby allowing the pari-mutuel cardrooms to conduct designated-player games in which players compete only against each other.

40.     The Tribe took the position that these designated-player games violated the exclusivity provisions of the 2010 Compact and, thereby relieved the Tribe of the obligation to continue revenue sharing under the 2010 Compact.

41.     In 2016, the Tribe sued Florida to establish its right to cease revenue sharing in light of Florida's decision to permit pari-mutuels to offer "banked" card games.  The Tribe prevailed in that lawsuit, and stopped all revenue sharing.

     3.   <u>The 2021 Compact at Issue Here Unlawfully Attempts to Expand Sports Betting Outside of Indian Lands to Individuals Throughout Florida.</u>

42.     On April 23, 2021, Governor DeSantis and the Tribe signed the Compact at issue here.

43.     Like the 2010 Compact, the new Compact allows the Tribe to conduct slot machines, raffles and drawings, and banked card games.  However, the new Compact also allows the Tribe to conduct new forms of gaming, including craps, roulette, "Fantasy Sports Contests"[4]

---

[4] The Compact defines "Fantasy Sports Contest," as a "fantasy or simulation sports game or contest offered by a contest operator or noncommercial contest operator in which a contest participant manages a fantasy or simulation sports team composed of athletes from a professional sports organization" where (1) the prizes and awards are established and known to participants in advance of the contest; (2) winning outcomes reflect the knowledge and skill of the participants;

and "Sports Betting."[5]  Exhibit A, Part III, Sec. F.  Critical to this litigation, the Compact permits sports betting to be conducted via online gaming and permits persons not physically present on the Tribe's reservations to engage in such gaming.  Exhibit A, Part III, Sec. CC.1.  The Compact also gives the Tribe a monopoly on such online sports betting on the basis of the race of the Tribe's members, and the Implementing Law gives that race-based monopoly the formal imprimatur of state legislation.

44.     The Compact also allows online sports betting to occur off Indian lands at pari-mutuel facilities willing to contract with the Tribe ("Qualified Pari-mutuel Permitholders").[6] Exhibit A, Part III, Sec. CC.3.  This arrangement has been described as a "hub and spoke," whereby the Tribe is the hub of the betting operation, and the participating pari-mutuels are the offsite

---

(3) no winning outcome is based on the score, point spread or any performance of any single actual team; and (4) there are no casino graphics displayed.  Exhibit A, Part III, Sec. L.

The Compact requires the Florida Legislature to regulate and ban others from conducting Fantasy Sports Contests, but the Florida Legislature has not done so.  As a result, Fantasy Sports Contests continue to be unregulated in Florida, but the Tribe, while able to conduct Fantasy Sports Contests, will not currently obtain a monopoly over them.

[5] The Compact defines "Sports Betting" as:

> wagering on any past or future professional sport or athletic event, competition or contest, any Olympic or international sports competition event, any collegiate sport or athletic event (but not including proposition bets on such collegiate sport or event), or any motor vehicle race, or any portion of any of the foregoing, including but not limited to the individual performance statistics of an athlete or other individual participant in any event or combination of events, or any other 'in-play' wagering with respect to any such sporting event, competition or contest, except 'Sports Betting' does not include Fantasy Sports Contests.

Exhibit A, Part III, Sec. CC.

[6] The Qualified Pari-mutuel Permitholder is allowed to perform "wagering undertaken through the use of electronic devices that will utilize the digital sports book(s) provided by the Tribe, and that use a brand of the Qualified Pari-mutuel Permitholder(s)."  *See* Exhibit A, Part III, Sec. CC.3(a).

spokes.  *See* https://floridapolitics.com/archives/430065-senate-passes-fantasy-sports-regulations-over-draftkings-and-fanduels-fears/ (Rep. Sam Garrison stating "There's a legitimate question and legal question as to whether or not the sports gaming, with the hub-and-spoke model as contemplated in the compact, triggers Amendment 3") (last visited Aug. 6, 2021).   Upon information and belief, the pari-mutuel locations will not be permitted to accept cash wagers for sports betting, regardless of whether the pari-mutuels accept cash wagers for other forms of gaming.

45.     The Compact purports to convert all sports betting wagers placed by persons located off Indian Lands—whether from the bettor's couch or from a pari-mutuel facility—into wagers made within Indian Lands by declaring:

> [W]agers on Sports Betting and Fantasy Sports contests made by players physically located within the State using a mobile or other electronic device *shall be deemed to take place exclusively where received* at the location of the servers or other devices used to conduct such wagering activity at a Facility on Indian Lands.

Exhibit A, Part IV, Sec. A (emphasis added).

46.     As originally drafted, the Compact also provided that Florida and the Tribe "agree to engage in good faith negotiations" to authorize the Tribe to offer all types of Covered Games online or via mobile devices to players physically located in Florida.  Exhibit A, Part XVIII, Sec. A.  It further contemplated the Tribe could offer not only Sports Betting, but also slot machines, craps, roulette, raffles and drawings, and any other "Covered Games" online or via mobile devices in the near future.  *Id.*

47.     During the Florida Legislature's special session, a number of legislators strenuously objected to any statewide online casino gambling.  As a result of the political backlash,

the Tribe released a letter stating that Florida was not obligated engage in those negotiations and that the provision was not enforceable.

48.     Thereafter, on May 17, 2021, the Compact was amended to delete Part XVIII, Section A in its entirety (attached as Exhibit E).  At the same time, Florida and the Tribe modified the Compact to provide that online sports betting will not be implemented before October 15, 2021. *Id.*

49.     On May 19, 2021, the Florida Legislature ratified the Compact as amended, by passing the Implementing Law.  *See* Exhibit B.

50.     The Implementing Law adopts the definitions in the Compact and amends Florida Statutes § 285.710 (previously enacted to ratify the 2010 Compact), to ratify and approve the Compact, as amended.  Exhibit B, at 4-5 (amending Fla. Stat. § 285.710(13)(b)).  It further recognizes that, had Secretary Haaland not approved the Compact or if the Compact is invalidated by court action, the 2010 Compact will remain in effect. *Id*. at 2.

51.     On May 25, 2021, Governor DeSantis approved the Implementing Law.

52.     On or about June 21, 2021, the State and/or the Tribe submitted the 2021 Compact to the Secretary Haaland for approval.

53.     Despite the unlawfulness and unconstitutionality of the Compact and Implementing Law, and despite Secretary Haaland's lack of jurisdiction over gaming off Indian lands, DOI took no action prior to the expiration of the forty-fifth (45th) day to disallow the Compact. The Compact thus was deemed approved under IGRA and became effective on August 11, 2021, when the notice of approval was published in the Federal Register.  86 Fed. Reg. 44037.

54.     On August 6, 2021, DOI sent a letter to the Chairman of the Seminole Tribe and Governor DeSantis (attached as Exhibit F) stating, "After thorough review under IGRA, we have

14

taken no action to approve or disapprove the Compact before August 5, 2021, the 45th day.  As a result, the Compact is considered to have been approved by operation of law to the extent that it complies with IGRA and existing Federal law.  The Compact will become effective upon the publication of notice in the Federal Register."  Notice was subsequently published in the Federal Register on August 11, 2021.  86 Fed. Reg. 44037.

