**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WEST FLAGLER ASSOCIATES, LTD. et al.,  )<br><br>*Plaintiffs*,  )<br><br>v.  )<br><br>DEB HAALAND, et al.,  )<br><br>*Federal Defendants*.  ) | Civil Action No. 21-cv-2192-DLF |

**FEDERAL DEFENDANTS' MOTION TO DISMISS**

Federal Defendants Deb Haaland, in her official capacity as Secretary of the Interior ("Secretary"), and the United States Department of the Interior ("Interior") (collectively, "Federal Defendants"), by and through their undersigned counsel, hereby respectfully move, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, for dismissal of all claims in the Complaint (ECF 1). The grounds for dismissal of this suit, as well as the reasons for denying West Flagler Associates Ltd., et al.'s ("Plaintiffs") *Motion for Summary Judgment or in the Alternative, a Preliminary Injunction* (ECF 19), are set forth in the accompanying memorandum.

Respectfully submitted this 12th day of October, 2021.

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
*/s/ Rebecca M. Ross*
REBECCA M. ROSS, Trial Attorney
HILLARY K. HOFFMAN, Trial Attorney
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice

OF COUNSEL:                          P.O. Box 7611, Ben Franklin Station
JODY H. SCHWARZ                      Washington, DC 20044
Senior Attorney                      Telephone:  (202) 616-3148
Office of the Solicitor              Facsimile:  (202) 305-0275
Division of Indian Affairs           Email: rebecca.ross@usdoj.gov

                                     *Attorneys for Federal Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| WEST FLAGLER ASSOCIATES, LTD. et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 21-cv-2192-DLF |
| | ) | |
| DEB HAALAND, et al., | ) | |
| | ) | |
| *Federal Defendants*. | ) | |
| | ) | |
| | ) | |

**CONSOLIDATED MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

STATUTORY AND REGULATORY BACKGROUND .................................................................2

FACTUAL AND PROCEDURAL BACKGROUND.....................................................................4

ARGUMENT ........................................................................................................................6

   I.  The Court Should Dismiss This Suit in Its Entirety ................................................6

      A.  Standard of Review for Dismissal Pursuant to Rule 12............................................6

      B.  Plaintiffs Lack Standing Because the Complaint Does Not Adequately Allege
that the Compact's Deemed Approval Has or Will Imminently Injure Them.........8

          i.  Plaintiffs' Speculative Claims of Injury are Unsupported by
the Declarations They Offer....................................................................10

          ii.  Plaintiffs Cannot Establish Injury When Their Injury Depends
on Their Own Business Decisions ...........................................................15

      C.  Plaintiffs Fail to State Plausible Claims for Relief ...............................................17

          i.  Count I Fails Because the Deemed Approval of the Compact
Does Not Violate the APA.......................................................................17

          ii.  Count II Fails Because the Deemed Approval Does Not Violate
the Equal Protection Clause of the United States Constitution.................21

              1.  Plaintiffs and the Tribe are not similarly situated.........................22

              2.  First, there is no fundamental right present. ................................24

              3.  Second, *Mancari*'s "rational relationship" test applies, and
the challenged deemed approval easily satisfies that test. .............26

   II.  The Court Must Reject Plaintiffs' Request for a Preliminary Injunction .........................31

      A.  Standard of Review.................................................................................................31

      B.  Plaintiffs Are Not Entitled to Emergency Mandatory Injunctive Relief .............33

      C.  Plaintiffs Fail to Demonstrate Entitlement to a Preliminary Injunction ...............35

          i.  Plaintiffs Have Not, and Cannot, Demonstrate Irreparable Harm ...........35

              1.  Plaintiffs' alleged harm is not imminent......................................36

              2.  Alleged economic harm is not irreparable harm...........................38

              3.  Even if economic harm is relevant, Plaintiffs' alleged harm is
speculative, not actual or imminent, and cannot be traced to
Federal Defendants. ....................................................................39

ii.   Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits .....42

iii.  The Balance of Equities and the Public Interest Weigh Against
Injunctive Relief.........................................................................................44

CONCLUSION...............................................................................................................45

## INTRODUCTION

Plaintiffs West Flagler Associates, Ltd. et al. ("Plaintiffs") filed this suit against the Secretary of the Interior ("Secretary"), and the United States Department of the Interior ("Interior") (collectively, "Federal Defendants"), seeking judicial review of the approval, by operation of law, of a Tribal-State Compact ("Compact") negotiated by and entered into between the State of Florida ("State") and the Seminole Tribe of Florida ("Seminole" or "Tribe").  As expressly provided by the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-21 ("IGRA"), the Secretary took no action on the Compact during the statutorily-identified forty-five day review period, which means that, as a matter of law, the Compact was "deemed approved," but only to the extent the Compact is consistent with the statute. *Id.* at § 2710(d)(8)(C).  After such deemed approval occurs, IGRA requires that the Secretary publish notice in the *Federal Register*, *id.* at § 2710(d)(8)(D), which the Secretary did, *see Indian Gaming; Approval by Operation of Law of Tribal-State Class III Gaming Compact in the State of Florida*, 86 Fed. Reg. 44,037, 44,037 (Aug. 11, 2021).  Thereafter the Secretary had, and continues to have, *no role whatsoever* with respect to the Compact or how it might be implemented.

Despite the fact that Federal Defendants have no role in implementing the Compact, Plaintiffs, which operate two casinos in Florida, move the Court for summary judgment on their claims in this case, and in the alternative, seek emergency mandatory injunctive relief, on the basis that, if the online sports betting contemplated by the Compact is implemented by the Tribe and the State, they may possibly suffer some unspecified economic injury at some unknown point in the future, even though they have the option to partner with the Tribe to *offer and profit from such sports betting* themselves.

Plaintiffs' Complaint (ECF 1) and recent *Motion for Summary Judgment or in the Alternative, a Preliminary Injunction* (ECF 19) ("Motion"), demonstrate that Plaintiffs object to how online sports betting may be implemented by either the State or Tribe going forward, and they seek to use the Administrative Procedure Act, 5 U.S.C. §§ 701-06 ("APA")—which focuses on federal action—to thwart any implementation of it.  The fact that these same Plaintiffs have filed a separate suit against certain State officials, in a separate federal court, asserting many of the same if not identical claims made here, further demonstrates this objective. *See West Flagler Assoc., Ltd. et al. v. DeSantis et al.*, No. 4:21-CV-470 (N.D. Fla.) (seeking declaratory relief that the Compact violates IGRA, the Wire Act, 28 U.S.C. § 1084 ("Wire Act"); the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. §§ 5361 *et seq.* ("UIGEA"); and the Equal Protection Clause of the United States Constitution).

As set forth below, Plaintiffs lack standing to maintain this suit and their Complaint fails to assert plausible claims for relief, and thus the Court lacks jurisdiction to reach the merits in this case.  Accordingly, Plaintiffs are not entitled to summary judgment on their claims.  And because Plaintiffs fail to establish a "likelihood of success on the merits," and the speculative, purely economic harm they allege fails to establish they will suffer any "irreparable harm," Plaintiffs are not entitled to the extraordinary remedy of preliminary injunctive relief.  The Court should therefore deny Plaintiffs' Motion and dismiss this suit in its entirety.

## STATUTORY AND REGULATORY BACKGROUND

IGRA "creates a framework for regulating gaming activity on Indian lands." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 785 (2014).  In enacting IGRA, Congress sought to establish a system that would balance the competing interests of two sovereigns: tribal and state governments.  On the one hand, IGRA aims "to provide a statutory basis for the operation of

gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1); *Confederated Tribes of the Grand Ronde Cmty. of Or. v. Jewell*, 830 F.3d 552, 557 (D.C. Cir. 2016) ("[T]he whole point of the IGRA is to 'provide a statutory basis for the operation of gaming by Indian tribes as means of promoting tribal economic development, self-sufficiency, and strong tribal governments.'") (quoting *Diamond Game Enters. v. Reno*, 230 F.3d 365, 366-67 (D.C. Cir. 2000)).  On the other hand, the statute contemplates a regulatory and supervisory role for the states and the federal government to prevent the infiltration of "organized crime and other corrupting influences." 25 U.S.C. § 2702(2).[1]

IGRA divides gaming into three classes. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 48 (1996).  The third of these—Class III gaming—is implicated here and includes "casino games" such as blackjack, roulette and slot machines. *See Bay Mills Indian Cmty.*, 572 U.S. at 785.  Class III gaming can occur on Indian lands only if "conducted in conformance with" an approved tribal-state compact "entered into by the Indian tribe and the State," 25 U.S.C. § 2710(d)(1)(C), or pursuant to procedures issued by the Secretary, *id.* at § 2710(d)(7).  "The rationale for the compact system is that 'there is no adequate Federal regulatory system in place for Class III gaming, nor do tribes have such systems for the regulation of Class III gaming currently in place,' and thus 'a logical choice is to make use of existing State regulatory systems' through a negotiated compact." *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1549 (10th Cir. 1997) (quoting S. Rep. No. 100-446, at 13-14, reprinted in 1988 U.S.C.C.A.N. 3071, 3083-84).

---

[1] Congress passed IGRA in response to the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 221-222 (1987), which had held that states lacked regulatory authority over gaming on Indian lands. *See Bay Mills Indian Cmty.*, 572 U.S. at 794.

