**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| WEST FLAGLER ASSOCIATES, LTD., et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:21-cv-02192-DLF |
| | ) | |
| DEB HAALAND, in her official capacity as | ) | |
| Secretary of the United States Department of | ) | |
| the Interior, et al.; | ) | |
| | ) | |
| *Federal Defendants.* | ) | |
| | ) | |

**FEDERAL DEFENDANTS' REPLY
IN SUPPORT OF MOTION TO DISMISS**

Federal Defendants Deb Haaland, in her official capacity as Secretary of the Interior

("Secretary"), and the United States Department of the Interior ("Interior") (collectively,

"Federal Defendants"), by and through their undersigned counsel, hereby reply in support of

Federal Defendants' Motion to Dismiss (ECF 25).

Respectfully submitted this 26th day of October, 2021.

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

*/s/ Rebecca M. Ross*
REBECCA M. ROSS, Trial Attorney
HILLARY K. HOFFMAN, Trial Attorney
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044
Telephone:  (202) 616-3148
rebecca.ross@usdoj.gov
hillary.hoffman@usdoj.gov
*Attorneys for Federal Defendants*

OF COUNSEL:
JODY H. SCHWARZ
Senior Attorney
Office of the Solicitor
Division of Indian Affairs

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARGUMENT ......................................................................................................................2

  I.  Plaintiffs Lack Standing to Obtain Summary Judgment or Any Other Relief .....................2

      A.  Federal Defendants Have Not Waived or Conceded Merits Arguments ................3

          i.  Proper Scope of Any Merits Review .................................................................3

          ii.  Federal Defendants Have Not Conceded Merits Arguments ...........................4

      B.  It is Plaintiffs' Burden to Establish Standing, and Their Effort Fails .....................6

          i.  There is No "Burden Shifting" for Article III Standing .....................................7

          ii.  Plaintiffs' Declarations Only Portend Potential Future Injury, Based on a
Highly Attenuated Chain of Possibilities .........................................................8

              1. Submitting Declarations Comprised Only of Speculation Does Not Cure
the Standing Problem in this Suit ..................................................................9

              2. Mr. Savin's Declaration Fails to Establish Standing..................................10

              3. Plaintiffs' Reliance on Competitor Standing is Misplaced ........................13

              4. Plaintiffs' Survey Asked One Set of Questions, and Then Derived From
Them a Different Set of Conclusions ...........................................................15

          iii.  Plaintiffs' Requested Relief Reveals Their Redressability Problem ...............17

  II.  Plaintiffs Fail to Plead Plausible Claims for Relief.........................................................19

      A.  Plaintiffs' Count I Fails Because it is Premised On Mistaken Theories About the
Secretary's Obligations Under IGRA ..................................................................19

          i.  Deemed Approvals are Not *Per Se* Unlawful..............................................20

          ii.  The Secretary Was Not Required to Disapprove the Compact for Purported
Violations of UIGEA or the Wire Act........................................................22

      B.  Plaintiffs' Equal Protection Claim, Which is Predicated on Their APA Claim,
Fails to State a Plausible Claim for Relief ...........................................................23

CONCLUSION...................................................................................................................25

## INTRODUCTION

West Flagler Associates, Ltd. et al. ("Plaintiffs") seek judicial review of the approval, by operation of law, of a Tribal-State Compact negotiated by and entered into between the State of Florida ("State" or "Florida") and the Seminole Tribe of Florida ("Tribe").  ECF 1.  Plaintiffs style their claims against the Secretary of the Interior as claims under the Administrative Procedure Act, 5 U.S.C. §§ 701-06 ("APA"), and the Equal Protection Clause.

The Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-21 ("IGRA"), provides that where the Secretary did not approve or disapprove the Compact during the statutorily-identified 45-day review period, "the [C]ompact shall be considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of this chapter." *Id.* § 2710(d)(8)(C).  Following the passage of the 45 days, on August 11, 2021, the Compact was thus considered to have been approved ("deemed approved"), *see Indian Gaming; Approval by Operation of Law of Tribal-State Class III Gaming Compact in the State of Florida*, 86 Fed. Reg. 44,037, 44,037 (Aug. 11, 2021), but only to the extent it is consistent with IGRA.  *Id.* Thereafter the Secretary had, and continues to have, *no role whatsoever* with respect to the Compact or how it might be implemented.

Plaintiffs demand to be heard on the purported "merits" of their claims, which they contend center on the legality of certain provisions of the Compact, ECF 30 at 25-28, but such position suffers from two fatal flaws.  First, they are not entitled to any relief at all in this case because they lack standing and have failed to plead plausible claims for relief.  Second, Plaintiffs' erroneous contention that Federal Defendants waived or otherwise conceded factual issues or merits defenses must be rejected.  Federal Defendants timely moved to dismiss all claims in this case pursuant to Rule 12 of the Federal Rules of Civil Procedure, raising serious

questions about this Court's jurisdiction.  Just because Plaintiffs want merits review on an

expedited basis—based on unsubstantiated statements from unidentified individuals described as

"representatives of the Tribe" made either "since Plaintiffs filed this Complaint," ECF 19 at 17

n.4, or "in late May or June 2021," ECF 19-3 at 5 (¶ 23)—does not mean that they have standing

or are otherwise entitled to relief in this case, nor does it mean that Federal Defendants were

required to engage them on such issues.  For these and the reasons set forth below, as well as in

prior briefing, *see* ECF 25, the Court should dismiss this suit for lack of jurisdiction and because

Plaintiffs have failed to plead plausible claims for relief.

## ARGUMENT

### I.   Plaintiffs Lack Standing to Obtain Summary Judgment or Any Other Relief

While Plaintiffs claim an entitlement to "merits" review and related relief, the first task

for the Court in this case is to evaluate whether it possesses the requisite jurisdiction to proceed.

"Without jurisdiction the court cannot proceed at all in any cause." *Ex parte McCardle*, 74 U.S.

506, 514 (1868).  And while Federal Defendants have moved for dismissal in this case, *see* ECF

25, the Court nevertheless also has "an independent obligation to determine whether subject-

matter jurisdiction exists," and when it is lacking, the proper course is dismissal. *Arbaugh v.

Y&H Corp.*, 546 U.S. 500, 514 (2006).  *See also Steel Co. v. Citizens for a Better Env't*, 523 U.S.

83, 101 (1998)).[1]  As explained in more detail below, Plaintiffs offer nothing but speculative,

---

[1] "The Constitution limits the 'judicial Power of the United States' to 'Cases' or 'Controversies,'
U.S. Const. art. III, §§ 1-2, and the requirement of standing is 'rooted in the traditional
understanding of a case or controversy.'" *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 612
(D.C. Cir. 2019) (citation omitted). *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976).
Subject matter jurisdiction is a threshold issue that should be addressed prior to merits review.
*Steel Co.*, 523 U.S. at 88-89.  Federal courts presumptively lack jurisdiction "unless the contrary
appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (quotation
marks and citation omitted); *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377

future, hypothetical allegations of injury, which turn on the actions of parties not before the Court rather than any action (or inaction) of Federal Defendants. Plaintiffs have entirely failed to demonstrate Article III standing, and thus the Court should dismiss this suit in its entirety.