55.     The Compact was intended to supersede the 2010 Compact, and if it remains in place, will have a thirty (30) year term, terminating July 31, 2051.  Exhibit A, Part XVI, Sec. B.

## THE COMPACT VIOLATES FEDERAL LAW

**A. The Compact Both Violates IGRA and Falls Outside Secretary Haaland's Authority to Approve Because It Purports to Authorize Class III Gaming That Takes Place Outside "Indian Lands."**

1.   Overview of IGRA.

56.     There are two types of casino gaming in the United States: (i) "tribal" gaming operated by Indian tribes (or private parties who are permitted to manage tribal casinos, which remain the sole proprietary interest of the tribe) on Indian lands pursuant to IGRA; and (ii) "commercial" gaming operated by private entities on non-Indian lands, which is governed by state law, such as casino gaming conducted in Las Vegas, Atlantic City or the slots approved by voters in Miami-Dade and Broward Counties, Florida.  Both types of casino gaming must comply with applicable federal law, with tribal gaming subject to the additional statutory regulation of IGRA.

57.     When it enacted IGRA in 1988, Congress created a comprehensive framework for regulation of tribal gaming on tribal lands.  Congress found that "Indian tribes have the exclusive right to regulate gaming activity *on Indian lands* if the gaming activity is not specifically prohibited by Federal law and *is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity*."  25 U.S.C. § 2701(5) (emphasis added).

58.     Importantly, IGRA only authorizes "Indian tribes" to conduct gaming "on Indian lands," which are Indian reservations or lands held in trust by the United States for the benefit of a federally recognized Indian tribe.  *See* 25 U.S.C. § 2703(4).  With few exceptions not relevant here,[7] IGRA does not authorize tribal gaming outside of Indian lands.  *See* 25 U.S.C. §§ 2701(5); 2702(3); 2710(a), (b)(1), (d)(l).  Indeed, binding precedent dictates that "IGRA affords tools . . . to regulate gaming on Indian lands, *and nowhere else*."  *Michigan v. Bay Mills Indian Cmty*., 572 U.S. 782, 795 (2014) (emphasis added).

59.     IGRA categorizes gaming into three classes[8] and allocates authority to regulate such gaming on Indian lands.  Class III gaming, at issue here, includes, but is not limited to, slot machines, any house banking game, sports betting, and lotteries.  25 C.F.R. § 502.4; 25 U.S.C. § 2703(8).

60.     IGRA provides that "Class III gaming activities *shall be lawful on Indian lands only if*" such gaming is:

- authorized by tribal ordinance or resolution approved by the Chairman of the National Indian Gaming Commission ("NIGC"), an independent federal agency within DOI that was created by IGRA;

---

[7] The exceptions are for lands acquired for Indians in trust by the DOI Secretary after October 17, 1988, if the land is acquired: (1) after the DOI Secretary determines acquisition to be in the best interest of the tribe and not detrimental to the local community and the governor of the state concurs; (2) for tribes that had no reservation on the date of enactment of IGRA; (3) as part of a land claim settlement; (4) as part of an initial reservation for a newly recognized tribe; or (5) as part of the restoration of lands for a tribe restored to federal recognition.  25 U.S.C. § 2719(a)-(b).  None is applicable here.

[8] Class I gaming includes "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as part of, or in connection with, tribal ceremonies or celebrations."  25 U.S.C. § 2703(6).  Class II gaming includes bingo and non-banking card games.  Class II gaming expressly excludes electronic games of chance, slot machines, and banking card games, such as blackjack, baccarat and chemin de fer.  25 U.S.C. § 2703(7).  Class III gaming is defined as "all forms of gaming that are not class I or class II gaming."  25 U.S.C. § 2703(8).

- located in a state that permits such gaming; and

- conducted in conformance with a Tribal-State compact.

*See* 25 U.S.C. § 2710(d)(l).

61.     If a state legalizes Class III gaming, IGRA grants a tribe the right to demand that the state engage in good faith negotiations with the tribe to enter into a compact authorizing such gaming on tribal lands.  25 U.S.C. § 2710(d)(3)(A) (a state "shall negotiate with the Indian tribe in good faith to enter into such a compact").  If the parties successfully negotiate a compact it becomes effective "*only*" after the DOI Secretary approves it and the notice of that approval is published in the Federal Register.  *Id.* §§ 2710(d)(3)(B), (d)(8)(D); *see also* 25 C.F.R. § 293.15.

62.     Under § 2710 of IGRA, the DOI Secretary can approve or disapprove of the compact, or, in the event no affirmative action disapproving the compact is taken after forty-five (45) days, the compact is "considered to have been approved," although it must still comply with all applicable federal law.  25 U.S.C. § 2710(d)(8); 25 C.F.R. § 293.12.

63.     Importantly, however, IGRA provides the DOI Secretary with authority to approve a Tribal-State compact only to the extent the compact "govern[s] gaming *on Indian lands*."  25 U.S.C. § 2710(d)(8)(A).  In addition, pursuant to IGRA and related regulations, the DOI Secretary has a legal obligation to disapprove a tribal-state compact purporting to authorize gaming if the compact violates: (1) any provision of IGRA; (2) "any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands;" or (3) "the trust obligations of the United States to Indians."  25 U.S.C. § 2710(d)(8)(B); 25 C.F.R. § 293.14.

64.     The DOI's Secretary's obligation is both mandatory and judicially enforceable. *Amador County v. Salazar*, 640 F.3d 373, 379-83 (D.C. Cir. 2011).  The obligation to disapprove illegal compacts, and judicially enforceable nature of that obligation, applies whether a compact

17

is affirmatively approved or "deemed approved" through inaction.  *Id.* at 381 ("And just as the Secretary has no authority to affirmatively approve a compact that violates any of subsection (d)(8)(B)'s criteria for disapproval, he may not allow a compact that violates subsection (d)(8)(C)'s caveat to go into effect by operation of law.").

> 2. <u>Because the Compact Purports to Authorize Gaming Outside of Indian Lands, It Both Violates IGRA and Falls Outside of Secretary Haaland's Legal Authority to Authorize.</u>

65.     The Compact here violates IGRA by purporting to authorize gaming activity occurring outside Indian Lands.  Under the Compact, sports betting will occur through the use of any "electronic device connected via the internet, web application or otherwise, including, without limitation, any Patron connected via the internet, web application or otherwise of any Qualified Pari-mutuel Permitholder(s) and regardless of the location in Florida at which a Patron uses the same."  *See* Exhibit A, Part III, Sec. CC.2.

66.     In an effort to get around the limitations of IGRA's limitation of lawful gambling to Indian lands, the Compact adds:

> [W]agers on Sports Betting and Fantasy Sports Contests made by players physically located within the State using a mobile or other electronic device *shall be deemed to take place exclusively where received* at the location of the servers or other devices used to conduct such wagering activity at a Facility on Indian Lands.

*Id.*, Part IV, Sec. A (emphasis added).