IGRA provides no role for the federal government in the compact negotiation process between tribes and states.  The Secretary holds authority to approve or, for limited reasons, disapprove a compact to which the state and the tribe do agree. 25 U.S.C. § 2710(d)(8)(A)-(B).  Congress also directed, however, that "[i]f the Secretary does not approve or disapprove a compact . . . before the date that is 45 days after the date on which the compact is submitted to the Secretary for approval, the compact shall be considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of [IGRA]." *Id.* § 2710(d)(8)(C).  Compacts approved by the Secretary, or deemed approved by operation of statute when the Secretary does not act, become effective after the Secretary publishes notice in the *Federal Register*. *See id.* § 2710(d)(3)(B), (d)(8)(D).  Lastly, Interior regulations set out the requirements for states and Indian tribes to properly submit compacts or compact amendments to Interior for the Secretary's review. *See* 25 C.F.R. pt. 293.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

---

[2] Plaintiffs' Motion and related filings set forth factual assertions in support of the relief they seek. *See*, *e.g.*, ECF 19 at 14-25.  In the context of Rule 12, the Court may consider "only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Hurd v. Dist. of Col., Gov't*, 864 F.3d 671, 678 (D.C. Cir. 2017).  And under Local Rule 65.1(c), requests for preliminary injunction are to "be supported by all affidavits on which the plaintiff intends to rely."  The Motion, however, seeks summary judgment in the first instance. Even if the Court had jurisdiction and the Complaint stated plausible claims for relief, Plaintiff cannot obtain such relief based on facts they present to the Court.  Rather, judicial review of the merits of final agency action (or inaction) in APA cases must be "based on the record the agency presents to the reviewing court," *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985), "not some new record made initially in the reviewing court," *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  Any such record would not be due until after Federal Defendants answered the Complaint. *See* Local Civil Rule 7(n).  That rule's purpose is to "assist the Court in cases involving a voluminous record (e.g., environmental impact statements) by providing the Court with copies of relevant portions of the record relied upon in any dispositive motion." LCvr 7(n) (cmt.).  This motion does not rely on an administrative record and thus compliance with Local Rule 7(n) is unnecessary. *See Connecticut v. U.S. Dep't of Interior*, 344 F. Supp. 3d 279, 294 (D.D.C. 2018).  In any event, Federal

On June 21, 2021, the State and the Tribe submitted the Compact to the Secretary, together with a tribal resolution and state certification, ECF 1-6 at 2 n.1, as required by 25 C.F.R. § 293.8.  This submission commenced the statutorily-identified forty-five day review period allowed under IGRA. 25 U.S.C. § 2710(d)(8).  The State and the Tribe further submitted a copy of a state statute that ratified and approved the Compact. ECF 1-6 at 2 n.1; *see also* ECF 1 at 15 (¶ 50) (discussing Fla. Stat. § 285.710) ("State Implementing Law").  The Secretary took no action on the Compact within the forty-five day review period (*i.e.*, on or before August 5, 2021), and thus, by operation of law, the Compact was deemed approved, "but only to the extent the compact is consistent with" IGRA. *Id.* at § 2710(d)(8)(C).  Thereafter, and as required by the statute, *id.* at § 2710(d)(8)(D), the Secretary published notice of the deemed approval in the *Federal Register* on August 11, 2021. *See Indian Gaming; Approval by Operation of Law of Tribal-State Class III Gaming Compact in the State of Florida*, 86 Fed. Reg. 44,037, 44,037 (Aug. 11, 2021) (Because the "Secretary took no action on the Compact between the Tribe and the State . . . the Compact is considered to have been approved, but only to the extent it is consistent with IGRA.").

On August 16, 2021, Plaintiffs filed this suit, asserting two claims. Count I asserts that (1) the deemed approval was "arbitrary, capricious, an abuse of discretion and not in accordance with law" under the APA because the Secretary had a "legal obligation" to disapprove the Compact, ECF 1 at 39-41 (¶¶ 124-34).  Count II alleges that the deemed approval violates the Equal Protection Clause of the Fifth Amendment to the United States Constitution, because "[t]he Compact establishes different treatment for gaming facilities on the basis of race, tribal

---

Defendants generally dispute Plaintiffs' factual assertions to the extent they conflict with the assertions made herein or in Federal Defendants' related filings.

affiliation, and national origin" and that they are harmed by such deemed approval because, Plaintiffs speculate, they "will no longer be able to compete on a level playing field with the Tribe." *Id.* at 41-42 (¶¶ 136-44).

## ARGUMENT

### I.  The Court Should Dismiss this Suit In Its Entirety

The first task for the Court in this case is to evaluate whether it has the requisite jurisdiction to proceed, even though Plaintiffs seek to pressure this Court and the Northern District of Florida[3] to expedite review of the merits of their claims.[4]  "Without jurisdiction the court cannot proceed at all in any cause." *Ex parte McCardle*, 74 U.S. 506, 514 (1868).  This Court has "an independent obligation to determine whether subject-matter jurisdiction exists," and when it is lacking, the proper course is dismissal. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).  As set forth below, Plaintiffs fail to demonstrate standing and further fail to assert plausible claims for relief in this case.  Accordingly, the Court should reject Plaintiffs' Motion and dismiss this suit in its entirety pursuant to Rule 12.

### A.  Standard of Review for Dismissal Pursuant to Rule 12

"The Constitution limits the 'judicial Power of the United States' to 'Cases' or 'Controversies,' U.S. Const. art. III, §§ 1-2, and the requirement of standing is 'rooted in the traditional understanding of a case or controversy.'" *Twin Rivers Paper Co. LLC v. SEC*, 934

---

[3] *See Federal Defendants' Motion to Transfer Venue*, filed concurrently herewith.
[4] Federal Defendants recognize that the "court has leeway 'to choose among threshold grounds for denying audience to a case on the merits.'" *Lab. Corp. of Am. Holdings v. NLRB*, 942 F. Supp. 2d 1, 3 (D.D.C. 2013) (quoting *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007)).  But because the Court must be assured of its jurisdiction to proceed in this case, Federal Defendants contend that it should address that issue first, which means resolving this motion and the Tribe's motion to dismiss, *see* ECF 13-4, to confirm that it may proceed forward, or in the alternative transfer, *see NLRB*, 942 F. Supp. at 3, before reaching the merits and other issues presented in Plaintiffs' Motion.

F.3d 607, 612 (D.C. Cir. 2019) (citation omitted).  Subject matter jurisdiction is a threshold issue, which should be addressed prior to any consideration of the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998).  Federal courts presumptively lack jurisdiction "unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (quotation marks and citation omitted); *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("It is to be presumed that a cause lies outside this limited jurisdiction . . . , and the burden of establishing the contrary rests on the party asserting jurisdiction.") (internal citations omitted).  Therefore, to survive a motion to dismiss pursuant to Rule 12(b)(1), a plaintiff bears the burden of establishing that the court has subject matter jurisdiction over all of its claims. *Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C. Cir. 2007).

"A court evaluating a Rule 12(b)(1) motion 'must treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Weissman v. Nat'l R.R. Passenger Corp.*, No. 20-CV-28 (TJK), 2020 WL 4432251, at *2 (D.D.C. July 31, 2020) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)).  "But the court need not accept the plaintiff's legal conclusions or the inferences he draws 'if [they] are unsupported by facts alleged in the complaint.'" *Id.* (quoting *Williams v. Wilkie*, 320 F. Supp. 3d 191, 195 (D.D.C. 2018)).  "[W]here necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).  Moreover, "[w]hen evaluating a Rule 12(b)(1) motion, a court may consider materials outside the pleadings to determine whether jurisdiction exists." *Dick v. Holder*, 67 F. Supp. 3d 167, 175 n.4 (D.D.C. 2014) (citing *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005)).

"A Rule 12(b)(6) motion tests the legal sufficiency of a claim or complaint." *Sickle v. Torres Advanced Enter. Solutions, LLC*, 884 F.3d 338, 344 (D.C. Cir. 2018) (citation omitted). Under Rule 12(b)(6), courts determine whether the complaint alleges "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). "A claim is facially plausible when the pleaded factual content 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Anthony v. Int'l Ass'n of Machinists & Aerospace Workers Dist. Lodge 1*, 296 F. Supp. 3d 92, 95 (D.D.C. 2017) (quoting *Iqbal*, 556 U.S. at 678). Courts, however, need not accept as true inferences unsupported by factual allegations nor legal conclusions. *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004); *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Rule 12(b)(6) "authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). And in a ruling on a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Anthony*, 296 F. Supp. 3d at 95 (internal quotations omitted).

### B. Plaintiffs Lack Standing Because the Complaint Does Not Adequately Allege that the Compact's Deemed Approval Has or Will Imminently Injure Them

Plaintiffs lack standing because they fail to adequately allege an actual or certainly impending injury in fact that derives from the Compact becoming effective by operation of law. At most, Plaintiffs identify highly speculative, hypothetical injuries that turn in part on Plaintiffs' own decision whether to participate in the online sports betting program to which they object. Such contentions fail to establish standing and thus this suit must be dismissed.

8

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976).  The Supreme Court has made "clear that . . . abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III." *Id.* at 40.

A plaintiff bears the burden of proof to establish federal jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  To meet the Article III standing requirements, Plaintiffs must establish three elements. *Id.*  First, Plaintiffs must show that they have suffered an "injury in fact" that is "concrete and particularized" and actual or imminent, not "conjectural" or "hypothetical." *Id.* at 560 (citations omitted).  Plaintiffs' injury must be "certainly impending" and cannot rely "on a highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409-10 (2013).

"[A]llegations of possible future injur[ies] are not sufficient." *Id.* at 409 (emphasis, quotation marks and citations omitted); *Ctr. For Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009); *La. Env't. Action Network v. Browner*, 87 F.3d 1379, 1384 (D.C. Cir.1996) (claim that "dire consequences . . . would befall [the plaintiff] if' certain events were to transpire insufficient to "state an injury sufficiently imminent and concrete for constitutional standing").  Second, Plaintiffs must establish a causal connection between the injuries complained of and the challenged agency action.  Plaintiffs' injuries must therefore be "fairly . . . trace[able]" to Federal Defendants' action (or, as here, inaction). *Lujan*, 504 U.S. at 560.  Third, Plaintiffs must show it is "likely, as opposed to merely speculative, that the injury will be addressed by a favorable decision" of the Court. *Id.* at 561 (internal quotation marks and citation omitted).

### i. Plaintiffs' Speculative Claims of Injury are Unsupported by the Declarations They Offer

Plaintiffs broadly assert that the introduction of online sports betting in Florida will "cannibalize" their businesses because, they contend, some unspecified portion of their existing customer base may opt to engage in it at some point in the future. ECF 19 at 23-24. Plaintiffs thus appear to assume, as they must to try to establish standing, that if online sports betting becomes available, it will have an instantaneous and transformative impact on the Florida gaming market to their detriment. Plaintiffs further assume that because some of their patrons may spend some of their gaming budget on sports betting wagers rather than on the games Plaintiffs offer, that such revenue likely will be diverted to the Tribe and forever lost to them. *Id.* Plaintiffs' own filings disprove such contentions.

In support of their Motion, Plaintiffs offer the Court results from a survey they conducted over two days with a portion of their existing customer base, *see* ECF 19-2 ("Padron Decl."); ECF 19-3 ("Savin Decl."); ECF 19-4 ("Chavez Decl.") (together, "Declarations"). Such surveys provide a limited snapshot of some customers' views concerning possible future sports betting in the abstract, but fail to establish that Plaintiffs will suffer any concrete or certainly impending injury as a result of the deemed approval of the Compact. Thus, Plaintiffs' unsupported speculation concerning potential but unspecified future economic harm stemming from the possible future introduction of online sports betting is insufficient to satisfy their burden of establishing standing in this case. This is exemplified by Mr. Savin's declaration, ECF 19-3, which offers Plaintiffs no support. First, his legal argument, *see* ECF 19-3 at 5 (¶¶ 20-22), and unsupported factual assertions, *see id.* at 5-11 (¶¶ 24-42), do not warrant the presumption of truth, *Weissman*, 2020 WL 4432251, at *2. Second, to the extent his remaining assertions rely on the work of Plaintiffs' other declarants, such reliance is misplaced for the reasons below.