**A. Federal Defendants Have Not Waived or Conceded Merits Arguments**

**i. Proper Scope of Any Merits Review**

Should the Court decide to reach the merits of Plaintiffs' APA claim, such review must be based "consistent with the APA standard of review." *Zemeka v. Holder*, 963 F. Supp. 2d 22, 24 (D.D.C. 2013). And, critically, under the terms of IGRA and controlling precedent, that review should be limited to the question whether there is a fundamental conflict between the compact and IGRA itself. *See Amador County v. Salazar*, 640 F.3d 373, 383 (D.C. Cir. 2011).[2] IGRA's short, 45-day period before a submitted compact is "deemed approved" is properly read to require the Secretary to consider only whether the compact as a whole is consistent with IGRA, not with other federal or state laws, or the assimilation of that law into IGRA. *Compare* 25 U.S.C. § 2710(d)(8)(A) (allowing but not obligating the Secretary to disapprove a compact that violates IGRA or other federal law or trust obligations) *with id.* § 2710(d)(8)(C) ("If the Secretary does not approve or disapprove a compact . . . [within] 45 days . . . the compact shall be considered to have been approved by the Secretary, but only to the extent the compact is consistent with the provisions of" IGRA).

---

(1994) ("It is to be presumed that a cause lies outside this limited jurisdiction . . . and the burden of establishing the contrary rests on the party asserting jurisdiction." (internal citations omitted)).
[2] In the unique context before it, the *Amador County* court concluded the agency's views were not necessary. 640 F.3d at 382. Such conclusion does not mean that the agency's views are never necessary in cases involving a challenge to a deemed approved compact, nor does *Amador County* provide for detailed, provision by provision review of a compact under the APA.

This analysis is consistent with the D.C. Circuit's decision in *Amador County*.  The issue presented in that case was whether any of the lands at issue constituted Indian lands, without which IGRA-authorized gaming would not have been permissible at all on the Rancheria at issue.  That is, the court was confronted with an all-or-nothing argument about facial consistency between the compact and IGRA itself. *See Amador County*, 640 F.3d at 383 ("we hold that where, as here, a plaintiff alleges that a compact violates IGRA, thus requiring the Secretary to disapprove the compact, nothing in the APA precludes judicial review of a subsection (d)(8)(C) no-action approval."); *see also id.* at 381 ("While [a particular argument against reviewability] may be correct as to compliance with other federal law and trust obligations, the caveat demonstrates that Congress had no intention of trading compliance with IGRA's requirements for efficiency in agency proceedings.").

Plaintiffs, in contrast, seek a provision-specific review of the Compact under various other federal and state laws. And Plaintiffs' Equal Protection Claim is not a facial challenge under IGRA, but is predicated on their APA claim and the details of the Compact, which they contend authorizes an unconstitutional "race-based monopoly" with respect to sports betting because the State has not authorized entities other than the Tribe to offer the game.  ECF 1 at 12-13 (¶ 43).  Should the Court determine it can and will reach the merits of Plaintiffs' claims, which exceed *Amador County*, such review must be done consistent with the APA.

### ii.  Federal Defendants Have Not Conceded Merits Arguments

Plaintiffs, while avoiding the term "waiver," contend without citation that because Federal Defendants did not engage them on the merits, ECF 30 at 8; did not counter their "evidence," *id.* at 19; and also did not file a responsive statement of facts, *id.* at 10, 14-15, Federal Defendants "conceded the accuracy of Plaintiffs' factual assertions." *Id.* at 10.  Not so.

4

It is beyond dispute that '[d]efendants do not have an obligation to raise every anticipated defense in a motion to dismiss." *Montgomery v. Risen*, 197 F. Supp. 3d 219, 239 (D.D.C. 2016), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017).  Federal Defendants filed a timely motion to dismiss; such response does not waive merits arguments. *See*, *e.g.*, *Whitsitt v. Krohomer*, No. 04-CV-2476, 2005 WL 2036923, at *6 (N.D. Cal. Aug. 22, 2005) (motion to dismiss "permissible response" and "does not waive any of the defendants' rights") (citing Fed. R. Civ. P. 12); *Jensen v. Corp. U.S.*, No. 94-CV-1296, 1995 WL 419809, at *1 (D. Ariz. Jan. 17, 1995) (defendants can seek dismissal on any grounds and do not waive merits arguments when they do).[3]

Plaintiffs' pronouncements also contradict the statements they made when seeking expedited briefing, *see* ECF 9 at 2 (stating intent to brief "purely legal issues"); *id.* at 3 (issues could be "resolved without the need for production of the administrative record").  In APA cases, the district court "sits as an appellate tribunal," and the question of whether the agency "acted in an arbitrary and capricious manner is a legal one which the district court can resolve on the agency record." *Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999).  Thus, Plaintiffs cannot obtain summary judgment based on a collection of factual allegations, however packaged,[4] to form the basis of a merits ruling.  Any such ruling must instead be "based

---

[3] Plaintiffs argue that Federal Defendants had to proffer their own experts or depose Plaintiffs, as if to suggest standard summary judgment procedures apply. *See* ECF 30 at 16 n.3 (citing *Conn. Indemn. Co. v. 21st Century Transp. Co.*, 186 F. Supp. 2d 264, 276 (E.D.N.Y. 2002) and *Hambrick ex rel. Hambrick v. Ken-Bar Mfg. Co.* 422 F. Supp. 2d 627, 638-39 (W.D. Va. 2002)). But here, "Rule 56's standards do not apply to a court's review of a final agency action under the APA." *Landmark Hosp. of Salt Lake City v. Azar*, 442 F. Supp. 3d 327, 331 (D.D.C. 2020). While summary judgment "is the proper mechanism" for resolving APA claims, the Court's task in APA cases is to "decid[e], as a matter of law, whether the agency action is supported by the record "and consistent with the APA standard of review." *Zemeka*, 963 F. Supp. at 24.

[4] Plaintiffs' factual assertions—which include their purported statement of undisputed facts, ECF 19-1—may be used for some issues, ECF 25 at 9-10 n.4, but not for summary judgment in this APA case. Such position is consistent with Local Civil Rule 7(h)(2) (delineating cases involving judicial review of agency action) and this Court's Standard Order, ECF 6 at 4 (same).

on the record the agency presents," *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985),

"not some new record made initially in the reviewing court," *Camp v. Pitts*, 411 U.S. 138, 142

(1973).  Plaintiffs' effort to cobble together a pseudo-record upon which this Court should rule

shows that this case is not one in which "purely legal issues" can be resolved without the

agency's record. *Cf. Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 267 (D.C.