67.     The Compact similarly provides that online, off-reservation sports betting "shall be deemed at all times to be exclusively conducted by the Tribe at its Facilities where the sports book(s), including servers and devices to conduct the same, are located, including any such wagering undertaken by a Patron *physically located in the State but not on Indian Lands* using an electronic device connected via the internet, web application or otherwise, including, without

limitation, any Patron connected via the internet, web application or otherwise of any Qualified Pari-mutuel Permitholder(s) and *regardless of the location in Florida at which a Patron uses the same*." *See* Exhibit A, Part III, Sec. CC.2 (emphasis added).

68.     The Implementing Law similarly states: "[w]agers on sports betting, including wagers made by players physically located within the state using a mobile or other electronic device, *shall be deemed* to be exclusively conducted by the Tribe where the servers or other devices used to conduct such wagering activity on the Tribe's Indian lands are located."  Exhibit B, at 5 (amending Fla. Stat. § 285.710(13)(b)) (emphasis added).

69.     Through this fiction, the Compact and Implementing Law seek to expand sports betting outside of Indian lands to individuals located anywhere in Florida so long as they have a computer and internet connection—subject only to the Tribe's monopoly.  Indeed, it purports to change Florida law to permit "a Patron physically located in the State, but not on Indian Lands" to engage in sports betting if done online, so long as the "sports book(s), including servers and devices" are located at one of the Tribe's casinos.  Exhibit A, Part III, Sec. CC.2.

70.     For example, under the Compact and Implementing Law, an individual over the age of twenty-one (21), who places a wager on a sporting event using his mobile device from his couch in Okaloosa, Florida, is "deemed" to have placed the bet over 600 miles away at the Seminole Hard Rock Hotel & Casino–Hollywood, simply because the Tribe's servers are located there.  Indeed, the text of the Compact itself acknowledges that the patron does not need to be on Indian Lands—in direct conflict with the requirements of IGRA and Florida law.

71.     Contrary to the legal fiction contained in the Compact and its Implementing Law, IGRA does not authorize a tribe to offer online gaming to patrons located off Indian lands in jurisdictions where gaming is otherwise illegal despite the servers accepting the bets being located

on Indian lands.  *California v. Iipay Nation of Santa Ysabel,* 898 F.3d 960, 967 (9th Cir. 2018)

(holding that tribe could not operate an online bingo site despite the server being on Indian lands

as "the patrons are engaging in 'gaming activity' by initiating a bet or wager in California and off

Indian lands . . . .  As a result, it seems clear that at least some of the 'gaming activity' associated

with [the online bingo site] does not occur on Indian lands").  This is because a bet or wager

encompasses two distinct legal acts and is placed both where the bettor and the casino are located,

as recognized by decades of precedent interpreting applicable federal law.  *See* Brief for the United

States of America as *Amicus Curiae* Supporting Appellee, *AT&T Corp. v. Couer d'Alene Tribe*,

295 F.3d 899 (9th Cir. 2002) (No. 99-35088), 1999 WL 33622333, at *12-14 (Exhibit C);[9] *see

also id.* at *13-14 ("It follows that 'wagering,' 'gambling,' or 'gaming' occur in both the location

from which a bet, or 'offer,' is tendered and the location in which the bet is accepted or received.");

*Iipay Nation of Santa Ysabel*, 898 F.3d at 967.

72.     Consistent with this law, the NIGC itself has repeatedly stated that IGRA does not

provide for gaming off Indian lands via the internet regardless of where the servers are located.

*See* Letter from Kevin Washburn, General Counsel, NIGC, to Joseph Speck, Nic-A-Bob

Productions, re: WIN Sports Betting Game (Mar. 13, 2001) ("The use of the Internet, *even though

the computer server may be located on Indian lands, would constitute off-reservation gaming* to

the extent any of the players were located off of Indian lands." (emphasis added)); Letter from

Kevin Washburn, General Counsel, NIGC, to Robert Rossette, Monteau, Peebles & Crowell, re:

Lac Vieux Desert Internet Bingo Operation (Oct. 26, 2000) (as the [Indian operated internet bingo]

"seeks to draw any player who can log on to the internet site from any location and who is willing

---

[9] The Ninth Circuit Court of Appeals did not reach the merits of the case, as it held the appellant,
AT&T, lacked standing to challenge the compact.  *AT&T Corp. v. Coeur d'Alene Tribe*, 295
F.3d 899, 901, 909-10 (9th Cir. 2002).

to pay the fee. *The game itself does not depend on the player being located in a tribal bingo facility or even on Indian lands" and is not authorized by IGRA* (emphasis added)); Letter from Penny J. Coleman, Deputy General Counsel, NIGC, to Terry Barnes, Director of Gaming, Bingo Networks (June 9, 2000) (concluding game described as a center located on tribal lands but allowing players to open an account with the gaming center through the Internet was off-reservation gaming not authorized by IGRA); Letter from Montie Deer, Chairman, NIGC, to Ernest L. Stensgar, Chairman, Coeur d'Alene Tribe, re: National Indian Lottery (June 22, 1999) (concluding an Indian internet lottery gambling enterprise, involving off reservation gaming, was not authorized by IGRA) (collectively, the "NIGC Letters," attached as Exhibit G); *see also* Amicus Brief of the United States, *Couer d'Alene Tribe*, 1999 WL 33622333 at *2-3, *9-10 (arguing for affirmance of district court decision holding that IGRA did not authorize interstate National Indian Lottery through telephonic communications connecting tribal reservations in several states).

73.     And indeed Florida itself has in the past taken the position that off-reservation betting is unauthorized under the IGRA because a bet is placed both where the bettor is physically located and where the bet is accepted:

> The "on Indian lands" requirement of IGRA clearly mandates that any Indian gaming activity, including a consumer's play or participation in the game, physically take place on tribal land. Gaming activity necessarily includes the player's placing of the wager or other participation in the game. *See, e.g.*, Black's Law Dictionary, 679 (6th ed. 1990) (definition of "gambling" includes "[m]aking a bet"); Webster's New International Dictionary, 932 (3rd ed. 1964) (definition of "gambling" includes the act or practice of betting). In the context of a lottery, for the gaming activity to be conducted, participants place their wager by purchasing lottery tickets. Under the NIL [National Indian Lottery] concept, persons physically present in any of the *amici* states, not on the Coeur d'Alene reservation, would be wagering on the NIL. *The existence of a phone bank and a centralized computer system on the Coeur d'Alene reservation does not change the uncontested fact that the person making the wager is located outside of Idaho, and clearly not on the Coeur d'Alene reservation. As a*

> *consequence, because the wager is placed off the reservation, the gaming*
> *activity is not conducted "on Indian lands" as plainly required by IGRA.*

Brief of Amici Curiae in Support of AT&T Corporation and Affirmance, *AT&T Corp. v. Couer d'Alene Tribe*, 295 F.3d 899 (9th Cir. 2002) (No. 99-35088), 1999 WL 33622330 at *4 (emphasis added) (footnote omitted).

74.    Although Secretary Haaland could have approved a compact between Florida and the Tribe to permit either in-person or online sports betting by patrons *physically on the Tribe's reservations*, the plain language of IGRA prevents her from approving the Compact here because it does not comply with IGRA's "Indian lands" requirement.  The Compact therefore both violates IGRA and falls outside the scope of compacts she is authorized to approve in the first instance.