10

The results of the survey conducted by Mr. Padron, ECF 19-2, and as analyzed by Mr. Chavez, ECF 19-4, fail to establish that Plaintiffs will suffer any concrete or certainly impending injury as a result of the introduction of online sports betting in Florida.  Even if the methodology employed for the surveys were reasonable—*i.e.*, if the tabulations were accurate and the number and demographic mix of the customers questioned constitutes a fair and accurate representation of Plaintiffs' entire customer base[5]—the answers to the survey questions paint at most an inconclusive future forecast.  And, as detailed below, the survey results do not support the broad and definitive conclusions Plaintiffs seek to draw from them.[6]

For example, the survey questions reveal that patrons were not asked if they would engage in online or in-person sports betting *to the exclusion of all other games*, nor were any of the questions premised on the understanding that Plaintiffs' facilities would not be the venue for them to do so. ECF 19-2 at 14.  Plaintiffs appear to assume that a patron's willingness to engage in sports betting necessarily means a corresponding reduction in spending on Plaintiffs' existing games for all time.  But the majority of respondents indicated they would increase their spending to incorporate sports betting, rather than divide their spending between sports betting and other games that Plaintiffs offer. ECF 19-2 at 25 (tally of responses to Question 5).  Indeed, none of

---

[5] Courts should carefully scrutinize any survey that asks biased, leading, or ambiguous questions. *See, e.g.*, *Manual for Complex Litigation, Sampling/Opinion Surveys*, § 11.493 at 103 (Federal Judicial Center, 4th ed. 2004) ("In assessing the validity of a survey, the judge should take into account . . . whether the questions asked were clear and not leading").

[6] And while Plaintiffs offer assurances that a survey taken on a Friday afternoon is approximate to a survey on any other weekday, and that the number of customers on a Saturday is consistent with the number on a Sunday, ECF 19-4 at 9, nothing in the survey actually demonstrates that the patrons selected for questioning are actually representative of Plaintiffs' typical customer base.  The survey thus fails to meet basic statistical standards. "The validity of a survey's results is undermined if the sample is not representative of the population it purports to represent or is not selected in a sufficiently random manner."  *United Parcel Service, Inc. v. U.S. Postal Service*, 184 F.3d 827, 840 n.14 (D.C. Cir. 1999).

the patrons surveyed—the overwhelming majority of whom indicated they visit Plaintiffs' facilities in-person "a few times a week or more," *id.*—were asked how likely it is that they would entirely abandon the games they play in Plaintiffs' facilities in favor of online sports betting, *id.* at 14.  And certainly none of the survey questions were premised on any understanding or assumption that the Tribe alone, and not Plaintiffs, would be the entity to offer such sports betting. *Id.*

Despite the lack of such key questions, Plaintiffs nevertheless conclude from these results that they "unambiguously demonstrate a stated pattern of behavior that would result in lost revenue for Magic City and/or Bonita Springs," ECF 19-4 at 14, or, based on their own supposition, that the "Tribe's online sports betting business" will "cannibalize Plaintiffs' in-person gaming business, both by permitting customers to gamble remotely, and by offering types of sports gaming that Plaintiffs are not permitted to offer by law." ECF 19 at 23.  But patrons were never asked if they would choose to stay home in lieu of visiting Plaintiffs' facilities to engage in online sports betting; or whether the answer changed depending on the entity who might offer the game. ECF 19-2 at 14.  Indeed, while Plaintiffs point to the number of patrons who responded that they would only place sports wagers online, ECF 19-4 at 16, a significant percentage of respondents, if not the majority, indicated they would place sports bets via all three methods identified (*i.e.*, in-person cash wagers; in-person kiosk wagers; or online). ECF 19-2 at 25; ECF 19-4 at 17.  Thus, even if some patrons might place sports bets exclusively online, a significant percentage, including the majority of patrons surveyed at Plaintiffs' Magic City Casino, were open to various methods, one of which (kiosks) is available to Plaintiffs were they to partner with the Tribe to offer the game.

Mr. Chavez's report further demonstrates how the survey results fail to substantiate Plaintiffs' injury claims.  First, the survey only included one question focused specifically on *online* sports betting, and it only asked whether the patron "would *open an online sports wagering account* where they *could* place bets from [their] phone, a tablet or computer." ECF 19-2 at 14 (emphasis added).  Mr. Chavez concludes that a "yes" answer to this question confirms that the patron would "bet on sports that are not currently legal to bet on through pari-mutuel means if online betting became legal in Florida." ECF 19-4 at 14.  But the question did not ask patrons whether they would *actually* place bets online, nor whether they would do so "through pari-mutuel means," just whether they would open an account.  If Plaintiffs wanted to know whether their patrons would place a sports bet wager online if the option became available, they could have asked that question, but they did not.  Plaintiffs may expect the Court to presume that a patron who is willing to open an online account would in fact place a wager online, but that is not an assumption this Court is required to make to establish standing.  It is Plaintiffs' burden to establish a concrete and certainly impending injury here, not the Court's.

Mr. Chavez's analysis of the survey results provides the Court with more reasons to find it unreliable.  In his analysis, Mr. Chavez excludes from the results those patrons who would *increase* their overall gaming spending if sports betting were to be offered, even though such respondents represented the majority of people surveyed, ECF 19-2 at 25, and whose response undercuts the notion that Plaintiffs will suffer economic losses as a result of the introduction of sports betting.  Lastly, Mr. Chavez focuses on the respondents who indicated they would "shift" some portion of their current spending to sports betting, concluding that "10-16% of current Bonita Springs Poker Room and Magic City Casino players would wager online and shift a non-zero amount of their current gambling spending away from poker and pari-mutuel betting." ECF

13

19-4 at 15.  While Mr. Chavez asserts the lack of ambiguity in such result, the question posed plainly does not ask patrons if they would "shift" their spending from Plaintiffs' facility to one of the Tribe's facilities.  The patron could have easily assumed that the "shift" in the question meant "shifting" their spending from a poker table at Plaintiffs' casino across the casino floor to a kiosk or sportsbook, or "shifting" spending from Plaintiffs' racebook to their sportsbook.  After all, the majority of survey questions consistently begin with the phrase, "[i]f sports betting were to become legal," but there is no explanation to respondents that the question pertains to *online* sports betting, as Mr. Chavez appears to assume, nor is there any explanation to respondents about whether Plaintiffs or some other entity would offer the game. ECF 19-2 at 14.

In other words, the patron could have readily assumed, based on the line of questioning, that Plaintiffs were considering developing an in-person sportsbook with both online and in-person betting options, and answered the survey questions on that basis.  Moreover, none of the questions got to the broader point Plaintiffs want this Court to derive from the surveys, namely, that once a patron "shifts" to sports betting, they are somehow "lost" forever as a customer, especially the majority of customers who, despite a global pandemic, reported that they visit Plaintiffs' facilities at least a few times each week.  Plaintiffs' assertion that once online sports betting is offered by the Tribe, they will forever lose those customers finds no support in the survey results, and Plaintiffs offer no other basis for this Court to make such an assumption. Plaintiffs have not offered any evidence about how online sports betting would fare in Florida, and they ignore information that calls into question Plaintiffs' assumption that its introduction in the state would result in immediate and transformative changes in the gaming market writ large.[7]

---

[7] *See*, *e.g.*, Andrew Barry, *Why Online Sports Gambling Companies May Never Earn Much Money*, BARRON'S, Sept. 9, 2021, https://www.barrons.com/articles/why-online-sports-gambling-companies-may-never-earn-much-money-51631199769 ("The U.S. online sports

In sum, it is simply unknown what the persons surveyed will do should the Tribe offer sports betting, whether in partnership with Plaintiffs or not. The answers to Plaintiffs' narrow survey questions simply do not support the broad conclusions they try to draw about whether and to what extent their patrons' gaming behavior or consumer choices would change as a result of the Tribe offering online sports betting. And because the survey was conducted with *existing* customers only, ECF 19-2 at 5 (¶ 15), Plaintiffs' contention that Tribe's offering of online sports betting will "diminish the amount of new business and new customer bases," ECF 19-3 at 6 (¶ 27) is entirely unsupported and should be rejected.[8]

### ii. Plaintiffs Cannot Establish Injury When Their Injury Depends on Their Own Business Decisions

Plaintiffs assert that the option to partner with the Tribe to offer online sports betting is not profitable enough and thus would still cause them economic injury. *See* ECF 1 at 36 (¶ 114) (objecting to amount of revenue they would need to share with Tribe if Plaintiffs offered online sports wagering through in-person kiosks at their facilities); *id.* at n.16 (stating that the cost to develop a web application would outweigh the benefits earned through the partnership as well as the losses they expect if they do not partner with the Tribe).

---

betting industry is losing a lot of money as more than a dozen companies compete for market share."); *id.* ("DraftKings has spent nearly $800 million in marketing and related expenses in the past 12 months" and expects to reach profitability within two to three years); *id.* ("many investors think the industry is too competitive and the business will never be profitable") (internal quotations omitted).

[8] And because the survey does not attempt to survey individuals who are presently *not* frequenting the establishment, but might do so if the facility participates in sport wagering or, alternatively, will not do so, the survey is under inclusive. The survey results therefore cannot be extrapolated to address potential customers, and any purported extrapolation at this point would be without basis. *See, e.g.*, *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 120-121 (D.D.C. 2003) ("Thus, even when presented with an opportunity to defend the extrapolation, the Defendants' counsel merely relied on the TTAB's decision to find that the survey represented the views of Native Americans as a whole. Moreover, the Defendants' counsel had no scientific basis for the extrapolation.").

This argument fails; Plaintiffs cannot establish standing based on injuries of their own making.  As detailed above, Plaintiffs contend that online sports betting will cause a significant portion of their existing customer base to abandon, for all time, the games Plaintiffs offer in favor of online sports betting.  Even if such proposition were accurate, and it is not, the fact that such dire forecast is *not enough* to incentivize Plaintiffs to join with the Tribe to offer those customers such gaming opportunity illustrates that it is not the deemed approval of the Compact that is the source of Plaintiffs' purported future injury, but rather Plaintiffs' own choices.[9]

Moreover, the speculative nature of their purported future potential economic harm is further demonstrated by the fact that the plaintiffs in the related suit, *Monterra MF, LLC et al. v. Haaland et al.*, No. 21-CV-2513, (D.D.C.), assert that if the Plaintiffs here partner with the Tribe to offer sports betting at a new facility (which the *Monterra* plaintiffs allege Plaintiffs purportedly plan to develop), such "expansion" of gaming will purportedly lead to increased traffic and other impacts. *See, e.g.*, *Monterra MF, LLC et al. v. Haaland et al.*, Compl. at 12-13 (¶¶ 32-33), No. 21-CV-2513 (D.D.C. Sept. 27, 2021).  Implicit in such assertion is the assumption that should Plaintiffs partner with the Tribe, they will draw *more*, not *fewer* customers to their facility, further calling into question Plaintiffs' assumption that such arrangement will cause them economic injury.