Cir. 2001) (court's narrow task was to interpret "the extent to which the [challenged] regulation

is consistent with the statute," and thus all the court determined it needed was "the statute and its

legislative history").[5]  Until such as time the Court determines Plaintiffs are entitled to such

review, Federal Defendants are not obligated to litigate over Plaintiffs' factual assertions so as to

defeat their summary judgment motion.

### B.   It is Plaintiffs' Burden to Establish Standing, and Their Effort Fails

"This case begins and ends with standing." *Carney v. Adams*, 141 S. Ct. 493, 498 (2020).

*See also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited

jurisdiction, we begin, and end, with an examination of our jurisdiction.").[6]  The Supreme Court

has "repeatedly reiterated that 'threatened injury must be certainly impending to constitute injury

in fact,' and that '[a]llegations of possible future injury' are not sufficient.'" *Clapper v. Amnesty

Int'l USA*, 568 U.S. 398, 409 (2013).  Plaintiffs, in seeking summary judgment, thus must now

provide "details" that render a "prediction of future injury" *certain* to occur. *Swanson Grp. Mfg.

LLC v. Jewell*, 790 F.3d 235, 242 (D.C. Cir. 2015); *In re Navy Chaplaincy*, 323 F. Supp. 3d 25,

---

[5] Even though Plaintiffs moved for summary judgment, Federal Defendants do not rely on the administrative record in the Motion to Dismiss and are thus not obligated to present it under Local Civil Rule 7(n) until such time as they answer the Complaint.

[6] *See also Freedom Watch, Inc. v. McAleenan*, 442 F. Supp. 3d 180, 186 (D.D.C. 2020); *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

39 (D.D.C. 2018) ("On summary judgment, the plaintiff must establish each of these elements [of standing] with 'specific facts' set out by affidavit or other admissible evidence.").

Plaintiffs seek to obfuscate this burden, and they misunderstand the law governing standing. Their reliance on cases involving summary judgment, such as *Pub. Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 83–85 (D.D.C. 2019), only confirm and emphasize the daunting task they face in demonstrating standing. Plaintiffs' burden "varies depending on the stage of the litigation," and such burden "grows heavier at each stage." *Freedom Watch, Inc. v. McAleenan*, 442 F. Supp. 3d 180, 186 (D.D.C. 2020) (citations omitted). Thus, even if the Court were to decide under Rule 12(b)(1), and draw all allegations and reasonable inferences in the light most favorable to Plaintiffs, they would fail to satisfy Article III standing.[7] But now that they have sought summary judgment, they "face a far more demanding standard." *Pub. Citizen, Inc.*, 361 F. Supp. 3d at 83.[8]

### i. There is No "Burden Shifting" for Article III Standing

As the parties seeking to invoke subject matter jurisdiction, it is *entirely* Plaintiffs' burden to make the necessary evidentiary showing, despite Plaintiffs' assertions to the contrary. ECF 30 at 10. *See Clapper*, 568 U.S. at 412 n.4 (it is "not the Government's burden to disprove standing") (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)); *Steel Co.*, 523 U.S. at 104; *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990); *Warth v. Seldin*, 422 U.S. 490, 508 (1975). If Plaintiffs cannot do so now, "the ordinary rules of forfeiture apply to standing," *Gov't*

---

[7] *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (under 12(b)(1), neither legal conclusions nor unsupported inferences are construed in non-movant's favor).
[8] *See also Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006) (a plaintiff "must establish the predicates for standing 'with the manner and degree of evidence required at' that stage of trial.") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)); *Swanson*, 790 F.3d at 239-40.

*of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) (citing *Huron v. Cobert*, 809 F.3d 1274, 1280 (D.C. Cir. 2016)).  A court may not presume missing facts "necessary to establish" standing elements. *Swanson*, 790 F.3d at 239 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).[9]  Without sufficient evidence provided by Plaintiffs, the Court must conclude that it lacks standing and does not have subject matter jurisdiction. *See, e.g., Menoken v. Miles*, 270 F. Supp. 3d 200, 210 (D.D.C. 2017), *aff'd sub nom. Menoken v. Kerner*, 741 F. App'x 817 (D.C. Cir. 2018).

### ii. Plaintiffs' Declarations Only Portend Potential Future Injury, Based on a Highly Attenuated Chain of Possibilities

The Court's skeptical scrutiny of Plaintiffs' declarations is warranted here, as "this case is riddled with contingencies and speculation that impede judicial review." *Trump v. New York*, 141 S. Ct. 530, 535 (2020).  To meet Article III standing requirements, Plaintiffs were required to show that they have suffered an "injury in fact" that is "concrete and particularized" and actual or imminent, not "conjectural" or "hypothetical." *Lujan*, 504 U.S. at 560 (citations omitted). Such injury, moreover, cannot rely on a "highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410.  The Supreme Court has made clear that Plaintiffs' "abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III." *Simon*, 426 U.S. at 40.  Instead, a concrete injury—which must be shown "even in the context of a statutory violation," *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 341 (2016), must be "direct, real, and palpable—not abstract." *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety*

---

[9] Plaintiffs seek injunctive relief, so they also have "a significantly more rigorous burden to establish standing than that on parties seeking redress for past injuries." *Swanson*, 790 F.3d at 240 (internal citations and quotations omitted). And because they are not "the object of the government action or inaction" being challenged, "standing is not precluded, "but it is ordinarily substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (quotations omitted).

*Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007).  And a particularized injury must be "personal, individual, distinct, and differentiated—not generalized or undifferentiated." *Id.*

"Allegations of possible future injury do not satisfy the requirements of Art. III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).  Plaintiffs' claimed injuries must instead be imminent, *i.e.*, "certainly impending" to establish standing.  Plaintiffs' declarations, discussed below, reveal that the parade of potential future economic injury they predict is "no more than conjecture" at this time. *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983).  And because they rely on a "highly attenuated chain of possibilities," *Clapper*, 568 U.S. at 410, Plaintiffs fail to establish that their alleged injuries are "fairly . . . trace[able]" to the final agency action at issue here, *Lujan*, 504 U.S. at 560, and thus fail to establish standing.

### 1. Submitting Declarations Comprised Only of Speculation Does Not Cure the Standing Problem in this Suit

Plaintiffs cannot "remedy" insufficiency in their Complaint simply "by attaching declarations." *In re Accuray, Inc. S'holder Deriv. Litig.*, 757 F. Supp. 2d 919, 926 (N.D. Cal. 2010).  Given that "general averments" and "conclusory allegations" are inadequate, *Swanson*, 790 F.3d at 242-44 (internal quotations and citations omitted), Plaintiffs contend that their declarations establish certain "facts" in this case. ECF 30 at 10; *id.* at 14-15; *id.* at 16 n.3.  But these allegations of "uncertain and unspecific prediction of future harm . . . [are] inadequate to establish Article III standing." *Swanson,* 790 F.3d at 242.  Plaintiffs would have this Court accept the declarations at face value, as if they have a talismanic effect so as to transform Plaintiffs' nebulous and highly-attenuated claims into something more than a pile of speculation.