**B.  The Compact Violates the Wire Act by Purporting to Allow the Tribe and Bettors to Use Wire Communication Facilities to Place, Receive, and Facilitate Bets Between the Tribe's Florida Reservations and Other Locations in Florida, Where Sports Betting Is Illegal.**

75.    The Compact not only violates IGRA, but also condones behavior that is contrary to another "provision of Federal law that does not relate to jurisdiction over gaming on Indian Lands," 25 U.S.C. § 2710(d)(8)(B)(ii)—the Wire Act of 1961.

1.    <u>Overview of the Wire Act.</u>

76.    The Wire Act of 1961, 18 U.S.C. §§ 1081, *et seq*., applies to transmissions in interstate or foreign commerce and prohibits interstate online sports betting.  Specifically, the Wire Act makes it illegal for anyone "engaged in the business of betting or wagering" to knowingly use "a *wire communication facility* for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers *on any sporting event or contest*, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers . . . ."  18 U.S.C. § 1084(a) (emphasis added).

22

77.     A "wire communication facility" is "any and all instrumentalities, personnel, and services (among other things, the receipt, forwarding, or delivery of communications) used or useful in the transmission of writings, signs, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission." 18 U.S.C. § 1081.  Telephone or cellular communications, debit or credit card transactions, and bank wire or credit card transfers are common examples of wire communication facilities.

78.     Wagering via the internet or by mobile phone involves interstate commerce when the wire and cellular transmissions that make data transmission possible are sent and received cross state lines, a routine occurrence even with intrastate transactions.  In fact, although a player may be located in one state, his or her internet transaction often is transmitted to a satellite, then transmitted down to a ground station before being routed to receiving servers.

79.     In addition, credit or debit card transactions are transmitted through a network and involve acquiring, processing and issuing credits and debits to or from banks or card processors at multiple locations throughout the United States.

80.     The Wire Act thus prohibits the Tribe from knowingly transmitting or receiving several types of wagering-related communications:

     a.   Internet-transmitted bets or wagers on any sporting event or contest;

     b.   Internet-transmitted information to assist in the placing of bets or wagers on any sporting event or contest;

     c.   Bank wire transfers that entitle the recipients to receive money or credit as a result of bets or wagers; or

     d.   Bank wire transfers that entitle the recipients to receive money or credit for information assisting in the placing of bets or wagers.

*See* 18 U.S.C. § 1084(a).

81.     To permit the use of wire communication facilities to further gambling wagers in locations where the gambling in question is legal, the Wire Act contains a safe harbor for "the transmission of information assisting in the placing of bets or wagers on a sporting event or contest *from a State or foreign country* where betting on that sporting event or contest is legal *into a State or foreign country* in which such betting is legal."  18 U.S.C. § 1084(b) (emphasis added).

      2.   <u>The Plain Language of the Statute Makes Clear That the Wire Act's Safe Harbor Does Not Apply to the Compact.</u>

82.     The Wire Act's safe harbor does not apply to the Compact because the Tribe is neither a "State," nor a "foreign country," but a "federally-recognized tribal government possessing sovereign powers and rights of self-government."  Exhibit A, Part II, Sec. A; *see also* https://www.semtribe.com/stof/history/introduction ("We [the Tribe] are a sovereign government with our own schools, police, and courts.").

83.     The safe harbor exception also does not exempt from liability the interstate transmission of bets themselves, but only for information "assisting" in the placing of bets.  *United States v. Lyons*, 740 F.3d 702, 713 (1st Cir. 2014) (citing *United States v. McDonough*, 835 F.2d 1103, 1104-05 (5th Cir. 1988); *United States v. Bala*, 489 F.3d 334, 342 (8th Cir. 2007)).

      3.   <u>The Safe Harbor Also Does Not Apply Because Sports Betting Is Illegal in Florida.</u>

84.     The safe harbor in the Wire Act also does not apply to the online sports gambling authorized in the Compact because sports betting is illegal in Florida.

85.     Except for a few statutorily approved exceptions, gambling in Florida is largely illegal.  *See generally* Fla. Stat. Ch. 849; Florida Senate Bill Analysis and Fiscal Impact Statement for SB 2A, Implementation of the 2021 Gaming Compact, prepared by The Professional Staff of the Committee on Appropriations, 4 https://www.flsenate.gov/Session/Bill/2021A/2A/Analyses/2021s00002A.pre.ap.PDF (last visited August 6, 2021).  For example, Florida law

24

prohibits keeping a gambling house, running a lottery,[10] and the manufacture, sale, lease, play, or possession of slot machines. *See* Fla. Stat. § 849.01; Fla. Stat. § 849.09; Fla. Stat. § 849.15.

86.     The following limited gaming activities are authorized by law and regulated by the state:

> a.  Pari-mutuel wagering at licensed horse tracks and jai alai frontons, Fla. Stat. Ch. 550;
>
> b.  Slot machine gaming at certain licensed pari-mutuel locations in Miami-Dade County and Broward County, Fla. Const. Art. X, § 23; and
>
> c.  Cardrooms at licensed pari-mutuel facilities.

Fla. Stat. § 849.086.[11]

87.     During the 2018 General Election, the Florida electorate overwhelmingly approved a constitutional amendment, now Article X, Section 30 of the Florida Constitution, seeking to limit the expansion of gambling in Florida. That amendment provides that a vote proposed by a citizen initiative to amend the State Constitution pursuant to Article XI, Section 3 of the State Constitution is (barring some other constitutional amendment) the *exclusive* method of authorizing "casino gambling"[12] in Florida:

---

[10] Florida's voters approved a state-run lottery by constitutional amendment in 1986.

[11] Under certain specific and limited conditions, the conduct of penny-ante games, bingo, charitable drawings, game promotions (sweepstakes), and bowling tournaments are also permitted. *See* Fla. Stat. § 849.085; Fla. Stat. § 849.0931; Fla. Stat. § 849.0935; Fla. Stat. § 849.094; Fla. Stat. § 849.141.

[12] "Casino gambling" under the Florida Constitution is defined in terms of Class III gaming under IGRA:

> As used in this section, "casino gambling" means any of the types of games typically found in casinos and that are within the definition of Class III gaming in the Federal Indian Gaming Regulatory Act, 25 U.S.C. ss. 2701 et seq. ("IGRA"), and in 25 C.F.R. s. 502.4, upon adoption of this amendment, and any that are added to such definition of Class III gaming in the future. This includes, but is not limited to, any house banking game, including but not limited to card games such as baccarat, chemin de fer, blackjack (21), and pai

This amendment ensures that Florida voters shall have the exclusive right to decide whether to authorize casino gambling in the State of Florida.  This amendment requires a vote by citizens' initiative pursuant to Article XI, section 3, in order for casino gambling to be authorized under Florida law. This section amends this Article; and also affects Article XI, *by making citizens' initiatives the exclusive method of authorizing casino gambling*.

Fla. Const. Art. X, § 30(a) (emphasis added.)

88.     No voter-initiated petition has amended the Florida Constitution to legalize sports betting in Florida, and no other constitutional amendment has been ratified that would alter the effect of Article X, Section 30.  Accordingly, other than horse racing and jai alai, sports betting remains illegal in Florida.