Lastly, the fact that any speculative future injuries depend on Plaintiffs' decision to partner, or not partner, with the Tribe, *see* ECF 19-3 at 8-11 (¶¶ 33-42), demonstrates that such injuries are not "fairly . . . trace[able]" to the deemed approval they challenge in this suit. *Lujan*, 504 U.S. at 560.  Likewise, Plaintiffs' concern about the injury posed by other entities possibly

---

[9] To the extent Plaintiffs assert that online sports betting would be profitable enough if they could offer it independently or in partnership with other commercial entities, they offer no support for such conclusion.

partnering with the Tribe, *see id.* at 7-8 (¶ 30), cannot establish Plaintiffs' standing here, as such injury stems from "the independent action of some third party not before the court," *Lujan*, 504 U.S. at 560, and not any action (or inaction) of Federal Defendants.

The unreliability of the Declarations, combined with the fact that, as discussed above, the *Monterra* plaintiffs forecast a future in which Plaintiffs' businesses generate more customers should they partner with the Tribe to offer sports betting, demonstrates that Plaintiffs fall far short of alleging a concrete, particularized, actual injury. *Lujan*, 504 U.S. at 560; *Amnesty Int'l USA*, 568 U.S. at 409-10.  The Complaint thus fails to allege any certainly impending injury in fact that derives from the deemed approval of the Compact.  The Complaint should therefore be dismissed for lack of jurisdiction.

### C.  Plaintiffs Fail to State Plausible Claims for Relief

#### i.  Count I Fails Because the Deemed Approval of the Compact Does Not Violate the APA

Even if Plaintiffs had the requisite standing to pursue Count I, and they do not, they have failed to state a plausible claim for relief.  Plaintiffs assert that, because certain provisions in the Compact are allegedly contrary to IGRA, the Wire Act, and the UIGEA, the Secretary acted arbitrarily and contrary to law by allowing the Compact to become effective. ECF 1 at 39-41 (¶¶ 124-34).  This claim not only fails as a matter of law to plead a plausible claim for relief, but by asserting the claim, Plaintiffs have pled themselves right out of court.

IGRA plainly states that "[i]f the Secretary does not approve or disapprove a compact . . . before the date that is 45 days after the date on which the compact is submitted to the Secretary for approval, the compact shall be considered to have been approved by the Secretary, *but only to the extent the compact is consistent with the provisions of this chapter*." 25 U.S.C. § 2710(d)(8)(C) (emphasis added).  When discussing this statutory provision, the Complaint and

the Motion routinely omit the pivotal statutory caveat at the end of the provision in an apparent attempt to mischaracterize the Secretary's inaction as an "approval." *See*, *e.g.*, ECF 1 at 18 (¶ 62); ECF 19 at 18.  In any event, if Plaintiffs are correct that certain provisions of the Compact are contrary to IGRA, then under their own theory, those provisions were not actually deemed approved.  As a result, the Secretary could not have made the allegedly unlawful approvals that form the basis of Count I.

The D.C. Circuit's decision in *Amador County v. U.S. Dep't of Interior*, 640 F.3d 373 (D.C. Cir. 2011), does not call for a different conclusion.  Plaintiffs rely heavily on *Amador County* to assert that the Secretary had a "legal obligation" to disapprove the Compact, *see* ECF 1 at 18-19 (¶ 63); ECF 19 at 47-48, but such reliance is misplaced.  *Amador County* addressed whether a statutory deemed approval of a compact was judicially reviewable under the APA, and it concluded it was.  *Amador County*, 640 F.3d at 380–83.  But the question of whether a private right of action exists under the APA is distinct from the question of whether Plaintiffs have pled a plausible claim for relief.

While the *Amador County* court did state in the context before it that IGRA obligates the Secretary to disapprove (rather than not act upon) a compact that violates provisions of IGRA, *see id.* at 381, 382, the *Amador County* court did not actually conclude in that case that the Secretary should have disapproved the subject compact at issue.  Instead, the court remanded the matter to the district court to consider a separate question relevant to the basis for the challenge—*i.e.*, whether the County was precluded from arguing that the subject Indian tribe's reservation did not constitute "Indian lands" under IGRA. *Id.* at 384.  The district court concluded that the County was so precluded, and the deemed approval remained intact as a result. *See Amador Cty. v. S.M.R. Jewell*, 170 F. Supp. 3d 135, 144-47 (D.D.C. 2016), *aff'd*,

*Amador Cty., Cal. v. U.S. Dep't of Interior*, 707 Fed. App'x 720, 721 (D.C. Cir. Nov. 27, 2017).

And unlike this case, *Amador County* did not involve a claim that a specific compact provision violated IGRA; rather, the County challenged the entire compact on the premise that the subject tribe's reservation did not constitute "Indian lands" under IGRA.  Moreover, the *Amador County* court did not explain how it might "direct the Secretary to disapprove [a] compact" that had been deemed approved, *Amador County*, 640 F.3d at 382, given that by such time, the forty-five day review period would have expired and the Secretary would be without authority to make any decision on such compact.  Nor did the *Amador County* court endorse what Plaintiffs propose here, namely a provision-by-provision examination of the legality of a Compact under various federal and state laws.  As a result, *Amador County* fails to support Plaintiffs.  Indeed, if Plaintiffs' reading of the case were correct, then the D.C. Circuit in effect erased the last clause of 25 U.S.C. § 2710(d)(8)(C).  Such a result would violate the rule of statutory construction that Courts must give meaning to all words in a statute. *See Moskal v. United States*, 498 U.S. 103, 109-10 (1990).  If the D.C. Circuit had intended such a sweeping rewrite of IGRA, surely it would have expressly said so.

Count I also fails to state a claim for another reason.  The Complaint alleges that the Secretary acted arbitrarily because the Compact purportedly authorizes gaming that is not otherwise permitted in Florida, contrary to 25 U.S.C. § 2710(d)(1)(B). ECF 1 at 25-29 (¶¶ 84-95); ECF 19 at 40, 43.  But IGRA authorizes Class III gaming on Indian lands where the tribe has an approved ordinance and the gaming is "(B) located in a State that permits such gaming for any purpose by any person, organization, and entity; *and* (C) conducted in conformance with a Tribal-State compact . . . ." 25 U.S.C. § 2710(d)(1)(B)-(C) (emphasis added).  The requirements in subparagraphs (d)(1)(B) and (d)(1)(C) are conjunctive.  Having an approved tribal-state

compact under (d)(1)(C) does not authorize a tribe to conduct gaming activities that would otherwise be contrary to the limitation in (d)(1)(B).  Thus, Count I fails to a state a claim that the Secretary unlawfully "authorized" otherwise impermissible gaming.

Moreover, nothing in IGRA or Interior regulations requires the Secretary to resolve an issue of state law before allowing a compact to become deemed approved under IGRA. *See* 25 U.S.C. § 2710(d)(8)(A); 25 C.F.R. §§ 293.7, 293.8. *See also Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1557 (10th Cir. 1997) ("[T]he Secretary is not expected to *resolve* state law issues regarding that authority in the 45-day period given to [her] to approve a compact") (emphasis in original).  Interior regulations set forth what compacting parties must submit to demonstrate that a compact has been "entered into" between a state and an Indian tribe. 25 C.F.R. § 293.8(a)-(c) (an original copy of the compact or amendment; a tribal resolution "that certifies that the tribe has approved the compact or amendment in accordance with applicable tribal law"; and "[c]ertification from the Governor or other representative of the State that he or she is authorized under State law to enter into the compact or amendment").  Here, the Tribe and the State submitted to the Secretary not only the Compact, a tribal resolution, and a certification from the Governor, *see* ECF 1-6 at 2 n.1, but further submitted a copy of legislation enacted by the Florida legislature ratifying the Compact, *id.*  Nothing more was required for the Secretary to confirm that the Compact had been "entered into" such that the forty-five day review period set by IGRA commenced. *See Pueblo of Santa Ana*, 104 F.3d at 1555 (IGRA requires that a compact be "entered into" "before it can go into effect"); *see also Class III Tribal State Gaming Compact Process*, 73 Fed. Reg. 74,004, 74,005 (Dec. 5, 2008) (regulation codified at 25 C.F.R. § 293.8 promulgated so as to require "documentation from both the tribe and the State certifying that their respective representatives were authorized to execute the proposed compact or amendment"

20

such that it can go into effect).  Plaintiffs' allegations are premised on the notion that Interior was required to look behind the State's certification and duly enacted state legislation submitted with the Compact to confirm whether the documents submitted by two branches of Florida's government complied with the Florida constitution.  Neither IGRA nor Interior regulations impose such a requirement.

In summary, taking "no action" on a compact is permissible under IGRA and only requires publication in the *Federal Register* that the deemed approval occurred. 25 U.S.C. § 2710(d)(8)(A)-(D).  *Amador Cty.* does not and did not impose additional obligations on Interior with respect to the Compact.

### ii. Count II Fails Because the Deemed Approval Does Not Violate the Equal Protection Clause of the United States Constitution

Even assuming that Plaintiffs otherwise have standing, Count II—their constitutional claim[10]—should be dismissed because it fails to state a plausible claim for relief.  Plaintiffs assert that the deemed approval of the Compact, coupled with the implementation of the State Implementing Law, facilitate the "different treatment for gaming facilities [within Florida] on the basis of race, tribal affiliation or national origin" in violation of the Equal Protection Clause of the Fifth Amendment to the United States Constitution ("Equal Protection Clause" or "Clause"). ECF 1 at 41 (¶ 139); *id.* at 42 (¶ 144).  This purported "state-wide, race-based monopoly," Plaintiffs contend, precludes them "from competing with the Tribe even within their own pari-mutuel facilities in offering sports wagering and online sports wagering." *Id.* (¶ 140).  Thus,

---

[10] While Plaintiffs contend that the doctrine of constitutional avoidance "weighs against adopting any interpretation of IGRA that could uphold the Secretary's approval," ECF 19 at 43, the doctrine in fact is much broader, and also instructs courts not to address a constitutional question "if there is also present some other ground upon which the case may be disposed of." *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936).