But instead of the alchemy that Plaintiffs hope for, courts dissect offered declarations, and dismiss complaints on standing when declarations fail to show more than the "possibility" of harm. *Id*. at 242-43 (declarations positing that injury "could" or "may" result "insufficient to

establish standing"); *Ass'n of Flight Attendants-CWA, AFL-CIO v. DOT*, 564 F.3d 462, 465-66

(D.C. Cir. 2009) (declarations insufficient). *See also Pub. Citizen, Inc. v. Nat'l Highway Traffic*

*Safety Admin.*, 513 F.3d 234, 237 (D.C. Cir. 2008) (alleged future harm insufficient); *Am.*

*Library Assn v. FCC*, 401 F.3d 489, 496 (D.C.Cir.2005) ("'[G]eneral averments,' 'conclusory

allegations,' and 'speculative "some day" intentions'" inadequate to demonstrate injury).

## 2.  Mr. Savin's Declaration Fails to Establish Standing

While Plaintiffs object to the manner in which Federal Defendants addressed Mr. Savin's

declaration in its Motion to Dismiss, ECF 30 at 14, a closer examination of it only further

confirms that, because it focuses on what *might* happen as a result of the Compact's deemed

approval, rather than what *will or is likely to* happen, it fails to establish standing. *See*, *e.g.*,

*Worth v. Jackson,* 451 F.3d 854, 858 (D.C. Cir. 2006) (assertion, by declaration, that plaintiff

"'intends to apply for new positions and promotions at HUD on a regular basis in the future' is

just the kind of speculative intention normally insufficient for standing purposes").

Other than his professional experience and beliefs about what the future may hold, Mr.

Savin relies on the declarations of Mr. Padron and Mr. Chavez for support, which as discussed

below, do not support the conclusions Mr. Savin tries to draw from them.  For example, Mr.

Savin simply concludes that "the Compact's online sports betting provisions will divert business

that would have been spent" at Plaintiffs' facilities, and "cause it to be spent on online sports

gaming offered by the Tribe" because "customers will prefer the ease of online gaming," ECF

19-3 at 5-6, even though such sweeping conclusions are not substantiated by the surveys

conducted.[10]  And because the survey Plaintiffs conducted did not pose questions to anyone

---

[10] Mr. Savin asserts that because the "Tribe also has the additional advantage of being able to offer on-site cash wagering," and because "many" of Plaintiffs' customers want to place untraceable bets, such offering benefits the Tribe. *Id.* at 6.  But Plaintiffs are not challenging the

except *existing* customers, Mr. Savin's assertion that "new business and new customer bases that can be generated by traditional pari-mutuel facilities" will "likely" diminish is baseless supposition, as is the statement that "[a]t least some potential new customers who otherwise would have traveled to [Plaintiffs'] facilities to conduct in-person gaming will prefer the convenience of the Tribe's online sports betting business." *Id.* at 6-7.

Likewise, Mr. Savin's speculation concerning his expected loss of goodwill or the inability to operate on a "level playing field" as the Tribe, ECF 19-3 at 7 (¶¶ 28-29), is entirely unsupported. Such assertion relies on the flawed conclusions of Plaintiffs' survey, discussed below, and further fails to account for the myriad reasons underlying consumer choices. For example, the "level playing field" to which Plaintiffs refer ignores that the Tribe's facilities are distinct both in scale and amenities as compared to Plaintiffs' businesses. Specifically, since 2009, Plaintiffs' Magic City Casino has offered "800 slot machines, electronic table games, such as blackjack, roulette, craps and baccarat, poker tables and tournaments, off-track betting and other live entertainment that draws in both in-state and out-of-state visitors." ECF 19-3 at 3 (¶ 8). In contrast, when the Tribe first opened its Hard Rock Casino and Resort in Hollywood, Florida in 2004, it offered a 500-room hotel; 4,000 gaming machines, poker tables, and multiple restaurants.[11] And today, the Tribe offers 3,100 slot machines; 200 table games; and a 45-table poker room. As part of this casino resort complex, the Tribe also operates three related hotel facilities, which together offer more than 1,200 hotel rooms for guests. In addition, the Tribe hosts a 7,000-person capacity concert venue; a comedy club, and "20 bars and lounges," and also

---

Tribe's ability to offer an in-person sportsbook at its gaming sites, and so whatever future "injury" Mr. Savin expects from such offering bears no relation to the claims here.

[11] John Holland, *From Hard Times to Hard Rock*, SUN SENTINEL, May 10, 2004, https://www.sun-sentinel.com/news/fl-xpm-2004-05-10-0405100094-story.html.

operates six fine dining restaurants, seven contemporary dining restaurants, and two additional locations offering coffee and to-go food options at the site.[12]  Plaintiffs' Bonita Springs Poker Room, which opened in May 2020, offers 37 poker tables as well as simulcasts of horse racing and jai-alai. ECF 19-3 at 4 (¶ 16).  The Tribe's Immokalee Casino, in contrast, first opened in 1994[13] and today offers 1,400 slot machines; 38 live table games; a nearly 100-room hotel; three restaurants and a coffee bar; three cocktail lounges; and a concert venue.[14]

And, even if it is reasonable to assume that Plaintiffs are currently operating on a "level playing field" with the Tribe, Plaintiffs have nevertheless maintained their "substantial, loyal customer base," ECF 19-3 at 7 (¶ 28), despite this existing competition, a significant majority of whom, per the survey results, ECF 19-2 at 26, visit Plaintiffs' facilities once a week or more. Plaintiffs contend, without providing supporting evidence, that as of November 15, 2021, the gaming market will immediately and suddenly shift.  On that date, Plaintiffs claim, their operation will suffer immediate harm because the Tribe will be able to offer sports betting pursuant to the Compact.  But the fact is, we simply do not know enough from Mr. Savin's declaration or Plaintiffs' survey whether any of Plaintiffs' customers might change their consumer choices at all, never mind based on what the Tribe may do.

Lastly, Mr. Savin asserts that the option to partner with the Tribe is itself an injury because (1) entering into the "likely illegal" business would involve investment costs that would exceed profits; and (2) they would still "lose" business to the Tribe or to other pari-mutuel operators who partner with the Tribe. ECF 19-3 at 7-8 (¶¶ 30-31), *id.* at 10 (¶ 39); ECF 30 at 9. With respect to the "legality" of a partnership with the Tribe, Plaintiffs feign disbelief that

---

[12] *See* SEMINOLE HARD ROCK HOTEL & CASINO, https://www.seminolehardrockhollywood.com.
[13] *See* SEMINOLE IMMOKALEE CASINO, https://www.seminoleimmokaleecasino.com/about-us.
[14] *See* SEMINOLE IMMOKALEE CASINO, https://www.seminoleimmokaleecasino.com.