> 4.   Sports Betting Remains Illegal in Florida, Despite the Compact.

89.     The Florida Constitution prohibits expanding casino gambling without a constitutional amendment, notwithstanding definitional attempts to circumvent the prohibition. *First*, both the Compact and the Implementing Law state that a sports bet placed by a person anywhere in the State and received by the Tribe's server is "deemed" to occur on Indian lands:

---

gow (if played as house banking games); any player-banked game that simulates a house banking game, such as California black jack; casino games such as roulette, craps, and keno; any slot machines as defined in 15 U.S.C. s. 1171(a)(1); and any other game not authorized by Article X, section 15, whether or not defined as a slot machine, in which outcomes are determined by random number generator or are similarly assigned randomly, such as instant or historical racing. As used herein, "casino gambling" includes any electronic gambling devices, simulated gambling devices, video lottery devices, internet sweepstakes devices, and any other form of electronic or electromechanical facsimiles of any game of chance, slot machine, or casino-style game, regardless of how such devices are defined under IGRA. As used herein, "casino gambling" does not include pari-mutuel wagering on horse racing, dog racing, or jai alai exhibitions. For purposes of this section, "gambling" and "gaming" are synonymous.

Fla. Const. Art. X, § 30(b).

> All [online sports betting] shall be deemed at all times to be exclusively
> conducted by the Tribe at its Facilities where the sports book(s), including
> servers and devices to conduct the same, are located, including any such
> wagering undertaken by a Patron physically located in the State but not on
> Indian Lands using an electronic device connected via the internet, web
> application or otherwise, including, without limitation, any Patron connected
> via the internet, web application or otherwise of any Qualified Pari-Mutuel
> Permitholder(s) and regardless of the location in Florida at which a Patron uses
> the same.

Exhibit A, Part III, Sec. CC.2, Part IV, Sec. A; *see also* Exhibit B, at 5.

90.     Second, the Implementing Law expands gambling in Florida to include sports

betting, but only to the extent authorized by the Compact itself:

> For the purpose of satisfying the requirement in 25 U.S.C. s 2710(d)(1)(B) that
> the gaming activities authorized under an Indian gaming compact must be
> permitted in the state for any purpose by any person, organization, or entity,
> the following class III games or other games specified in this section are
> hereby authorized to be conducted by the Tribe pursuant to the compact
> described in subsection (3)(b), when such compact has been approved by the
> United States Secretary of the Interior, has not been invalidated by court action
> or change in federal law, and is effective: …. (7) Sports betting….

Exhibit B, at 4-5 (amending Fla. Stat. § 285.710(13)(b)).

91.     Neither of these provisions can circumvent provisions of the Florida Constitution,

which is the supreme law in Florida.

92.     Moreover, the relevant exception in the Florida Constitution specifically *invokes*

*IGRA* to define its scope:

> … In addition, nothing herein shall be construed to limit the ability of the state
> or Native American tribes to negotiate gaming compacts pursuant to the
> Federal Indian Gaming Regulatory Act for the conduct of casino gambling on
> tribal lands, *or to affect any existing gambling on tribal lands pursuant to*
> *compacts executed by the state and Native American tribes pursuant to IGRA.*

Fla. Const. Art. X, § 30(c) (emphasis added).

93.     That is, Florida's constitution invokes *federal law* to define the geographic areas in which gambling may be expanded without a citizens' initiative.  Because a State cannot legislate around the plain meaning of a federal statute, the Florida legislature cannot legislate around IGRA.

94.     No federal statute exists that would alter the scope of the term "Indian lands" in IGRA for the purpose of online gaming.

95.     The Compact thus violates the Wire Act because it permits the placement of sports betting by persons located in areas of Florida in which such betting is illegal while using electronic devices connected to a server on the Tribe's reservations via the Internet, cellular signals, or web applications.[13]  Secretary Haaland therefore was obligated to disapprove the Compact as contrary to federal law.

**C.  The Compact Violates UIGEA Because It Purports to Allow Bettors and the Tribe to Transfer Payments Relating to Bets or Wagers Between the Tribe's Reservations and Other Locations in Florida, Where Such Bets Are Illegal.**

96.     In addition to IGRA and the Wire Act, the Compact purports to authorize conduct that is contrary to the Unlawful Internet Gambling Enforcement Act ("UIGEA"), by permitting the transfer of payments for bets or wagers between the Tribe's reservations in Florida, and other locations in Florida, where sports betting remains illegal.

    1.  Overview of UIGEA.

97.     In 2006, Congress enacted UIGEA to strengthen the enforcement of existing prohibitions against illegal gambling on the Internet.  *See* 31 U.S.C. § 5361(4).

---

[13] Indeed, even where such bets are placed at pari-mutuel locations that contract with the Tribe, the bets still must be placed "electronically," as it appears as though the Tribe will not permit the pari-mutuels to collect cash wagers for sports betting.

98.     UIGEA prohibits anyone "engaged in the business of betting or wagering" from "knowingly accept[ing]," various types of payments[14] "in connection with the participation of another person in unlawful Internet gambling."  *See* 31 U.S.C. § 5363.

99.     "Unlawful Internet gambling" occurs when an individual knowingly places, receives or transmits a "bet or wager by any means which involves the use, at least in part, of the Internet *where such bet or wager is unlawful* under any applicable Federal or State law *in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made*."  31 U.S.C. § 5362(10)(A) (emphasis added).  That is, for a bet or wager placed over the internet to be lawful, the bet must be legal in both the State or Tribal lands in which the bet or wager is placed and where it is received.  *See id.*

100.    Betting or wagering on "sporting event[s]" is explicitly covered by UIGEA.  31 U.S.C. § 5362(1)(A).

101.    UIGEA includes a safe harbor for certain bets or wagers "initiated and received or otherwise made *exclusively within a single State*," and both "the bet or wager and the method by

---

[14] The types of payments covered by UIGEA are:

> (1) credit, or the proceeds of credit, extended to or on behalf of such other person (including credit extended through the use of a credit card);

> (2) an electronic fund transfer, or funds transmitted by or through a money transmitting business, or the proceeds of an electronic fund transfer or money transmitting service, from or on behalf of such other person;

> (3) any check, draft, or similar instrument which is drawn by or on behalf of such other person and is drawn on or payable at or through any financial institution; or

> (4) the proceeds of any other form of financial transaction, as the Secretary and the Board of Governors of the Federal Reserve System may jointly prescribe by regulation, which involves a financial institution as a payor or financial intermediary on behalf of or for the benefit of such other person.

31 U.S.C. § 5363.

which the bet or wager *is initiated and received* or otherwise made is *expressly authorized by and placed in accordance with* the laws of such State . . . ."  *See* 31 U.S.C. § 5362(10)(B) (emphasis added).[15]

> 2. The Plain Language of the Statute Makes Clear That the Safe Harbor in UIGEA Does Not Apply to the Compact.

102.    This safe harbor does not apply to the Compact here because the Tribe is not a "State" under UIGEA.  *See* 31 U.S.C. § 5362(9) (defining "State" as "any State of the United States, the District of Columbia, or any commonwealth, territory or other possession of the United States.").  Accordingly, bets placed between the Tribe's lands and other locations in Florida do not qualify as bets made "exclusively within a single State."