Plaintiffs assert, "[u]nder the terms of the Compact and the [State] Implementing Law passed to enter the terms of the Compact into Florida law, Plaintiffs will no longer be able to compete on a level playing field with the Tribe." *Id.* at 41 (¶ 138).

As set forth below, Plaintiffs have failed to plead a plausible equal protection claim, because they are not similarly situated to the Tribe; there is no fundamental right at issue; and there is a well-established and long-recognized rational basis for Congress to enact laws that promote the self-government and economic self-sufficiency of federally recognized Indian tribes. Simply put, the Equal Protection Clause does not protect Plaintiffs from increased market competition and thus the Court must dismiss Plaintiffs' constitutional claim.

### 1.   Plaintiffs and the Tribe are not similarly situated.

The first of several flaws with Count II is that it is based on the incorrect assumption that Plaintiffs and the Tribe are similarly situated.  With regard to distinctions based on race, ethnicity, and the like, the Equal Protection Clause directs that "all persons similarly circumstanced shall be treated alike." *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920).  But "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147 (1940). Therefore, the Clause precludes dissimilar treatment only for those groups that are similarly situated. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 437-39 (1985). Only federally recognized Indian tribes can conduct gaming pursuant to IGRA. *See* 25 U.S.C. § 2703(4)-(5).  The threshold question, then, is whether private card rooms and racetracks are similarly situated to sovereign political bodies having a unique political status under the Constitution.  Manifestly, they are not.  IGRA authorizes federally recognized tribal governments to enter into compacts with states that, if approved by the Secretary, or deemed

approved by operation of IGRA, permit that tribal government to conduct Class III gaming.  To

say that private casinos are similarly situated to federally recognized Indian tribes is to ignore

entirely the historically unique political status of such Indian tribes vis-a-vis the United States.

*See*, *e.g.*, *United States v. Wheeler*, 435 U.S. 313, 322-23 (1978).  This is the very essence of the

Supreme Court's conclusion in *Morton v. Mancari*, 417 U.S. 535, 553-55 (1974), namely that a

preference in favor of a tribe is not a race-based preference at all.  It is precisely because of this

unique status of tribes as political entities that IGRA was enacted to afford both the tribal

governments and the states a role in the governmental regulation of Class III gaming.  Without a

threshold showing that Plaintiffs are similarly situated to the Tribe, the Constitution's equal

protection guarantee is not triggered, and therefore the inquiry must end.

      Even if this high hurdle could be surmounted, however, the next question the Court must

resolve is the appropriate standard of review to apply in determining whether the deemed

approval violates the Clause.[11]  To the extent that the deemed approval could be challenged on

an equal protection ground, rational basis review is applicable, and Plaintiffs' claim would

necessarily fail for the two reasons explained below.

---

[11] Government actions challenged on equal protection grounds may be subject to one of three
levels of judicial review, depending upon the nature of the claim involved. Actions can be
subject to strict scrutiny when they discriminate against a suspect class, such as a racial group,
*see, e.g., Grutter v. Bollinger*, 539 U.S. 306, 326 (2003), or when they impact a fundamental
right such as the right to vote, *see, e.g., Reynolds v. Sims*, 377 U.S. 533, 562 (1964). Actions are
subject to an intermediate level of scrutiny when they discriminate based on certain other
classifications, such as gender. *See, e.g., Miss. Women for Hope v. Hogan*, 458 U.S. 718, 723
(1982). All other actions are subject to rational basis review. *Fitzgerald v. Racing Ass'n*, 539
U.S. 103, 106-07 (2003). Rational basis review, then, is applied to determine the legitimacy of a
classification where no suspect class is involved and no fundamental right is burdened.  Such
review is very deferential, such that a law or action will survive this level of review so long as it
"bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996).

## 2.   First, there is no fundamental right present.

Strict scrutiny is warranted only where the statute at issue makes classifications based on race or national origin, or infringes on a fundamental right. *Clark v. Jeter*, 486 U.S. 456, 461 (1988); *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).  There is, of course, no fundamental right to engage in gaming or to be insulated from economic competition.  Plaintiffs do not assert they are members of a suspect class, but they contend that deemed approval of the Compact somehow creates an impermissible classification based on race or national origin.  Not only do Plaintiffs' contentions lack merit, but because they cannot establish that the Secretary's inaction with respect to the Compact infringes on any fundamental right, strict scrutiny is not warranted in this case on that basis either.

Thus, IGRA and any Interior action (or inaction) taken pursuant to it are entitled to a strong presumption of validity.  Classifications not involving fundamental rights or suspect classes must be upheld "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 319-20 (1993).  The United States "has no obligation to produce evidence to sustain the rationality of a statutory classification," and "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Id*. at 320, 321. The burden is instead on the party attacking the legislative alternative to negate every conceivable basis which might support it. *Id*. at 320.  As the Supreme Court stated in *Nordlinger v. Hahn*, 505 U.S. 1, 11-12 (1992):

> [T]he Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification . . ., the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker . . ., and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

Moreover, the Supreme Court has stated that when social or economic legislation is at issue, the Equal Protection Clause allows legislators "wide latitude," and the Constitution "presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne*, 473 U.S. at 440.  For much the same reason, courts have consistently rejected the contention that state laws which prohibit certain forms of gambling, such as individual lotteries, but allow other forms of gambling, such as a state lottery, violate the Clause. *United States v. Williams*, 124 F.3d. 411, 423 (3d Cir. 1997), *cert. denied*, 118 S. Ct. 698 (1998); *United States v. Washington*, 879 F.2d 1400, 1401 (6th Cir. 1989).

No court that has heard an equal protection challenge related to tribal gaming has applied strict scrutiny, and all have rejected the claim.  In *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 731-36 (9th Cir. 2003) (hereafter, "*Artichoke Joe's*"), the Ninth Circuit held that California Proposition 1A, which adopted an exception from the general state prohibition against casino gambling exclusively for the benefit of Indian tribes engaged in Class III gaming, was consistent with IGRA, *id.* at 731, and did not violate petitioners' right to equal protection of the laws, *id.* at 731-40.  The court concluded that, because Proposition 1A granted preferential treatment to Indian Tribes based on their political status, rather than the race of their members, Proposition 1A is subject to rational-basis review. *Id.* at 736.  The court further found that Proposition 1A is a rational means for California to regulate the growth of Class III gaming in the State while also fostering tribal sovereignty and self-sufficiency, consistent with IGRA's goals. *Id*. at 736-42. *See also United States v. Garrett*, 122 F. App'x 628, 632 (4th Cir. 2005) (rejecting equal protection argument related to a compact between the Eastern Band of Cherokee Indians and the State of North Carolina raised as a defense to a criminal prosecution under 18 U.S.C. § 1955); *KG Urban Enters. v. Patrick*, No. 11-CV-12070, 2014 WL 108307, at *1, 8-10

(D. Mass. Jan. 9, 2014) (rejecting the argument that the Massachusetts Gaming Act, which for one geographic region of the State "contained a built-in preference for a casino under the control of a federally recognized Indian tribe," created a race-based classification).

### 3. Second, *Mancari*'s "rational relationship" test applies, and the challenged deemed approval easily satisfies that test.

Since 1974, the Supreme Court has repeatedly held that federal statutes providing special treatment based on membership in a federally recognized Indian tribe do not impose suspect racial classifications. *Mancari*, 417 U.S. at 554-55; *see also, e.g., United States v. Antelope*, 430 U.S. 641, 643-47 (1977); *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 479-80 (1976); *Fisher v. District Court*, 424 U.S. 382, 390-91 (1976). Such provisions instead draw political classifications, which are upheld "[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians." *Mancari*, 417 U.S. at 555. That rational relationship standard applies here as well. "[I]f a statute is reasonably related to the special government-to-government political relationship between the United States and the Indian tribes, it does not violate equal protection principles. *Mancari*—and its progeny— confirm that classifications relating to Indians need not be specifically directed at Indian self-government to be considered political classifications for which rational basis scrutiny applies." *Brackeen v. Haaland*, 994 F.3d 249, 334 (5th Cir. 2021) (*en banc*).

*Mancari* involved a United States Bureau of Indian Affairs' ("BIA") hiring preference for members of federally recognized tribes. 417 U.S. at 553 n.24. The preference eligibility criteria are reproduced in the *Mancari* opinion and contain no requirement that an applicant live on or near a reservation. *Id.*[12] Non-Indians in *Mancari* contended that the preference constituted

---

[12] The *Brackeen* en banc court, surveying the applicable decisions, specifically rejected the argument advanced by Plaintiffs here, *see* ECF 19 at 45-46, that *Mancari* and its progeny

"invidious racial discrimination." *Id*. at 551.  A unanimous Supreme Court disagreed. *Id*. at 551-

55.  The Court explained that the preference was enacted against the "unique legal status of

Indian tribes under federal law and upon the plenary power of Congress, based on a history of

treaties and the assumption of a 'guardian-ward' status, to legislate on behalf of federally

recognized Indian tribes." *Id*. at 551.  Against that background, federal laws singling out tribes

and members are not suspect: to the contrary, "[l]iterally every piece of legislation dealing with

Indian tribes and reservations . . . single[s] out for special treatment a constituency of tribal

Indians living on or near reservations." *Id*. at 552.[13]  Turning to the particular hiring preference at

---

somehow apply only within the boundaries of a reservation. *Brackeen*, 994 F.3d at 336 (citing, e.g., *Am. Fed'n of Gov't Emps. v. United States*, 330 F.3d 513, 516, 521 (D.C. Cir. 2003), which affirmed a contracting preference that was "not restricted to Indian activities on or near reservations or Indian land").