Federal Defendants would not concede that Plaintiffs would suffer injury by entering into "a business of questionable legality." ECF 30 at 21.  But Plaintiffs' repeated assertions about the purported "illegality" of sports betting under Florida law is premised on the theory that the state law ratifying the Compact violates the Florida Constitution. ECF 1 at 3-4 (¶ 5); ECF 19 at 15-16. Neither Federal Defendants nor the Court is required to accept Plaintiffs' pronouncements on the legality of state law or their attempt to premise standing on the idea that undertaking gaming authorized by state law would be unlawful in a way that would injure them or their reputation.

With respect to the contention that investment costs will render a partnership unprofitable, Mr. Savin lists types of expenditures, but offers no specifics as to what those costs could be. ECF 19-3 at 8-9 (¶ 34).  Mr. Savin then summarily asserts that after such investments Plaintiffs "will realize a lesser yield from the kiosks than the yield it now realizes from its lines of businesses that will be cannibalized by the Tribe's online sports betting business." *Id.* at 9 (¶ 35).  Such assertions lack substantiation because the amount of purported investment costs is entirely unknown, and it is entirely possible no customers will imminently "shift" their spending to the Tribe or a pari-mutuel competitor.  Plaintiffs do not establish standing by positing potential future scenarios and letting the Court fill in the details.  They instead have to establish concrete, particularized, and imminent injury stemming from the Compact's deemed approval.

### 3.   Plaintiffs' Reliance on Competitor Standing is Misplaced

Plaintiffs assert that as a competitor, they readily satisfy the elements of Art. III standing. ECF 30 at 13; *id.* at 14 n.2.  But competitor standing requires proof of an "actual or imminent increase in competition" at the outset. *Am. Inst. of Certified Pub. Accts. v. IRS*, 804 F.3d 1193, 1197 (D.C. Cir. 2015); *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010). *Delta Air Lines, Inc. v. Export-Import Bank of United States*, 85 F. Supp. 3d 250, 267 (D.D.C. 2015) (no standing

"when the prospect and nature of future competition remains indeterminable and amorphous pending future clarifying events that postdate the filing of the complaint") (citations omitted).

For example, Plaintiffs' "indeterminable and amorphous claims of injury," *Delta Air Lines, Inc.*, 85 F. Supp. 3d at 267, stemming from assumed increased competition from the Tribe at some unknown point in the future, fails to establish injury.  This is not a case where the risk of market competition is concrete and imminent because the final agency action was the "final hurdle" to the development of a new gaming facility twelve miles from the plaintiffs' facility. *See Connecticut v. U.S. Dep't of Interior*, 344 F. Supp. 3d 279, 301 (D.D.C. 2018).  Nor does this case involve federal policy choices that directly result in increased market competition.[15] The Secretary had no role in the negotiation of compact.  The State, as a matter of policy, negotiated with the Tribe, and agreed to terms that contemplated the Tribe could offer certain games exclusively. It is thus the State's choices, not the Secretary's, as well as choices by the Tribe about when and how it will implement its options under the Compact, which may affect the gaming market in Florida.  Thus, harms stemming from how the Compact may or may not be implemented, that are uncertain to injure Plaintiffs at all, are precisely the sort of "highly attenuated chain of possibilities," *Clapper*, 568 U.S. at 410, that fails to establish standing.

But *even if* Plaintiffs could establish a causal connection, they have failed to establish that such harm is either actual or imminent.  Plaintiffs apparently believe that simply asserting the Tribe will offer sports betting on November 15, 2021, ECF 19-3 at 5 (¶ 23); ECF 19 at 17 n.4,

---

[15] *See Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 211-12 (D.C. Cir. 2013); *La. Energy & Power Auth. v. Fed. Energy Reg. Comm'n*, 141 F. 3d 364, 367 (D.C. Cir. 1998); *Neighborhood Assistance Corp. of Am. v. Consumer Fin. Prot. Bureau*, 907 F. Supp. 2d 112, 121 (D.D.C. 2012); *City & Cty. of San Francisco v. U.S. Citizenship & Immig. Servs.*, 944 F.3d 773, 787 (9th Cir. 2019). Plaintiffs' reliance on a case involving organization standing, *Spann v. Colonial Vill., Inc.*, 899 F.2d 24 (D.C. Cir. 1990), is also misplaced.

combined with the bare assertion that it will pose "serious and immediate," ECF 19-3 at 5 (¶ 24), harm, establishes imminent, or "certainly impending," injury.  Plaintiffs are incorrect.[16]  "Were all purely speculative increased risks deemed injurious, the entire requirement of actual or imminent injury would be rendered moot.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015) (quoting *Pub. Citizen, Inc.*, 489 F.3d at 1294).  This is why "[t]he Supreme Court has repeatedly held that disputes about future events where the possibility of harm to any given individual is remote and speculative are properly left to the policymaking Branches, not the Article III courts." *Pub. Citizen*, 489 F.3d at 1295.  If that was not so, "all hypothesized, nonimminent injuries could be dressed up as increased risk of injury." *Id.* at 1294.

### 4.  Plaintiffs' Survey Asked One Set of Questions, and Then Derived From Them a Different Set of Conclusions

Plaintiffs present two declarations concerning the survey they conducted of existing patrons in early September 2021. *See* ECF 19-2; ECF 19-3.  Plaintiffs summarily dismiss Federal Defendants' critiques of the survey, ECF 30 at 15-18,[17] but the bottom line is that Plaintiffs draw sweeping conclusions about consumer behavior from a series of questions that are at best ambiguous.  This effort fails to establish Plaintiffs' standing.

Federal Defendants challenged Plaintiffs' contention that the Compact's deemed approval will lead to concrete, particularized, and imminent harms due to their expectation that

---

[16] Likewise, the potential that unidentified, state-licensed pari-mutuel competitors near Plaintiffs *might* partner with the Tribe, ECF 19-3 at 7-8 (¶ 30) is another attenuated, conjectural, and not certainly impending allegation that fails to demonstrate standing.

[17] Plaintiffs' survey, prepared for litigation, ECF 19-2 at 4 (¶ 14), should be scrutinized. *See Kraft Foods Group Brands, LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741-42 (7th Cir. 2013).  Surveys are not reliable when they contain leading questions, *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 134 (3d. Cir. 1994), or misleading questions, *Procter & Gamble Pharms., Inc. v. Hoffmann-LaRoche Inc.*, No. 06-CIV-0034, 2006 WL 2588002, at *22-23 (S.D.N.Y. Sept. 6, 2006).

patrons will "shift" their spending to the Tribe's online sports betting program. ECF 25 at 18-19. Plaintiffs respond by defending Mr. Chavez's analysis on the basis that Federal Defendants simply do not understand it, ECF 30 at 15-16, and that he undertook a "conservative" approach to focus on patrons who would engage in online gaming. *Id.* at 16-18.  However explained, the survey fails to confirm the broad conclusions Plaintiffs draw from it.