> 3. The Safe Harbor in UIGEA Also Does Not Apply Because Sports Betting is Illegal in Florida.

103.    In addition, the safe harbor makes clear that the bets or wagers must be legal not only where received, but also where "initiated."  *See* 31 U.S.C. § 5362(10)(B).  As discussed in Section B.4 above, sports gambling is illegal in Florida and cannot be expanded without a citizens' initiative—*except* for gambling "on tribal lands pursuant to compacts executed by the state and Native American tribes pursuant to IGRA."  Fla. Const. Art. X, § 30(c).  And, as discussed in Section B.4 above, Florida's attempt to contract and legislate around that illegality fails.

---

[15] UIGEA also excludes from coverage certain bets or wagers that are "initiated and received or otherwise made *exclusively within the Indian lands of a single Indian tribe* (as such terms are defined under the Indian Gaming Regulatory Act," as well as certain bets or wagers between two or more Indian tribes.  *See* 31 U.S.C. § 5362(10)(C) (emphasis added).  But the Compact does not fit within either exception, as neither applies to online bets or wagers placed from outside Indian lands to Indian lands located in a state where the bet or wager otherwise is unlawful.  *See Iipay Nation of Santa Ysabel,* 898 F.3d at 967 (holding that gaming that does not occur on Indian lands is not subject to jurisdiction under IGRA and IGRA cannot serve as a shield from the application of the UIGEA).

104.    Florida officials and others have publicly acknowledged the legal concerns with the

Compact:

       a.    Florida State Representative Randy Fine, the House Chair of the Select Committee on Gaming stated: "We're going to allow the Seminole Tribe to offer sports betting where you can be sitting in your bathtub or sitting on your couch, thinking about a football game, and you can make a wager, regardless of where you physically are, on your cellphone." William P., *House Legislators Approve Deal That Grants Seminole Tribe Expanded Grambling Rights in Florida–Includes Roulette, Craps, and Sports,* Florida Insider (May 19, 2021), https://floridainsider.com/business/house-legislators-approve-deal-that-grants-seminole-tribe-expanded-gambling-rights-in-florida-includes-roulette-craps-and-sports/ (last visited Aug. 6, 2021).

       b.    Florida State Senator Jason Brodeur acknowledged: "You're going to get into a legal question about where the servers are located and where does the bet take place?  You're going to have folks that argue that the bet actually takes place on tribal land, because that's where the servers are located.  But then the other side is going to say, well, you know, the offer takes place…where the bet was placed." Jim Rosica, *High Stakes: Is Florida Ready for Smartphone-Based Online Sports Betting?*, Tallahassee Democrat (May 14, 2021), https://www.tallahassee.com/story/news/local/state/2021/05/14/florida-legal-sports-betting-seminole-tribe-compact-desantis-gambling-deal-special-session/4988655001/ (last visited Aug. 6, 2021).

       c.    George Skibine, former Deputy Assistant Secretary of Indian Affairs at Department of the Interior told the Florida House Select Committee on Gaming:  "[T]he Department [of Interior] will have to look at whether the gaming – when a bet is placed outside Indian lands and the server is on Indian land, whether that satisfies the IGRA requirement that it's gaming on Indian lands.  And I think there is language in [the Desert Rose] opinion that indicate that this is going to be a difficult decision for the department …." *See* Testimony before the Florida House Select Committee on Gaming, May 18, 2021, https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=7311 (last visited July 24, 2021).

       d.    John Sowinski, president of No Casinos, an organization that opposes gambling and advocated for the adoption of Amendment 3, has stated: "It is not legal and permissible to have tribal gambling exceed the boundaries of tribal land." Forrest Saunders, *Florida Poised to Approve New Gaming Rules When Lawmakers Return Next Week*, WPTV (May

31

14, 2021) https://www.wptv.com/news/state/florida-poised-to-approve-new-gaming-rules-when-lawmakers-return-next-week   (last   visited Aug. 6, 2021).

e.   Florida State Representative Sam Garrison has stated: "There's a legitimate question and legal question as to whether or not the sports gaming, with the hub-and-spoke model as contemplated in the compact," is constitutional. "It's an open legal question. Period."  Ryan Nicol, *Dan Gerber, Philip Levine Argue Voters Should Have a Say in New Gaming Deal, Florida Politics*, FloridaPolitics.com (May 17, 2021) https://floridapolitics.com/archives/430075-gelber-levine-voters-gaming-deal/ (last visited Aug. 6, 2021)

f.   Representative Garrison also has stated: "There is no black and white answer whether the hub and spoke model is going to be permitted or not. As we've said from Day One, and as the parties have contemplated, [whether the hub and spoke model is constitutional] is an open question."  Mary Ellen Klas & Ana Ceballos, *Florida Legalizes Sports Betting, Hard Rock to Add Roulette, Craps*, Tampa Bay Times (May 19, 2021)                https://www.tampabay.com/news/florida-politics/2021/05/19/florida-legalizes-sports-betting-but-hurdles-remain/ (last visited Aug. 6, 2021).

105.    The Florida Governor's office itself has acknowledged that the legality of online betting is, at a minimum, an open question: "The main concern is whether online gaming is considered gambling 'in tribal lands.'"  *See* Frequently Asked Questions – 2021 Compact, Governor's   Office   Materials,   https://www.myfloridahouse.gov/api/document/house?Leaf=HouseContent/Lists/LegislatorUResources/Attachments/66/2021.05.12%20Compact%20FAQs.pdf (last visited Aug. 6, 2021).

106.    Even Jim Allen, Chairman of Hard Rock International (the Tribe's casino operation) has acknowledged the possibility that the online sports betting portions of the 2021 Compact will be struck down:  "If we were not to prevail in a state or federal court for the purpose of sports betting being authorized, the Tribe has already stated it will honor the revenue share from our land-based casinos at a minimum."  Haley Brown, *House Panel Approves Gaming Compact amid   'Open   Legal   Question,'*   FloridaPolitics.com   (May   17,   2021),

https://floridapolitics.com/archives/430058-house-panel-approves-gaming-compact-amid-open-legal-question/ (last visited Aug. 6, 2021).

107.    Because of this recognized uncertainty, the Compact itself contemplates that part of the Compact (and in particular the off-reservation sports-betting provisions), may be invalidated, and includes the following severability provisions:

> Each provision, section, and subsection of this Compact shall stand separate and independent of every other provision, section, or subsection, and shall be interpreted to ensure compliance with IGRA. In the event that a federal district court in Florida or other court of competent jurisdiction shall find any provision, section, and subsection of this Compact to be invalid, the remaining provisions, sections and subsections of this Compact shall remain in full force and effect . . . . *If at any time the Tribe is not legally permitted to offer Sports Betting as described in this Compact, including to Patrons physically located in the State but not on Indian Lands, then the Compact will not become null and void*, but the Tribe will be relieved of its obligation to pay the full Guaranteed Minimum Compact Term Payment . . . .

Exhibit A, Part XIV, Sec. A (emphasis added).