[13] As the *Brackeen* en banc court noted, the Constitution itself provides particular authority with respect to Indian tribes:

> The historical development of the federal Indian affairs power is essential to understanding its sources and scope. See [*District of Columbia v.*] *Heller*, 554 U.S. 570, at 581, 128 S.Ct. 2783. Earlier, we reviewed the Framers' dissatisfaction with the untenable division of authority over Indian affairs between the states and the national Government under the Articles of Confederation. We explained how this led the Framers to endow the national government with exclusive, plenary power in regulating Indian affairs under the new Constitution. [] This intent, we observed, is revealed through a holistic reading of the Constitution; the combination of the charter's Treaty, Property, Supremacy, Indian Commerce, and Necessary and Proper Clauses, among other provisions, operate to bestow upon the federal government supreme power to deal with the Indian tribes. *See* [Gregory] Ablavsky, *Beyond the Indian Commerce Clause*, [124 YALE L.J. 1012], 1043-44 [(2015)]. Understandably, then, the Supreme Court has consistently characterized the federal government's Indian affairs power in the broadest possible terms. *See*, *e.g.*, *United States v. Lara*, 541 U.S. 193, 200 [] (2004) (noting that the Indian Commerce and Treaty Clauses are sources of Congress's "plenary and exclusive" "powers to legislate in respect to Indian tribes"); *Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue of N.M.*, 458 U.S. 832, 837 [] (1982) (discussing Congress's "broad power . . . to regulate tribal affairs under the Indian Commerce Clause"); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142, [] (1980) (same); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72, [] (1978) ("As we have repeatedly emphasized, Congress'

issue, *Mancari* explained that the preference for members of federally recognized tribes "does not constitute 'racial discrimination'" because "it is not even a 'racial' preference"; instead, it targets individuals for special treatment based on their affiliation with "quasi-sovereign tribal entities whose lives and activities are governed by" the federal agency offering the preference. *Id*. at 553-54.  That preference was permissible because it was "reasonably and directly related" to a "legitimate, nonracially based goal"—in that case, making the BIA more responsive to tribal needs. *Id*. at 554.[14]

Since *Mancari*, the Supreme Court has repeatedly rejected arguments that other federal laws singling out tribes and tribal members draw suspect racial classifications. *See, e.g., Antelope*, 430 U.S. at 643-47 (upholding statute subjecting Indians who commit crimes on Indian lands to federal jurisdiction); *Moe*, 425 U.S. at 479-80 (upholding exemption from state sales and

---

authority over Indian matters is extraordinarily broad . . . "); *Mancari*, 417 U.S. at 551-52 [] (noting that "[t]he plenary power of Congress to deal with the special problems of Indians is drawn both explicitly and implicitly from the Constitution itself").

*Brackeen*, 994 F.3d at 300.  This constitutional framework entirely undermines Plaintiffs' argument that the unique treatment of federally recognized Indian tribes is suspect.

[14] Plaintiffs make vague reference to discrimination on the basis of "national origin." ECF 1 at 40-42 (¶¶ 128, 139, 142); ECF 19 at 11-12, 44-45, 47. The challengers in *Mancari* attacked the BIA preference as one based on race rather than national origin, but had they fashioned a challenge based on national origin (*e.g.*, preferring individuals whose place of origin is any Indian reservation over all other individuals), nothing in the reasoning or logic of *Mancari* or its progeny suggests that such a claim would have fared any better.  First, American Indians and Alaska Natives born in the United States are United States citizens by birth. *See* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, § 14.01(1) (Nell Jessup Newton et al. eds., 2012) (citing 8 U.S.C. § 1401(b)).  Second, if Plaintiffs' objection stems from the fact that they may be ineligible for membership in an Indian tribe, such circumstance does not give rise to an equal protection claim. *See, e.g.*, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55-72 (1978) (Indian tribes possess inherent right of self-government, including the authority to determine their own membership, free of federal court interference).

personal property taxes for on-reservation Indians); *Fisher*, 424 U.S. at 390-91 (upholding law requiring individuals to bring adoption proceedings in tribal court).[15]  Courts considering challenges to Indian gaming and tribal-state compacts under IGRA uniformly agree. *See Artichoke Joe's*, 353 F.3d at 731-76; *Garrett*, 122 Fed. App'x at 632.  In *Artichoke Joe's*, non-Indians argued that California law permitting Indian tribes to conduct gambling activities that were not lawful for non-Indians violated their rights to equal protection, as guaranteed by the Fifth and Fourteenth Amendments to the Constitution. *Id*. at 714, 731.  The Ninth Circuit held that the distinction between Indian and non-Indian gaming interests was a political, rather than a racial, classification, and that rational basis review therefore applied. *Id*. at 731-36.  In reaching this conclusion, the court relied on *Mancari* and *Antelope*. *Id*. at 732-36.  The court held that "[t]he very nature of a Tribal-state compact is political: it is an agreement between an Indian tribe, as one participant, and a state, as another." *Id*. at 734.  Likewise, in *Garrett*, 122 Fed. App'x at 633, the Fourth Circuit applied *Mancari* in rejecting the argument of a non-Indian criminal defendant gaming operator that a compact between North Carolina and a tribe was unconstitutional. The court noted that

> [a]pplying the rational basis standard for Indian tribal preferences set forth in *Mancari*, we hold that the gaming preferences given to the Eastern Band of Cherokee Indians are rationally related to a legitimate governmental interest. The laws creating this preference "promot[e] the economic development of federally recognized Indian tribes (and thus

---

[15] Plaintiffs include a "*see also*" reference to *Rice v. Cayetano*, 528 U.S. 495 (2000), but fail to explain its relevance. *See* ECF 19 at 46. If Plaintiffs imply that *Rice* fundamentally rewrote *Mancari* along Plaintiffs' preferred lines, they are incorrect.  *Rice* involved a state statute that limited the right to vote in certain elections for state office to those whose distant ancestors had lived in Hawaii. *Id*. at 509.  *Rice* held that the state statute violated the Fifteenth Amendment's specific prohibition of race-based discrimination in voting.  The Court cited *Mancari* approvingly but recognized that the Hawaii statute was fundamentally different from the hiring preference at issue in *Mancari* because it drew distinctions based on ancestry alone, rather than based on current-day affiliation with a political entity. *Id*. at 518-20.  The hypothetical limit on *Mancari* articulated in *Rice*—that under the Fifteenth Amendment, legislatures may not bar non-Indians from voting in state elections—simply has no relevance to IGRA.

> their members)[.]" . . . The Supreme Court has explicitly held that this goal constitutes
> not just a legitimate, but an important government interest . . . . It also appears undisputed
> that gaming operators derive significant profits from their business. Therefore, gaming
> preferences for Indian tribes conducted on tribal land are a rational means of ensuring the
> economic development of the Eastern Band of Cherokee Indians. For these reasons,
> North Carolina's State-Tribal Compact and the scheme set forth pass muster under the
> rational basis standard of review.

*Id.* (citations omitted).  Plaintiffs thus fundamentally miss the point by attempting to place focus

on whether *Florida* has a "special relationship," ECF 19 at 47, with the Tribe.

Congress was well aware of the unique status of tribes and consciously legislated IGRA

on the premise that tribes were historically and legally unique political bodies with sovereignty:

> In determining what patterns of jurisdiction and regulation should govern the conduct of
> gaming activities on Indian lands, the Committee has sought to preserve the principles
> which have guided the evolution of Federal-Indian law for over 150 years.  In so doing,
> the Committee has attempted to balance the need for sound enforcement of gaming laws
> and regulations, with the strong Federal interest in preserving the sovereign rights of
> tribal governments to regulate activities and enforce laws on Indian land.  The Committee
> recognizes and affirms the principle that by virtue of their original tribal sovereignty,
> tribes reserved certain rights when entering into treaties with the United States, and that
> today, tribal governments retain all rights that were not expressly relinquished.

S. Rep. 100-446, 5.  Tribal-State compacts were thus Congress' method of respecting the unique

status of Indian tribes within federal law.

In light of the foregoing, no aspect of IGRA, or Federal Defendants' compliance with it,

involves a suspect racial classification.  The statute applies to the Tribe because of its

governmental status as a federally recognized tribe, not because of its members' Indian heritage.

It is well established that the United States may provide benefits to recognized Indian tribes to

further their interest in self-government and self-determination. *Antelope*, 430 U.S. at 645

("Legislation with respect to these 'unique aggregations' has repeatedly been sustained by this

Court against claims of unlawful racial discrimination."); *Mancari*, 417 U.S. at 552 ("Literally

every piece of legislation dealing with Indian tribes and reservations . . . single(s) out for special

30

treatment a constituency of tribal Indians living on or near reservations.").  IGRA, including its provisions concerning tribal-state gaming compacts, facilitates legitimate government interests, which are to "promote tribal economic development, tribal self-sufficiency, and strong tribal government." 25 U.S.C. § 2701(4).  Accordingly, the deemed approval by operation of the statute lacks any race-based characteristic.  Therefore, even if Plaintiffs could properly allege a violation of the equal protection guarantee, their claim would necessarily fail.

## II.    The Court Must Reject Plaintiffs' Request for a Preliminary Injunction

Plaintiffs' Motion seeks, in the alternative, that the Court grant a "preliminary injunction enjoining the Secretary's approval of the online sports betting portion of the Compact pending final judgment in this litigation." ECF 19-6; *see also* ECF 19 at 49-54.  But as explained below, Plaintiffs are not entitled to such extraordinary relief, which would, if anything, *alter* the status quo, not preserve it for future proceedings as Plaintiffs suggest.  Plaintiffs have failed to establish entitlement to a preliminary injunction, let alone any mandatory injunctive relief to alter the status quo.  The Court should reject Plaintiffs' alternative request for a preliminary injunction.

### A.  Standard of Review

A preliminary injunction "is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A preliminary injunction is "an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017).  In exercising this discretion, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  Moreover, the Supreme Court has also admonished that a preliminary injunction cannot issue on the basis of speculative or possible

injury. *Winter*, 555 U.S at 22 (movant must establish that irreparable harm is "*likely* in the absence of an injunction") (emphasis in original).  Thus, when considering a request for preliminary injunctive relief, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24 (internal citations and quotations omitted).

To prevail on a motion for a preliminary injunction, the movant must establish: (1) a likelihood of success on the merits; (2) a likelihood that they will suffer irreparable harm if the injunction is not granted; (3) that the balance of equities falls in their favor; and (4) that the preliminary injunction is in the public interest. *Id.* at 20; *Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011); *see also League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) (declining to address whether pre-*Winter* D.C. Circuit "sliding scale" approach is valid after *Winter*).  The last two factors—balance of equities and public interest— "merge" when "the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The moving party bears the burden of persuasion and must demonstrate, by a "clear showing[,]" that the requested relief is warranted. *League of Women Voters of the U.S.*, 838 F.3d at 6 (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)); *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) ("[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors").

And where, as here, a party "seeks a mandatory injunction—to change the status quo through action rather than merely to preserve the status quo—typically the moving party must meet a higher standard than in the ordinary case: the movant must show 'clearly' that [they are] entitled to relief or that extreme or very serious damage will result." *Farris v. Rice*, 453 F. Supp. 2d 76, 78 (D.D.C. 2006).

### B.  Plaintiffs Are Not Entitled to Emergency Mandatory Injunctive Relief

Plaintiffs contend that their request for a preliminary injunction is intended to preserve the status quo pending a decision on the merits of their claims. ECF 19 at 53-54.  But the "status quo" at the time Plaintiffs filed suit included a deemed approval that had already occurred, and a notice that had already been published in the *Federal Register*.  Accordingly, the chief function of and justification for issuance of a preliminary injunction—maintenance of the status quo at the time litigation is filed—is wholly absent here.