First, in response to Federal Defendants' arguments concerning the significant omissions in the survey questions, ECF 25 at 18-20, Plaintiffs broadly contend that such considerations are irrelevant, ECF 30 at 17, and that respondents are "commonly presumed to have relevant knowledge to the matter on which the survey is conducted," *id.* at 18.  Plaintiffs apparently believe that patrons were presumed to understand that the Tribe, pursuant to the Compact, could offer online sports betting—but not in partnership with Plaintiffs.  Presuming respondents had such knowledge of specific provisions of the Compact is flawed.  It is entirely possible respondents would have given different answers whether they knew answers concerning "sports wagering" referred to "*online* sports wagering," exclusively offered by the Tribe.

Even if it is reasonable to presume respondents understood these complexities, Plaintiffs entirely fail to explain why, then, they prefaced several questions with the phrase, "If sports wagering were to become legal in Florida . . ." ECF 19-4 at 25.  There is an obvious disconnect between presuming that patrons understood that the "sports wagering" questions contemplated *online* wagering *with the Tribe*, while at the same time contemplating *some future change in the law* could make sports betting more widely available.  And because the survey never explains *who* might offer sports betting, *when* they might do so, or *how*, respondents might have believed any "shift" in their spending pertained to a future sportsbook that Plaintiffs might offer.  Thus,

while Plaintiffs contend these responses confirm that some patrons will "shift" their spending to the Tribe at some point in the future, the survey plainly does not support such conclusion.[18]

Moreover, none of the declarations establish that such purported harm is imminent in any way. Whether, when, and to what extent the Tribe decides to offer sports betting during the duration of the Compact's thirty-year term, in any way that poses any potential injury to Plaintiffs, is entirely unknown. Possible future injury is not enough. *Whitmore*, 495 U.S. at 158. Alleged injuries must instead "be certainly impending to constitute injury in fact." *Id.*; *Clapper*, 568 U.S. at 409 ("allegations of possible future injur[ies] are not sufficient").[19]  Plaintiffs have not met this burden and thus lack standing in this case.

### iii.  Plaintiffs' Requested Relief Reveals Their Redressability Problem

To establish Art. III standing, Plaintiffs must show it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" of the Court. *Lujan*, 504 U.S. at 561 (internal quotation marks and citation omitted).  As with their attempts to downplay their burden with respect to injury and causation, Plaintiffs blithely contend they have "easily" demonstrated redressability. ECF 30 at 22.  This position, however, combined with their request that the Court declare the online sports betting provisions of the Compact "void," ECF 19-5 at 2, raises questions of whether they have established redressability at all.

---

[18] Plaintiffs contend that any "loss" of business, however "temporary or permanent, partial or total, is sufficient injury to establish standing." ECF 30 at 9. But the survey does not confirm that they will suffer any loss whatsoever, never mind an imminent one.  While some respondents would "divide" their spending, Plaintiffs are wrong to assume that means Plaintiffs will be harmed by the introduction of certain forms of sports betting, since respondents were never asked if they would divert gaming funds to place wagers at Plaintiffs' facilities. That is, respondents might "shift" spending from another facility—perhaps one of Plaintiffs' competitors—to sports wagering while keeping the amount of spending at Plaintiffs' facilities constant. The survey also does not detail the relative spending of any of the respondents, so we do not know the relative impact of such a shift, or whether the "shift" is to the Tribe.
[19] *See also Ctr. For Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009); *La. Env't. Action Network v. Browner*, 87 F.3d 1379, 1384 (D.C. Cir. 1996).

Plaintiffs assert that they have demonstrated redressability for standing purposes because, they argue, "if they 'succee[d] on the merits . . . the Secretary would have to reject the compact.'" ECF 30 at 22 (quoting *Amador County*, 640 F.3d at 378).  But as explained herein and in prior briefing, the *Amador County* court did not ultimately conclude that the Secretary was required to disapprove the compact at issue in that case. *Id.* at 384.  Nor did the court explain the mechanism for "direct[ing] the Secretary to disapprove the compact," *id.* at 382, when, by the time of any such judgment, IGRA's 45-day review period would have ended.

Plaintiffs dismiss this problem as a "heads I win, tails you lose" conundrum, ECF 30 at 10, but by asking that the Court declare certain provisions of the Compact "void," they appear to recognize the problem they face in this Compact deemed approval case.  They notably do not ask the Court to remand the case, or even, as suggested by *Amador County*, to direct the Secretary to disapprove the Compact.  Plaintiffs instead go further and ask the Court to declare as "void" certain provisions of the Compact, which would require the Court to undertake an examination of the Compact's legality in the first instance, untethered from any agency decision in this case. Plaintiffs point to and critique a letter issued by then Acting Assistant Secretary-Indian Affairs Bryan Newland, *see* ECF 1-6, as if it reflects an agency decision in this case, ECF 30 at 9.  Such letter, however, was issued after the final agency action—*i.e.*, the Compact's deemed approval— occurred, and thus cannot constitute an "agency decision" under any theory of APA review.

This Court, like all other federal courts, is a court "of limited jurisdiction . . . It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life. Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Review of final agency action is governed and restrained by the APA standards of review.  Even if Plaintiffs can establish jurisdiction to maintain this APA suit, the

Court cannot expand its jurisdiction "by judicial decree," *id.*, as Plaintiffs appear to believe.  It is well-established that absent an express statutory waiver of sovereign immunity, the United States may not be sued. *United States v. Testan*, 424 U.S. 392, 399 (1976).  Plaintiffs bring this suit pursuant to the APA, *see* ECF 1 at 2, 39,[20] but the waiver of United States' sovereignty in the APA only extends to the review of final agency actions. *Lujan*, 497 U.S. at 882 (citing 5 U.S.C. § 704).  Any relief in APA cases should only be granted "[t]o the extent necessary," and must also be tailored to some finding by the court that the challenged final agency action violated one of the APA's enumerated criteria. *See* 5 U.S.C. § 706.  Plaintiffs want this Court to conduct a provision-by-provision inquiry as to the "legality" of portions of the Compact, ECF 19-5 at 2, but by requesting relief that goes beyond the proper scope of APA review, Plaintiffs reveal that any proper APA relief that could be granted in this case would not redress their alleged harms.

## II.     Plaintiffs Fail to Plead Plausible Claims for Relief

Even if Plaintiffs could establish standing to maintain this suit, and they cannot, their claims are subject to summary dismissal because they fail to state plausible claims for relief. Because Plaintiffs first claim relies on the mistaken assumption that the Secretary was obligated to disapprove the Compact under IGRA, the claim fails.  And because Plaintiffs' constitutional claim is predicated on the success and viability of their APA claim, such claim fails too. Plaintiffs are not entitled to any relief whatsoever in this case.