**D.  Approval and Implementation of the Compact Will Significantly Harm Plaintiffs.**

108.    Plaintiffs have for several years competed against the Tribe for customers for slot machines and customers for using card rooms offering banked card games.  The Compact will significantly harm Plaintiffs' business by introducing online gaming into Florida and granting the Tribe the exclusive right to engage in it.  As a result, anyone physically located in Florida, including Plaintiffs' customers, will be able to engage in sports betting online with the Tribe from their home or from any Florida location where they have access to an internet connection.  This approval will therefore have a significant and potentially devastating competitive impact on Plaintiffs and the brick-and-mortar businesses who depend for their profits on individuals coming into their businesses to engage in gaming activities.

109.    Pari-mutuels such as Plaintiffs depend for their revenue on in-person commerce. The pari-mutuel business model allows pari-mutuels to profit by offering pari-mutuel betting pools to the public and collecting a percentage of the money collected from bettors.  Pari-mutuel betting is a gambling framework, utilized primarily in horse racing, jai alai, and any authorized event, where the competitors finish in a ranked order, from first to last.  For example, bettors will bet on horses to "Win," "Place" or "Show"—the first three horses across the finish line.  The payout is determined once the betting event (the race or round) commences, which is when the betting pool is closed.  The sportsbook or racetrack where the wager is placed collects a percentage from the pool, called the vigor, in exchange for offering the wager.  *The higher the amount of wagers placed in the betting pool, the greater the vigor and, thus, the greater the net revenue to the pari-mutuel*. In Miami-Dade County, pari-mutuels like the Magic City Casino can also offer Las Vegas-style slot machines.  And all pari-mutuels in Florida can obtain a card room permit.  Unlike the online sports gaming that the Tribe will now be able to offer, patrons must visit the pari-mutuels in order to play slots or poker or engage in pari-mutuel betting.

110.    By enabling the Tribe to offer sports betting via computer or phone from a person's home or any other location in Florida, the Tribe will have a significant competitive advantage and cost Plaintiffs significant amounts of revenue.  "Home casinos," as contemplated by the Compact, will significantly diminish revenue at Plaintiffs' pari-mutuels' brick and mortar locations to the advantage of their competitor because individuals in Florida will be able to gamble from the comfort of their homes or from any location in Florida, but only with the Tribe.  Plaintiffs also will incur increased costs in advertising and related expenses in an effort to maintain some of their customer bases.

111.    These harmful effects will be even higher because of the COVID-19 global pandemic that has vastly increased the comparative attractiveness of goods and services that can be obtained through a computer rather than in person.

112.    Plaintiffs also will be harmed by related provisions of the Compact that purport to authorize pari-mutuels to offer online sports betting placed with the Tribe via on-site kiosks located at the pari-mutuel facilities.[16]

113.    As State Representative Sam Garrison explained, the Compact creates a "hub-and-spoke model."[17]  The Tribe is at the center of the hub and, at its option, one or more pari-mutuels not located on Indian lands are at spokes of the sports betting wheel.

114.    These contracts will be uneconomical, but Plaintiffs will have no choice but to enter them to avoid losing further business to other pari-mutuels in addition to the business that they already will lose to the Tribe's online sports betting operation.  Under these contracts, the Tribe may take 40% of the net win on bets placed at kiosks.  Further, it may take an as-yet undetermined amount for the Tribe's expenses.  By contrast, Plaintiffs will not be able to deduct their expenses before sharing revenue with the Tribe.  The "net win" solely refers to the amount won from the bet, not the profit after expenses.

---

[16] The Compact also permits pari-mutuels to procure, develop, and advertise the web application that patrons will use to place sports betting wagers with the Tribe.  Exhibit A, Part III, Sec. CC.3. Unlike the on-site kiosks—which as discussed in the text, are uneconomical but will be necessary to implement to prevent loss of business to other pari-mutuels—the option of developing mobile applications for the Tribe is not a realistic one because the costs to implement it well outweigh both any additional revenue it would generate or lost revenue it would prevent.

[17] Mary Ellen Klas & Ana Ceballos, *Florida Expands Gambling, Joins Ranks of Sports Betting States. But Hurdles Remain*, Bradenton Herald (May 19, 2021), https://www.bradenton.com/news/politics-government/state-politics/article251528698.html (last visited Aug. 6, 2021).

115.    The Tribe also will largely be able to dictate the remaining terms of the contract. The Compact provides that "Within three (3) months of the Effective Date of this Compact, the Tribe shall negotiate in good faith with any and all willing Qualified Pari-mutuel Permitholders to enter into written contracts as provided in [the] Section."  Aside from certain specific conditions, the Tribe exclusively determines the terms and conditions of the contracts.  The only consequence of not entering into at least three (3) contracts with Qualified Pari-Mutuel Permitholders under the Compact is that the Tribe will pay the state an additional 2% of its "Net Win" from Sports Betting. Once the Tribe enters into contracts with the first three pari-mutuels, it is up to the Tribe to negotiate in good faith with other willing pari-mutuels.  *See* Exhibit A, Part III, Sec. CC.4.

116.    The Tribe has already begun soliciting potential spokes for its off-reservation online sports betting.  On June 24, 2021, the Tribe, through Jim Allen, Chairman of Hard Rock International and CEO of Seminole Gaming, reached out to Magic City "to initiate discussions … regarding the proposed sports book offering in the state" pursuant to the Compact (the "Allen Letter", attached as Exhibit H).  The purpose of the Allen Letter is to have Plaintiffs' pari-mutuels, and presumably other pari-mutuel facilities, respond to the Tribe's request for information regarding their facilities and "proposed framework for branding and marketing the sportsbook." Following receipt of the pari-mutuels responses to the request for information, the Tribe will schedule meetings with interested pari-mutuels to discuss a proposed marketing agreement and sports betting offering.  *Id.*

117.    As the Compact and the Allen Letter make clear, the only way a pari-mutuel can participate in online off-reservation sports betting is to be one of the spokes on terms and conditions dictated exclusively by the Tribe.

118.    These provisions thus further harm Plaintiffs by requiring them to invest significant resources in, among other things, negotiating new contracts, installing kiosks and other new equipment, increasing marketing expenditures, and strategies and planning for entering the new business.  Further, they will be forced to offer a product (the sports-betting kiosks) that will take business away from other on-site gaming options that are far higher margin.  Yet despite the highly uneconomical nature of the terms, Plaintiffs will have no choice but to offer the option to avoid losing customers to the Tribe and other pari-mutuels who will offer on-site sports betting.  If that occurred, Plaintiffs would lose both the walk-in traffic from those who will not choose to gamble online through the Tribe *and* additional walk-in traffic to pari-mutuels on which their business models are based.  The lost walk-in revenue affects their revenue from slot machines, card rooms, and pari-mutuel wagering, as well as the ancillary entertainment and dining options offered to patrons of their facilities.