Plaintiffs' request also suffers from a fatal practical flaw, namely that if they are right that the online sports betting provisions of the Compact violate IGRA, (and the United States does not concede they are), then as a matter of law, such provisions are not in effect under IGRA and, as a result, there is nothing for the Court to enjoin.  Thus, it is only if Plaintiffs are *wrong* that the provisions violate IGRA, *i.e.*, that the subject provisions are "in effect" under IGRA, that there may be anything for this Court to enjoin.  But, of course, if Plaintiffs are wrong on the law, then they cannot demonstrate entitlement to the extraordinary remedy of preliminary injunctive relief.

In any event, courts routinely deny injunction requests against governmental agencies and entities that would alter the status quo, and the Court should do the same here. *See*, *e.g.*, *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (affirming denial of injunction that would, in effect, alter the status quo); *Sherley*, 644 F.3d at 398 (vacating a "preliminary injunction" that "would in fact upend the status quo" and impose a "hardship" on defendants).  The time frame for consideration of whether a "status quo" injunction should be issued is the status that existed before litigation. *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) ("The primary purpose of a preliminary injunction is to preserve the object of the controversy in its then existing condition—to preserve the status quo.").  Plaintiffs filed their Complaint on August 16, 2021,

and this Motion on September 21, 2021, after the deemed approval occurred and notice was published in the *Federal Register*.  Any request for relief that seeks to turn back the clock to a time before the either the deemed approval occurred, or notice was published, is aimed at *altering*, not *preserving* the status quo in this case.

And any request that would require Federal Defendants to do *anything* to alter this status quo would not only be in contravention to IGRA, but would in fact constitute a mandatory injunction that must be evaluated under the rigorous standard applied to those motions.  "A mandatory injunction, which requires an affirmative change to the pre-litigation *status quo*, 'is an extraordinary remedy, especially when directed at the United States Government.'" *U.S. Airline Pilot Ass'n v. Pension Benefit Guar. Corp.*, No. 09-CV-1675, 2010 WL 3168048, at *1 (D.D.C. April 16, 2010) (quoting *Sierra Club v. Johnson*, 374 F. Supp. 2d 30, 33 (D.D.C. 2005)). *See also Elec. Privacy Info. Ctr. v. U.S. Dep't of Justice*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) (mandatory injunction is one "'where its terms would alter, rather than preserve, the status quo by commanding some positive act[,]'") (quoting *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997)).

Plaintiffs, moreover, fail to explain what, exactly, should be "enjoined" here.  The Secretary's role with respect to the Compact ended when notice of the deemed approval was published in the *Federal Register*.  Neither the Secretary nor Interior has any role with implementing the Compact in Florida.  Thus, there is no future agency action to be taken with respect to the Compact that could be enjoined.  And to the extent Plaintiffs want this Court to unwind either the deemed approval or the *Federal Register* publication, they offer the Court no legal basis to do so.  Congress mandated the deemed approval and the publication through IGRA; thus any "unwinding" of these mandates would directly contravene that statute.

Because plaintiffs seek an order that, as to Interior and its officials, would properly be meaningless because there is nothing left for the agency to do, no injunction should issue against Federal Defendants.  Also, before the mandatory prerequisites for injunctive relief are even considered, the Motion fails for another reason: it seeks an order that essentially rules on the merits of Plaintiffs' claims.  It is not the proper function of preliminary injunctive relief to provide Plaintiffs with a means to bypass the litigation process and achieve rapid victory. *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 n.13 (D.C. Cir. 1969) ("a preliminary injunction should not work to give a party essentially the full relief he seeks on the merits") (per curiam); *see also Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("[I]t is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits."); *Cobell v. Kempthorne*, 455 F.3d 301, 314-15 (D.C. Cir. 2006) (explaining that the district court incorrectly styled its relief "as a preliminary injunction," when in fact it awarded a "portion of the ultimate relief sought" in the case).  A preliminary injunction is already a form of extraordinary relief; a mandatory injunction is subject to an even stricter standard; and a request for the full relief sought in the litigation raises the bar even higher. *See, e.g., City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117, 127 (D.D.C. 2006) (courts should review requests to upend the status quo "with even greater circumspection than usual").

The Court can therefore deny the Motion solely on the basis that it seeks relief that is impermissible against Federal Defendants.  Nevertheless, and as set forth below, even if the Court were to examine the prerequisites, none of them are satisfied.

### C.  Plaintiffs Fail to Demonstrate Entitlement to a Preliminary Injunction

#### i.  Plaintiffs Have Not, and Cannot, Demonstrate Irreparable Harm[16]

---

[16] Plaintiffs' inability to establish injury for standing purposes, *see supra* Section I(B), illustrates why they cannot establish irreparable injury. *See*, *e.g.*, *Cal. Ass'n of Private Postsecondary Schs.*

### 1. Plaintiffs' alleged harm is not imminent.

There is no need to act on Plaintiffs' request for preliminary relief now because no irreparable harm is imminent.  This Court cannot issue a preliminary injunction unless Plaintiffs demonstrate that its threatened injury is irreparable.  Plaintiffs fall far short of a clear showing that the relief they request is necessary to avoid serious, irreparable harm to their interests, especially given their claim to injury rests upon possible future harms that, in part, turn on their own business decisions as set forth above. *Winter*, 555 U.S. at 22.  That alone merits the denial of the Motion.  This is because "[r]egardless of whether the sliding scale framework applies, a movant must at minimum demonstrate irreparable harm, which has 'always' been '[t]he basis of injunctive relief in the federal courts.'" *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 398 (D.D.C. 2020) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)).  "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  Indeed, if a court concludes that a movant has not demonstrated irreparable harm, it need not even consider the remaining factors. *See CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

And no presumption of injury can be made.  In light of the Supreme Court's holding in *eBay*, a presumption of irreparable harm cannot be assumed simply because a movant establishes a likelihood of success on the merits. *eBay v. MercExchange LLC*, 547 U.S. 388, 393-94 (2006).  Because, irrespective of relative or public harms, a movant must establish *both* a likelihood of success on the merits *and* irreparable harm, and a court may deny a preliminary injunction based

---

*v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) ("A prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury.").

on the movant's failure to establish *either* of these two crucial factors without making additional findings as to the other factors. *E.g.*, *CityFed Fin. Corp.*, 58 F.3d at 747. Here, Plaintiffs cannot establish either a likelihood of success on the merits or irreparable harm, so the Motion should be denied on that basis alone.

As the Supreme Court has made clear, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Plaintiffs speculative, unsubstantiated claims of possible economic injury at some point in the future fails to establish their standing in this case, and further fails to meet the "high standard for irreparable injury," *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297, to warrant preliminary injunctive relief. It is a "well known and indisputable principle[]" that an "unsubstantiated and speculative" harm cannot constitute an irreparable injury for purposes of injunctive relief. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). Plaintiffs must also "substantiate" its "claim that irreparable injury is 'likely' to occur" with appropriate evidence, *id.*, but the Declarations they offer are entirely unreliable and fail to establish irreparable injury in this case.

Plaintiffs' Declarations, which tells the Court nothing about what its customer base may do if the Tribe offers online sports betting, fails to demonstrate that their future economic injury is "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters*, 838 F.3d at 7-8. And Plaintiffs offer the Court no basis whatsoever to conclude that, because some customers may try online or in-person sports betting, such customers will abandon Plaintiffs' businesses altogether. Plaintiffs thus further fail to demonstrate that such purported harm is "beyond

remediation," which they must do to establish irreparable harm. *Id.* at 8. *See also Cal. Ass'n of Private Postsecondary Schs.*, 344 F. Supp. 3d at 170 (even if movant's claimed injury can establish standing, that "does not necessarily satisfy the more demanding burden of demonstrating irreparable injury"). Plaintiffs' "broad conclusory statements," about future potential economic injury stemming from the introduction of sports betting in Florida are insufficient to demonstrate irreparable injury. *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21 (D.D.C. 2013). And the Declarations they offer do not constitute the "competent evidence" required to support their claims of possible future economic injury. *Id.* at 21-22. Statements by a party or their counsel of potential impact are insufficient, since the moving party "must demonstrate the threat of irreparable harm by independent proof, or no injunction may issue." *Nivel Parts & Mfg. Co., LLC v. Textron, Inc.*, No. 3:17-CV-146-J-32JRK, 2017 WL 1552034, at *1 (M.D. Fla. May 1, 2017). *See also, e.g., Mike's Train House, Inc. v. Broadway Ltd. Imports, LLC*, 708 F. Supp. 2d 527, 533 (D. Md. 2010) ("Here, the lone affidavit of MTH's founder and owner, Michael Wolf, which asserts imprecise and exaggerated potential losses, does not establish irreparable harm.").

Thus, to be entitled to an injunction, Plaintiffs must substantiate that there is "likely," "imminent," and "irreparable" injury. Plaintiffs have not made and cannot make this showing.

## 2.   Alleged economic harm is not irreparable harm.

In this case, Plaintiffs make broad generalizations about speculative financial impact, without any independent, demonstrable support for the claim. No other assertions of harm are made. Even if Plaintiffs *could* demonstrate that some economic harm is likely, the general rule is that *economic harm does not constitute irreparable injury. Wisc. Gas Co.*, 758 F.2d at 674. And the fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of

irreparable harm, because the harm must be "more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff." *Mylan Pharms. v. Shalala*, 81 F. Supp. 2d 30, 42 (D.D.C. 2000) (citation omitted); *see also Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n.3 (D.C. Cir. 1977) ("The mere existence of competition is not irreparable harm, in the absence of substantiation of severe economic impact.").

### 3. Even if economic harm is relevant, Plaintiffs' alleged harm is speculative, not actual or imminent, and cannot be traced to Federal Defendants.

While Plaintiffs cannot base irreparable injury upon speculative purported harms, as the alleged harm must be certain, great, actual and not theoretical, *Winter*, 555 U.S. at 22, that is precisely what they have done in this case. Plaintiffs are required to demonstrate that irreparable injury is *likely* in the absence of an injunction, but the speculative, uncertain economic injury they contend they may experience at some unknown point in the future does not amount to irreparable injury. A plaintiff must show a significant risk of irreparable harm in order to obtain a preliminary injunction and thus, "[b]are allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact occur*. The movant must provide . . . proof indicating that the harm is certain to occur in the near future." *Wis. Gas Co.*, 758 F.2d at 674 (emphasis in original). Moreover, Plaintiffs have entirely failed to demonstrate that their purported economic injury is "likely to occur before the district court rules on the merits." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1260 (10th Cir. 2003)). And in making this showing, Plaintiffs must rely solely on injuries to themselves, not the interests of state residents as parens patriae, *see* ECF 19 at 13, in this lawsuit against the United States. *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179-80, 183 (D.C. Cir. 2019).