### A.  Plaintiffs' Count I Fails Because it is Premised On Mistaken Theories About the Secretary's Obligations Under IGRA

---

[20] Plaintiffs' equal protection claim is predicated on the viability of their APA claim, as they do not plead an independent claim facially attacking the constitutionality of IGRA. ECF 1 at 40 (¶ 128); *id.* at 41-42 (¶¶ 136-44).  As Plaintiffs acknowledge, should they succeed on their APA claim, the Court need not reach their equal protection claim. ECF 30 at 30. Plaintiffs' claim is centered on the final agency action at issue in this case and does not facially attack IGRA. *Id.*

Plaintiffs assert that the Secretary had to disapprove the Compact because it violates IGRA, *id.* (¶ 125); and on the theory that the contemplated gaming is "illegal" in Florida, *see, e.g.*, *id.* at 26-29 (¶¶ 87-93), the Compact further violates the Wire Act of 1961, 18 U.S.C. §§ 1801 *et seq.* ("Wire Act"); and the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. §§ 5361 *et seq.* ("UIGEA").  Plaintiffs are incorrect, for the reasons set forth below.

### i.  Deemed Approvals are Not *Per Se* Unlawful

Plaintiffs contend in Count I that the Compact's deemed approval violates the APA because the Secretary "had a legal obligation to disapprove the Compact." ECF 1 at 39 (¶ 124). Plaintiffs rely heavily on *Amador County* to argue that the Secretary was required to either approve or disapprove the Compact.  But as previously argued, *see* ECF 25 at 24, *Amador County* did not rewrite the statute to conclude that the Secretary may *never* take no action on a compact that comes before her.  Such a result would not only violate the rule of statutory construction that courts must give meaning to all words in a statute, *see Moskal v. United States*, 498 U.S. 103, 109-10 (1990), but further disregard the presumption of regularity that extends to final agency action, *see United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926).

IGRA is properly understood to limit judicial review of a "deemed approval" to the sort of stark and fundamental IGRA question presented in *Amador County*—whether the compact violates IGRA, not other federal law or state law. 640 F.3d at 383.  And, the case concerned a broader question than that posed here, *i.e.*, whether the Indian tribe's reservation—on which the compact authorized gaming—were Indian lands, such that any gaming conducted thereon would be done consistent with IGRA. *Id.* at 375.  Plaintiffs assert their claim concerns "Indian lands" to link it with *Amador County*.  Federal Defendants dispute such characterization and contend that

Plaintiffs' allegations that rely on state law and contend that the Compact violates IGRA fail to state a plausible claim for relief. *See* ECF 25 at 23-24.

Plaintiffs point to the *Amador County*'s analysis of IGRA's provisions, 640 F.3d at 381, considered in the context of determining whether a compact's deemed approval was a final agency action subject to judicial review under the APA, to contend that the Compact's deemed approval violates the APA. ECF 30 at 24-26.[21]  In the context of confirming IGRA's provisions provided "law to apply," *Amador County* noted that the statutory language "suggest[ed] that disapproval [of compacts] is obligatory where" any of IGRA's three enumerated grounds for disapproval are implicated. *Amador County*, 640 F.3d at 381.  The Court subsequently held, however, that IGRA's 45-day timeframe limited APA review, demonstrating that Congress did not intend for APA review to extend beyond the stark consistency with IGRA review at issue there. *Id.*  Based on the unique context presented, the Court concluded, "we hold that where, as here, a plaintiff alleges that a compact violates IGRA, thus requiring the Secretary to disapprove the compact, nothing in the APA precludes judicial review of a subsection (d)(8)(C) no action approval." *Id.* at 383.

The *Amador County* court did not ultimately conclude that the Secretary "reject the compact" at issue in that case. 640 F.3d at 384.  Plaintiffs discuss the purpose of the remand in *Amador County* in broad terms, ECF 30 at 26-27, but the limited scope of the remand directive from the D.C. Circuit is made clear by the district court decision itself. *Amador County v. S.M.R. Jewell*, 170 F. Supp. 3d 135, 141 (D.D.C. 2016).  Plaintiffs' argument that *Amador County*

---

[21] Plaintiffs seek to avoid dismissal by delving into the merits of their claim, ECF 30 at 24-27, but Federal Defendants contend that, *even if* they have stated a plausible claim for relief with respect to whether the Compact violates IGRA, their APA claim should still be dismissed for lack of standing and thus they are not entitled to be heard on the merits.  Moreover, as explained above, if the Court were to reach the merits of Plaintiffs' claim, it must do so consistent with the APA.

applies whether a challenge attacks a compact in whole or in part, ECF 30 at 27, misses the broader point that the *Amador County* court grappled with whether the Secretary had a duty to disapprove a compact in a context where a plaintiff raises the question of whether the Indian tribe had any "Indian lands" at all. 640 F.3d at 112. Nothing in *Amador County* endorses what Plaintiffs propose here, namely a provision-by-provision examination of the legality of a Compact under various federal and state laws. Indeed, the court ultimately found on remand that the County was precluded from challenging the status of the lands and thus, the compact remained in place. *Jewell*, 170 F. Supp. 3d at 141-47. So, too, Plaintiffs here, who lack standing and should not be able to avail themselves of any APA review at all.

### ii. The Secretary Was Not Required to Disapprove the Compact for Purported Violations of UIGEA or the Wire Act

Plaintiffs further assert an argument rejected in *Amador County* that the Secretary acted arbitrarily because the Compact purportedly authorizes gaming that is "illegal" in Florida, contrary to 25 U.S.C. § 2710(d)(1)(B). ECF 30 at 28-29. Such unproven assertion is based on a series of allegations contending that the Florida Legislature, when enacting the state law ratifying the terms of the Compact, did so without complying with the requirements of the Florida Constitution. *E.g.*, ECF 1 at 27-29. Based on this, Plaintiffs argue the Secretary had to reject the State's representations, assume the gaming contemplated was "illegal" under state law, and then review the Compact in that context. ECF 30 at 28-20. Neither IGRA nor Interior regulations require the Secretary to do any of those things. *See* 25 U.S.C. § 2710(d)(8)(A)-(C); 25 C.F.R. §§ 293.7, 293.8. *See also Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1557 (10th Cir. 1997).

Plaintiffs argue about the relevancy of Interior regulations governing how the Secretary confirms the Compact is validly entered into by a state, ECF 30 at 28-29, but they fail to recognize that the Secretary's obligations with respect to resolving state law issues begin and end

there.[22]  In 2008, Interior adopted regulations pursuant to IGRA, setting forth various requirements, including what an Indian tribe and state must submit in connection with a compact to confirm that it was is validly "entered into" under tribal and state law respectively. *See* 25 C.F.R. 293.8(a)-(c).  The Tribe and State fulfilled these requirements, and further provided a copy of the state statute ratifying the Compact, to confirm that the Compact was validly entered into consistent with both Tribal and State law. ECF 1-6 at 2 n.1.  At that point, the 45-day review period commenced.  Neither IGRA nor Interior regulations required the Secretary to do anything more to confirm that the State "validly bound itself to the compact." *Pueblo of Santa Ana*, 104 F.3d at 1557.  Plaintiffs' Count I thus fails to state a plausible claim for relief.

### B.  Plaintiffs' Equal Protection Claim, Which is Predicated on Their APA Claim, Fails to State a Plausible Claim for Relief

Plaintiffs begin by admitting that there is no circumstance in which this Court should reach the constitutional issue. ECF 30 at 30.  That is because if Plaintiffs lack standing or cannot state a cause of action under the APA, there is clearly no basis for the Court to rule on constitutional grounds.  But even if Plaintiffs are *right—i.e.*, they have standing, state a plausible claim for relief under the APA, and the Court were to rule in their favor on such claim, the doctrine of constitutional avoidance counsels against taking on the equal protection claim. *Spector Motor Serv. v. McLaughlin,* 323 U.S. 101, 105 (1944).  Even if this Court could appropriately reach the issue, Plaintiffs' claim hangs on whether they can establish that the Compact—which was negotiated by the State and thus reflects the State's, not the Secretary's

---

[22] Plaintiffs' cite to *Stand Up for Cal. v. U.S. Dep't of Interior*, 204 F. Supp. 3d 212, 255 (D.D.C. 2016), fails to support their position. *See* ECF 30 at 29 n.13.  There, the court stated that, "in the similar Tribal-State compact context," IGRA did not intend for "the Secretary to make extensive inquiry into state law," to determine whether a state validly entered into a compact, but that there are consequences if "the state has not validly bound itself to the compact." *Id.* (quoting *Pueblo of Santa Ana*, 104 F.3d at 1557).

choices—"authorizes" a purported "race-based monopoly" simply because it contemplates that the Tribe has the exclusive right to offer certain games.  Dooming their effort is the longstanding precedent acknowledging that federal legislation concerning federally recognized Indian tribes and their membership does not give rise to racial discrimination.  Plaintiffs' brief seemingly acknowledges this fact, but suggests—while ignoring decisions that specifically addressed and upheld IGRA against equal protection claims—that dicta in nonbinding and unrelated cases warrants a different result. Such effort fails to establish a plausible claim.

Plaintiffs seize on Ninth Circuit dicta indicating that there may be limits to the applicability of *Morton v. Mancari*, 417 U.S. 535 (1974). *See* ECF 30 at 30-31 (citing *Williams v. Babbitt*, 115 F.3d 657 (9th Cir. 1997), *cert. denied*, 523 U.S. 1117 (1998)).  Plaintiffs contend that *Williams* departed from the longstanding approach illustrated by *Mancari* with regard to federal statutes.  But only in dicta did the court express concern about the constitutionality of an agency interpretation of a federal law that would bar non-Indians from entry in the Alaskan reindeer industry. *Id*. at 659, 663-66.  The court posited that a statute which "in no way relates to native land, tribal or communal status, or culture" might not fall under *Mancari*. *Id*. at 664.

Nevertheless, the Ninth Circuit has since repeatedly reaffirmed that preferences for Indians are political in nature. *See E.E.O.C. v. Peabody Western Coal Co.*, 773 F.3d 977, 988 (9th Cir. 2014) (upholding hiring preference based on tribal affiliation as a political classification). And IGRA falls squarely within the sweep of *Mancari* as construed by the dicta in *Williams*.[23] This is illustrated by the fact that every court to have specifically examined an

---

[23] Plaintiffs cite to *Malabed v. North Slope Borough*, 335 F.3d 864, 868 n.5 (9th Cir. 2003), but that case involved a hypothetical statute entirely dissimilar to IGRA. And, *Kornhaas Const., Inc. v. Oklahoma Dep't of Cent. Servs.*, 140 F. Supp. 2d 1232 (W.D. Okla. 2001) and *Tafoya v. City of Albuquerque*, 751 F. Supp. 1527 (D.N.M. 1990), did not concern federal statutes.

equal protection claim in the context of Indian gaming has applied *Mancari* and rational basis review to reject the claim.  Plaintiffs make no real effort to confront these decisions, which as previously discussed, ECF 25 at 30-31, dealt with what Plaintiffs would characterize as a "monopoly" on forms of gaming.  The Ninth Circuit readily rejected an equal protection challenge in *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 718 (9th Cir. 2003), where, pursuant to California Proposition 1A, "Indian tribes are the only entities that are permitted to conduct class III gaming in California." *Id*. *See also United States v. Garrett*, 122 F. App'x 628, 632 (4th Cir. 2005) (rejecting equal protection argument against a compact between the Eastern Band of Cherokee Indians and the State of North Carolina providing exclusivity to the Band); *KG Urban Enters. v. Patrick*, No. 11-CV-12070, 2014 WL 108307, at *1, 8-10 (D. Mass. Jan. 9, 2014) (dismissing argument that state law providing, in one geographic region of the State, "a built-in preference for a casino under the control of a federally recognized Indian tribe," created a race-based classification).  These decisions clearly refute the argument that IGRA or compacts somehow sanction unconstitutional "monopolies."[24]  Plaintiffs' claim should not be heard.  If it is, it should be dismissed.

## CONCLUSION

Federal Defendants respectfully request that the Court dismiss this suit in its entirety. Respectfully submitted this 26th day of October, 2021.

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

---

[24] Plaintiffs' attempt to cabin *Mancari* by geography, ECF 30 at 33, has been squarely rejected, *Brackeen v. Haaland*, 994 F.3d 249, 336 (5th Cir. 2021) (en banc); ECF 25 at 31-32 n.12. So too the claim that gaming is not "a unique interest." ECF 30 at 33. *See Artichoke Joe's*, 353 F.3d at 733 (unique status of Indian tribes under federal law permits legislation for their benefit).

/s/ *Rebecca M. Ross*
REBECCA M. ROSS, Trial Attorney
HILLARY K. HOFFMAN, Trial Attorney
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice
OF COUNSEL:                        P.O. Box 7611, Ben Franklin Station
JODY H. SCHWARZ                    Washington, DC 20044
Senior Attorney                    Telephone:  (202) 616-3148
Office of the Solicitor            rebecca.ross@usdoj.gov
Division of Indian Affairs         hillary.hoffman@usdoj.gov
                                   *Attorneys for Federal Defendants*

**CERTIFICATE OF SERVICE**

I, Rebecca M. Ross, hereby certify that on October 26, 2021, I caused the foregoing

FEDERAL DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS to be sent

electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ *Rebecca M. Ross*
REBECCA M. ROSS, Trial Attorney
Indian Resources Section
Environment and Natural Resources Division
United States Department of Justice