119.    The Tribe also has the additional advantage of being able to offer on-site cash wagering.  Plaintiff pari-mutuels permit cash wagering in their gaming, but the Tribe has either not been willing or not been able to identify any way that the pari-mutuels would be able to permit on-site cash wagers for sports betting.  The ability to conduct cash wagering is an important feature to many of Plaintiffs' customers who do not wish to be tracked or to release personal information. Pari-mutuel customers that prefer cash wagers for their gaming thus will have no incentive to use the pari-mutuel's facilities, and those who prefer to do so via credit card will have no need to visit the facility to do so.  The inability to offer cash wagering thus would further diminish the advantages of offering on-site sports betting beyond preventing other pari-mutuel facilities from gaining a competitive advantage.  At the same time, the Tribe will be able to offer both on-site cash sports betting and the ability to engage in sports betting online from anywhere in the state.

120.    In sum, Secretary Haaland's approval of the Compact's unauthorized purported legalization of online, off-reservation sports betting will significantly reduce Plaintiffs' revenues while imposing significant new costs and burdens to prevent even further revenue losses.

121.    All conditions precedent to the bringing of this action, if any, have occurred, have been waived or are excused.

122.    Plaintiffs have retained the undersigned counsel and have incurred costs in bringing this action.

## COUNT I

### (Administrative Procedure Act, 5 U.S.C. §§ 700, et seq.)
### (Against All Defendants)

123.    Plaintiffs reallege and incorporate by reference the allegations in the foregoing numbered paragraphs.

124.    Pursuant to IGRA and related regulations, Secretary Haaland has a legal obligation to disapprove the Compact if it violates: (1) any provision of IGRA; (2) "any other provision of Federal law that does not relate to jurisdiction over gaming on Indian lands;" or (3) "the trust obligations of the United States to Indians."  25 U.S.C. § 2710(d)(8)(B); 25 C.F.R. § 293.14.

125.    The Secretary's approval of the Compact is contrary to IGRA and exceeds the Secretary's authority under IGRA, which authorizes the Secretary to approve Compacts only where they relate to "gaming *on Indian Lands*." 25 U.S.C. § 2710(d)(8)(A) (emphasis added).  The Compact here purports to permit gaming by persons located anywhere in the State of Florida, without requiring their presence on Indian Lands.

126.    The Secretary's approval of the Compact also is unlawful because the Compact authorizes transactions that are illegal under the Wire Act.  Specifically, the Compact unlawfully allows bettors located outside the Tribe's reservations to place online bets on sporting events and

to receive payments for such bets using wire communications facilities, even though such sports betting is illegal in Florida. *See* 18 U.S.C. § 1084(a).

127.    The Secretary's approval of the Compact also is unlawful because the Compact authorizes transactions that are illegal under UIGEA.   Specifically, the Compact unlawfully permits the Tribe to receive payments from persons who are physically located outside the Tribe's reservations and are making the payments in connection with sports betting that is illegal in Florida. *See* 31 U.S.C. § 5361(4).

128.    The Secretary's approval of the Compact is also unlawful because the Compact violates the equal protection guarantee provided by the Due Process Clause of the Fifth Amendment of the United States Constitution.   The Compact discriminates by affording different treatment for gaming facilities on the basis of race, tribal affiliation, and national origin.   There is no compelling, legitimate, or even rational government interest that could justify this race-based and tribe-based disparate treatment of gaming operations, and the Compact is not narrowly or reasonably tailored to advancing a proper government interest.

129.    The Secretary's approval of the Compact, whether by action or inaction, is arbitrary, capricious, an abuse of discretion and not in accordance with law.

130.    The Secretary's approval of the Compact, whether by action or inaction, constitutes final agency action for which Plaintiffs have no other adequate remedy at law.   No other administrative review is available to plaintiffs.

131.    The Secretary's action with respect to the Compact is not entitled to deference pursuant to *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Connecticut v. U.S. Dep't of the Interior*, 344 F. Supp. 3d 279, 307-08 (D.D.C. 2018).

132.    Plaintiffs have both constitutional and prudential standing to assert this claim.

133.     Plaintiffs and the public would be irreparably harmed if the Compact is implemented.

134.     The intent of Congress and the public interest will be served by an Order vacating the Secretary's approval of the Compact.

## COUNT II

### (Violation of the Fifth Amendment Guarantee of Equal Protection)
### (Against All Defendants)

135.     Plaintiffs reallege and incorporate by reference the allegations paragraphs 1 through 121 above.

136.     The Fourteenth Amendment to the United States Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  The Supreme Court has held that the Fifth Amendment binds the federal government to the same standard to which the Fourteenth Amendment binds the states.  *See Bolling v. Sharpe*, 347 U.S. 497, 500 (1954); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995).

137.     Plaintiffs have invested years and millions of dollars into the pari-mutuel facilities, including offering cardroom and slot machine facilities to patrons as those options were made available to them under Florida law.  Plaintiffs compete with the Tribe for walk-in patrons who, until the Compact's terms go into effect, were required to be on the premises of facilities to engage any gaming offered by each of them.

138.     Under the terms of the Compact and the Implementing Law passed to enter the terms of the Compact into Florida law, Plaintiffs will no longer be able to compete on a level playing field with the Tribe.

139.     The Compact establishes different treatment for gaming facilities on the basis of race, tribal affiliation, and national origin.

40

140. The Compact provides that Florida will permit *only the Tribe* to offer internet-based gaming *throughout the State of Florida*, rather than limited to the Tribe's gaming facilities and or even its tribal land more generally. In granting a state-wide, race-based monopoly to the Tribe, the Compact precludes Plaintiffs from competing with the Tribe even within their own pari-mutuel facilities in offering sports wagering and online sports wagering.

141. Plaintiffs are owned by individuals who are not members of the Tribe, and who are not Native American.

142. Secretary Haaland's application of IGRA in approving the Compact therefore violates the Equal Protection guarantee of the Fifth Amendment, by giving federal imprimatur to a compact that establishes different treatment for gaming facilities on the basis of race, tribal affiliation, and national origin.

143. There is no compelling, legitimate, or rational government interest that could justify this race-based and tribe-based disparate treatment of gaming operations. Moreover, the race-based benefit approved by Secretary Haaland is not narrowly or reasonably tailored to advancing a proper government interest. By granting the state-wide monopoly to offer gaming via the internet, the approved Compact strays well beyond the purpose of IGRA in supporting self-governance. Far from identifying a basis sufficient to justify such discrimination, the Compact is based on the transparent legal fiction that conduct is "deemed" to take place somewhere it does not.

144. As such, the approval by Secretary Haaland of the Compact violates the equal protection guarantee of the Fifth Amendment and Secretary Haaland's approval of the Compact should be vacated.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs pray for the following relief:

A.  An order vacating and setting aside the Secretary's approval of the Compact as unlawful;

B.  An order awarding Plaintiffs costs, expenses, and attorneys' fees incurred in these proceedings pursuant to 28 U.S.C. § 2412; and

C.  Such other and further relief as the Court deems just and proper.


Respectfully submitted,

   /s/ Hamish PM Hume
BOIES, SCHILLER FLEXNER LLP

Hamish P.M. Hume
Amy L. Neuhardt
Samuel C. Kaplan
1401 New York Avenue, N.W.
Washington, DC  20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
aneuhardt@bsfllp.com
skalpan@bsfllp.com

Jon Mills
100 SE Second Street, Suite 2800
Miami, FL 33131
Tel:  305 539 8400
Fax: 305 539 1307
jmills@bsfllp.com