Plaintiffs also cannot recast their alleged loss as of goodwill or reputation in order to avoid this high hurdle. *See* ECF 19-3 at 7 (¶ 28-29); ECF 19 at 51.[17]  The Supreme Court has held that claims of loss of goodwill and damage to reputation do not establish irreparable harm in the context of a motion for injunctive relief. *Sampson v. Murray*, 415 U.S. at 91-92.  Consistent with *Sampson*, courts in this jurisdiction have repeatedly held that "[t]he loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms." *M3 USA Corp. v. Qamoum*, No. 20-CV-2903, 2021 WL 2324753, at *20 (D.D.C. June 7, 2021). *See also Econ. Rsch. Servs., Inc. v. Resol. Econ., LLC*, 140 F. Supp. 3d 47, 52-53 (D.D.C. 2015) ("Clients, though not fungible in the traditional sense are, nonetheless, the currency of commercial enterprise . . . [u]nfortunately for ERS, economic injuries of this kind are eminently compensable."); *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Rsrv. Sys.*, 773 F. Supp. 2d 151, 182 (D.D.C. 2011) (regulation that "will cause many mortgage brokers to lose their jobs or close their business" presented "purely economic injury")).

The fact that "economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm—for the harm *must also be great, certain and imminent*." *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 211 (D.D.C. 2012) (emphasis added) (internal quotation marks and citation omitted).  Plaintiffs cannot meet any of these requirements based on the bare allegations and speculation they have offered.  Although they reference a generalized projected harm to themselves stemming from the implementation of the sports betting provisions of the Compact, they make no effort to—and cannot—quantify specifically "the size of such

---

[17] Despite their assertions to the contrary, *see* ECF 19-3 at 7 (¶¶ 28-29), Plaintiffs have no "right" to a "level playing field" with the Tribe, as it is a matter of state policy whether to grant a Tribe the exclusive right to offer casino gaming, and such arrangement is permissible under federal law and the United States Constitution. *See*, *e.g.*, *Artichoke Joe's*, 353 F.3d at 731, 741-42.

impact, or the portion of such impact attributable to the [agency]," *Commonwealth v. Dep't of Educ.*, 340 F. Supp. 3d 7, 17 (D.D.C. 2018), as is required to justify preliminary relief.  This is especially true as the scope of their purported injury depends on whether to engage in the online sports betting program they oppose in this case—a decision only they can make. *See Winter*, 555 U.S. at 22 (mere "possibility" of irreparable harm cannot support a preliminary injunction); *Wis. Gas Co.*, 758 F.2d at 675-76 (finding the alleged harm "specious," given "common knowledge" that harm depends on many "variables"). *See also Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50-51 (D.D.C. 2011) (finding plaintiff failed to demonstrate irreparable harm where declarant mentioned his company's lost revenues and predicted that he "will be out of business within [eighteen] months" because declaration failed to "offer a projection of anticipated future losses, tie that to an accounting of the company's current assets, or explain with any specificity how he arrived at the conclusion that he would be forced out of business in eighteen months").

Moreover, Plaintiffs cannot demonstrate the seriousness of any financial harms, so as to justify an injunction against Federal Defendants, without first establishing that any financial harms were the *result of* the challenged deemed approval, *rather than by implementation of the Compact or the State Implementing Law by the State and the Tribe*, and are likely to continue into the future.  Plaintiffs' claimed potential future economic losses cannot be traced to IGRA and the deemed approval of the Compact by operation of the statute.  Instead, any loss—whether sufficient to show irreparable injury or not—is due to the implementation of the sports betting program rather than to any action (or inaction) taken by Federal Defendants.  This is demonstrated by the fact that Plaintiffs moved for emergency relief one month *after* they filed this suit, seeking a ruling from this Court not related to any action of Federal Defendants, but instead in connection with the date Plaintiffs assert the online sports betting program will be

operational (*i.e.*, November 15, 2021). ECF 19 at 53; ECF 9 at 2 (proposing schedule to seek a decision from the Court on the "purely legal issues in this case" "by or before November 15, 2021 – which is the date that Plaintiffs contend that the relevant provisions of the tribal state compact at issue in this case are scheduled to be implemented").

To obtain preliminary injunctive relief, Plaintiffs had to have to demonstrated that alleged financial loss will come directly from the federal statute, rather than the implementation of the program; they would have to show that Interior's deemed approval was the direct cause of such loss and will be the direct cause of that change in the future, and that any such injury would be both "certain and great."  They have not made, and cannot make, such a showing. *Cf. District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 37 (D.D.C. 2020) (finding irreparable harm where state plaintiffs showed significant anticipated injuries supported by concrete and specific examples of monetary costs of implementing agency's rule).  Plaintiffs' claimed economic injury cannot justify preliminary relief, and their failure to satisfy this prerequisite dooms their Motion.

### ii.  Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits

Because Plaintiffs cannot establish irreparable harm, the Court need not consider any other factor to deny the Motion.  Nevertheless, Plaintiffs cannot establish a likelihood of success on the merits, because, as explained above, they lack standing to maintain this suit. *See supra* Section I(B).  Because Federal Defendants have demonstrated that this suit should be dismissed in its entirety pursuant to Rule 12, the Court should also conclude that Plaintiffs cannot demonstrate a likelihood of success on the merits.

And because the Tribe has moved to dismiss this suit on the basis that it is a necessary and indispensable party that cannot be joined, *see* ECF 13-4, the Court should evaluate that question before evaluating Plaintiffs' Motion (and after considering the jurisdictional challenges

raised by Federal Defendants in this motion), as a finding that a party is necessary and indispensable but cannot be joined necessarily means that the plaintiff cannot demonstrate a likelihood of success on the merits.[18]

As this Court is aware, "Rule 19 governs compulsory party joinder in federal district courts." *E.E.O.C. v. Peabody W. Coal Co.*, 400 F.3d 774, 778 (9th Cir. 2005).  If the Court concludes that the Tribe is a required and indispensable party under Rule 19, then plaintiffs cannot demonstrate a likelihood of success in order to obtain an injunction. *See, e.g., Keweenaw Bay Indian Community v. State of Michigan*, 11 F.3d 1341, 1348 (6th Cir. 1993) ("We note first that the court did not err in considering the Rule 19 issue before addressing the Community's motion for a preliminary injunction . . . the court's subsequent dismissal of the action for failure to join an indispensable party rendered the injunction request moot."); *Tankersly v. Albright*, 514 F.2d 956, 965-66 (7th Cir. 1975) ("[Rule 19] interests must be weighed and the necessity or indispensability of absent persons determined prior to any consideration of the merits of a case"); *Escamilla v. M2 Tech., Inc.*, 536 Fed. App'x 417, 423 (5th Cir. 2013) ("Because the district court could not proceed to the merits without an indispensable party, it also follows that" plaintiff cannot succeed on the merits, "and so injunctive relief would not be appropriate.").

Simply put, if a necessary party cannot be joined, then the "merits may not be reached and a preliminary injunction may not be granted." *Boat Basin Inv'rs, LLC v. First Am. Stock Transfer, Inc.*, 2003 WL 282144, at *1 (S.D.N.Y. Feb. 7, 2003).  *See also Shenandoah v. U.S. Dep't of Interior*, 1997 WL 214947, at *3 (N.D.N.Y. Apr. 14, 1997) ("Plaintiffs' failure to join the Oneida Nation also disposes of their preliminary injunction motion, because plaintiffs cannot

---

[18] Federal Defendants take no position on the Tribe's *Motion to Dismiss* (ECF 13-4) at this time; Federal Defendants will respond to such motion on October 19, 2021. *See West Flagler Assoc., Ltd. et al. v. Haaland et al.*, Minute Order, No. 21-CV-2192 (Sept. 24, 2021).

show a likelihood of success on the merits of their lawsuit."); *Glancy v. Taubman Centers, Inc.*, 373 F.3d 656, 662 (6th Cir. 2004) (considering joinder where defendant did not affirmatively move for dismissal, but instead "raised the issue of joinder and lack of subject matter jurisdiction in its brief in opposition to Glancy's motion for a preliminary injunction."); *Sunset Homeowners Ass'n, Inc. v. DiFrancesco*, 386 F. Supp. 3d 299, 307 (W.D.N.Y. 2019) ("the nonjoinder of a necessary party is grounds to deny a preliminary injunction for failure to demonstrate a likelihood of success on the merits").

### iii.  The Balance of Equities and the Public Interest Weigh Against Injunctive Relief

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger*, 456 U.S. at 312 (citation omitted).  "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987). These factors— balance of harms and the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.  Plaintiffs have failed to demonstrate that these factors weigh in favor of granting an injunction in this case.

As discussed above, Plaintiffs allege purely economic harm stemming from the deemed approval of the Compact that is attenuated, speculative, and not imminent.  Plaintiffs cannot demonstrate either irreparable harm or a likelihood of success on the merits, and thus they cannot demonstrate that granting them this extraordinary relief would further any public interest at all. Moreover, the Secretary's role with respect to the Compact is limited, and she complied with IGRA by taking no action on the Compact and publishing notice of the resultant deemed approval in the *Federal Register*.  Thereafter, the Secretary had and continues to have no role

with respect to the Compact or its implementation.  Thus, there is nothing to "enjoin" in this case.  Given these circumstances, the balance of public and private equities clearly weighs against granting Plaintiffs any preliminary injunctive relief.

## CONCLUSION

Plaintiffs lack standing to maintain this suit, and they fail to state plausible claims for relief, and thus the Court should deny Plaintiffs' request for summary judgment on their claims. For these same reasons, Plaintiffs cannot establish a likelihood of success on the merits, nor can they demonstrate they are irreparably harmed by the deemed approval of the Compact, and thus they are not entitled to emergency injunctive relief in this case.  Accordingly, the Court should deny Plaintiffs' Motion and dismiss this suit in its entirety.

Respectfully submitted this 12th day of October, 2021.

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

/s/ Rebecca M. Ross
REBECCA M. ROSS, Trial Attorney
HILLARY K. HOFFMAN, Trial Attorney
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044
Telephone:  (202) 616-3148
Facsimile:  (202) 305-0275
Email: rebecca.ross@usdoj.gov

OF COUNSEL:
JODY H. SCHWARZ
Senior Attorney
Office of the Solicitor
Division of Indian Affairs

*Attorneys for Federal Defendants*

**CERTIFICATE OF SERVICE**

I, Rebecca M. Ross, hereby certify that on October 12, 2021, I caused the foregoing

FEDERAL DEFENDANTS' MOTION TO DISMISS to be sent electronically to the registered

participants as identified on the Notice of Electronic Filing.

/s/ *Rebecca M. Ross*
REBECCA M. ROSS, Trial Attorney
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice