## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

WEST FLAGLER ASSOCIATES, LTD.,
d/b/a MAGIC CITY CASINO, and BONITA-
FORT MYERS CORPORATION, d/b/a
BONITA SPRINGS POKER ROOM,

                *Plaintiffs,*

vs.

                  Case No. 1:21-cv-02192-DLF

DEB HAALAND, in her official capacity as
SECRETARY OF THE UNITED STATES
DEPARTMENT OF THE INTERIOR and
UNITED STATES DEPARTMENT OF THE
INTERIOR,

                *Defendants.*

## RESPONSE TO AMICUS CURIAE BRIEF OF THE STATE OF FLORIDA

**TABLE OF CONTENTS**

I.     THE ONLINE SPORTS BETTING PROVISIONS OF THE COMPACT ARE INVALID UNDER IGRA. ................................................................................ 1

     A.     The Text and Structure of IGRA Foreclose Florida's Argument. .............. 1

     B.     Florida's Precedent and Policy-Based Arguments Are Irrelevant and Wrong. ...................................................................................................... 4

     C.     Florida's Position on IGRA's "On Indian Lands" Limitation Contradicts Its Own Prior Litigation Position. ............................................................. 8

II.     THE COMPACT AUTHORIZES CONDUCT THAT VIOLATES UIGEA. ....... 9

III.     THE COMPACT AUTHORIZES CONDUCT THAT VIOLATES THE WIRE ACT........................................................................................................................ 9

CONCLUSION ................................................................................................................ 14

## TABLE OF AUTHORITIES

### <u>Cases</u>

*AT&T Corp. v. Coeur d'Alene Tribe*,
295 F. 3d 899 (9th Cir. 2002) ....................................................................................... 8

*Banks v. Booth*,
3 F.4th 445 (D.C. Cir. 2021) ........................................................................................ 4

*Bond v. United States*,
572 U.S. 844 (2014) .................................................................................................... 11

*Cherokee Nation v. Georgia,*
30 U.S. 1 (1831) ......................................................................................................... 12

*Cir. City Stores, Inc. v. Adams*,
532 U.S. 105 (2001) .................................................................................................... 10

*Cotton Petroleum Corp. v. New Mexico*,
490 U.S. 163 (1989) .................................................................................................... 13

*Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*,
138 S. Ct. 1061 (2018) ................................................................................................. 4

*Jones v. United States*
539 U.S. 848 (2000) .................................................................................................... 11

*Maine v. Taylor*,
477 U.S. 131 (1986) ...................................................................................................... 7

*Merrion v. Jicarilla Apache Tribe*,
455 U.S. 130 (1982) .................................................................................................... 13

*Michigan v. Bay Mills Cmty.*,
572 U.S. 782 (2014) ............................................................................................ 3, 4, 7

*Muhammad v. Comanche Nation Casino*,
2010 WL 4365568 (W.D. Okla. Oct. 27, 2010) .......................................................... 3

*Navajo Nation v. Dalley*,
896 F.3d 1196 (10th Cir. 2018) .................................................................................... 3

*Pueblo of Santa Ana v. Nash*,
972 F. Supp. 2d 1254 (D.N.M. 2013) ........................................................................... 3

*Stand Up for California! v. U.S. Dep't of Interior*,
410 F. Supp. 3d 39 (D.D.C. 2019) ............................................................................... 7

*Stand Up for California! v. U.S. Dep't of the Interior*,
994 F.3d 616 (D.C. Cir. 2021) ................................................................................. 7

*United States v. Am. Bldg. Maint. Indus.*,
422 U.S. 271 (1975) ................................................................................................ 10

*United States v. Lyons*,
740 F.3d 702 (1st Cir. 2014) .................................................................................. 10

*Whitman v. Am. Trucking Ass'ns, Inc.*,
531 U.S. 457 (2001) .................................................................................................. 4

*Yakima Valley Mem'l Hosp. v. Washington State Dep't of Health*,
654 F.3d 919 (9th Cir. 2011) ................................................................................... 7

**Constitutional Provisions**

Fla. Const. Art. X, § 30 .................................................................................. 5, 9, 11

**Statutes**

18 U.S.C. § 1084 ............................................................................................ 9, 12, 13

25 U.S.C. § 2701(1) .................................................................................................. 6

25 U.S.C. § 2702 ....................................................................................................... 6

25 U.S.C. § 2710(d) ........................................................................................ 1, 2, 3, 4

25 U.S.C. § 2719(b) .................................................................................................. 7

31 U.S.C. § 5361(b) ................................................................................................ 11

47 U.S.C. § 153(28) ........................................................................................... 10, 12

48 Stat. 1065 ...................................................................................................... 10, 12

Fla. Stat. § 849.14 .................................................................................................... 9

**Other Authorities**

Brief for Amicus Curiae States Supporting Respondent and Affirmance
1999 WL 33622330 .................................................................................................. 8

*Whether the Wire Act Applies to Non-Sports Gambling*,
35 Op. O.L.C. 134 (2011) ...................................................................................... 10

*Reconsidering Whether the Wire Act Applies to Non-Sports Gambling*,
2018 WL 7080165 (Nov. 2, 2018) .................................................................... 10, 11

On October 19, 2021, the State of Florida ("Florida") submitted an amicus brief in support of Defendants' motion to dismiss and opposition to Plaintiffs' motion for summary judgment. Florida submitted its filing on the evening of the deadline for Plaintiffs' reply in support of summary judgment and opposition to Defendants' motion to dismiss, thus depriving Plaintiffs of the opportunity to respond to Florida in that filing. Plaintiffs do not oppose the Court's consideration of Florida's amicus brief, but instead submit this response showing that Florida's arguments are incorrect.

## I. THE ONLINE SPORTS BETTING PROVISIONS OF THE COMPACT ARE INVALID UNDER IGRA.

Plaintiffs' complaint and summary judgment motion establish that the Secretary's approval of the online sports betting provisions of the Compact was contrary to law because IGRA does not authorize the approval (or "deemed approval") of a compact that provides for gaming activities that are not "on Indian lands." ECF 1 ¶¶ 56-74; ECF 19 at 18-30. Florida's arguments to the contrary are meritless.

### A. The Text and Structure of IGRA Foreclose Florida's Argument.

Florida argues that a compact that regulates gaming on Indian lands also may address "matters taking place at physical locations outside of Indian lands." ECF 28 at 4. This vague use of the word "matters" shows that Florida is trying to obscure the fact that the Compact's online sports betting provisions authorize *gambling* throughout the State of Florida, outside of Indian lands. The issue in this case is not whether an IGRA compact can address certain ancillary "matters" related to gambling on Indian lands; the issue is whether an IGRA compact can *authorize gambling off of Indian lands*. As a matter of law, it cannot.

Florida relies on the following three subsections to 25 U.S.C. § 2710(d)(3)(C), providing that an IGRA compact may include "provisions relating to—

(i)     the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

(ii)    the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

…

(vii)   any other subjects that are directly related to the operation of gaming activities."

ECF 28 at 4-6.

Based on these provisions, Florida argues that its Compact with the Tribe "allocated to the Tribe jurisdiction" by including a provision in the Compact "deeming" any online sports betting pursuant to the Compact as taking place "exclusively" "on Indian lands." ECF 28 at 5-6; ECF 1-1 Part IV, Section A; ECF 1-1 Part III, Sec. CC.2. As Plaintiffs have shown previously, this argument is meritless. ECF 19 at 26-27.[1] The Compact's provisions authorizing gaming activity off of Indian lands do not "allocate jurisdiction." Instead, they seek to evade IGRA's "Indian lands" limitation by pretending that conduct that occurs off Indian lands is actually occurring "on Indian lands." This attempt to evade IGRA's provisions through a transparently unlawful fiction is no more an allocation of jurisdiction than would be "deeming" roulette (a Class III activity) to be bingo (a Class II activity). Indeed, if this Compact's fictional construct is merely "allocating jurisdiction," then IGRA would also permit a compact that allows the Seminoles to create a casino off of Indian lands that is "deemed" to be "on Indian lands" as a mere "allocation of jurisdiction."

---

[1] Florida ignores Plaintiffs' discussion of § 2710(d)(3)(C) in our opening brief. Further, Defendants' counsel has notably declined to advance or defend the claim that the "deeming" provisions of the Compact are somehow an "allocation of jurisdiction", even though that argument appeared in the DOI letter of August 6, 2021. *See* generally ECF 25; ECF 1-6 at 7. This further reflects that the argument is not just wrong, but frivolous.

Further, nothing in § 2710(d)(3)(C)(i), (ii), or (vii) even arguably authorizes compacts to include gaming activity outside of "Indian lands." Far from it, subsections (i) and (ii) authorize the enforcement of laws and allocation of jurisdiction for "***such activity***," which as the immediately preceding subsection makes clear, refers to "***gaming activities on the Indian lands of the Indian tribe***." *See* 25 U.S.C. § 2710(d)(3)(B) ("Any State and any Indian tribe may enter into a Tribal-State compact ***governing gaming activities on the Indian lands of the Indian tribe***") (emphasis added). The words "on Indian lands" "reflect[] IGRA's overall scope" and "are repeated some two dozen times in the statute." *Michigan v. Bay Mills Cmty.*, 572 U.S. 782, 791 (2014). Florida's argument is therefore squarely foreclosed by the statutory text and structure.[2]

Florida also points to subsection (vii), which permits compacts to address "other subjects that are directly related to the operation of gaming activities." Florida claims that the gaming activity which the Compact allows to occur off of Indian lands (*i.e.*, placing bets from anywhere in the State of Florida) is an "other subject" that is "directly related" to the gaming activity that takes place *on* the Indian lands (*i.e.*, the receipt of wagers by servers located on Indian lands). Florida thus seeks to convert an ancillary provision into a massive loophole that would permit IGRA compacts to authorize Internet gambling anywhere outside of Indian lands. The Court

---

[2] Florida also cites three irrelevant cases addressing whether compacts may allocate state courts jurisdiction over tort claims against tribes and tribal casinos based on tortious activity at casinos on Indian lands. None addresses whether IGRA compacts may authorize gaming activity off Indian lands. *See Pueblo of Santa Ana v. Nash*, 972 F. Supp. 2d 1254, 1255 (D.N.M. 2013) (holding IGRA does not authorize "allocation of jurisdiction from tribal court to state court over a personal injury claim" arising from activity on Indian land); *Navajo Nation v. Dalley*, 896 F.3d 1196, 1211 (10th Cir. 2018) (holding that 25 U.S.C. § 2710(d)(3)(C)(i)-(ii) "do not authorize tribes to allocate during the compacting process jurisdiction to state courts for tort claims" brought by visitors to casinos on Indian lands); *Muhammad v. Comanche Nation Casino*, 2010 WL 4365568, at *6 (W.D. Okla. Oct. 27, 2010) (holding that tribes could allocate jurisdiction over tort claims to state courts related to activity at a casino on Indian lands).

should reject that argument. "Congress does not hide elephants in mouseholes." *Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1071-72 (2018) (quoting *Whitman v. Am. Trucking Ass'ns, Inc.,* 531 U.S. 457, 468 (2001)); *see also Banks v. Booth*, 3 F.4th 445, 449 (D.C. Cir. 2021) ("We have stated before that Congress does not hide elephants in mouseholes."). Like the other provisions cited by Florida, subsection (vii) does not expand the scope of gaming activity that IGRA authorizes beyond "Indian lands." Instead, it authorizes compacts to address "any *other* subjects" that directly relate to the "*operation*" of the gaming activities. 25 U.S.C. § 2710(d)(3)(C)(vii) (emphasis added). The "operation" of gaming activity in turn is different from the "gaming activity" itself. *See e.g. Bay Mills Cmty.*, 782 U.S. at 792 (explaining that "class III gaming activity means just what it sounds like—the stuff involved in playing class III games" and distinguishing it from the licensing and operation of the activity).[3] Actual "gaming activity" is thus two steps removed from the "other subjects" that subsection (vii) addresses: there are "gaming activities," which must be "on Indian lands"; then there is the "operation" of those "gaming activities"; and then there are the "other subjects" that "directly relate" to that "operation of gaming activities." Thus, the ancillary provision in subsection (vii) cannot be read to create a massive unauthorized loophole for compacts to permit "gaming activities" that are not "on Indian lands."

### B.  Florida's Precedent and Policy-Based Arguments Are Irrelevant and Wrong.

With no basis for its position in the text or structure of IGRA, Florida cites compacts involving off-track horse race betting as purported "precedent for a gaming compact to involve gaming activities physically occurring off Indian lands." ECF 28 at 7. These other compacts are obviously irrelevant: they involve gambling that occurs 100% on Indian lands. Only the horse race

---

[3] The "deeming" provision of the Compact demonstrates that Florida and the Tribe themselves recognize the lack of any merit to this argument. If subsection (vii) authorized off-reservation gaming activities, the Tribe and Florida would not have needed to resort to the unlawful "deeming" fiction that all gaming activity will be treated as if it takes place "*exclusively*" "on Indian lands."

that is bet upon occurs elsewhere. Plaintiffs here are not arguing that the Compact's online sports betting provisions are unlawful because the sporting events on which bets are placed will occur off of Indian lands; we are arguing that the provisions are unlawful because *the placing of bets* on those sporting events will occur off of Indian lands.[4]

Florida also argues that there is "no cogent reason" to construe IGRA as limited to approving compacts that authorize gambling only "on Indian lands." According to Florida, it has "plenary jurisdiction" over tribal gaming activity off of Indian lands, and IGRA was enacted merely "to give the states additional regulatory tools." ECF 28 at 7 (emphasis removed).

As an initial matter, Florida did not exercise "plenary jurisdiction" to authorize gaming off of Indian lands. Florida's Constitution expressly prohibited its legislature from authorizing any casino gambling other than through (a) a citizens' initiative, which was not conducted here, or (b) through IGRA compacts "for the conduct of casino gambling *on tribal lands*." *See* Fla. Const. Art. X, § 30 (emphasis added); *see also* Section II *infra* and ECF 19 at 6-7, 30-32. Here, the Florida legislature merely approved the purported IGRA Compact, and (given the absence of any citizens' initiative) had no other way to authorize online sports betting throughout the state.

In any event, Florida's self-serving view of "cogent" policy is of no moment given IGRA's unambiguous statutory text that only authorizes compacts that provide for gambling "on Indian lands." Further, there are ample "cogent" reasons for construing IGRA to be limited to gaming "on Indian lands" as the plain text and structure of IGRA require. To begin with, IGRA carefully balances various concerns and interests in addressing the specific issue of gaming "on Indian

---

[4] Footnote 2 of Florida's brief cites sections of three different compacts but does not provide them. Plaintiffs have attached the sections as Exhibit 1 along with additional sections reflecting that the betting was required to take place on Indian lands under the compacts.

lands." IGRA's first finding, for example, is that "numerous Indian tribes have become engaged in or have licensed gaming activities *on Indian lands* as a means of generating tribal governmental revenue." 25 U.S.C. § 2701(1) (emphasis added). Further, in its declaration of policy, IGRA declares its purpose as establishing "Federal standards for gaming on Indian lands," protecting it from the interests of organized crime, establishing "independent Federal regulatory authority for gaming on Indian lands," and "protect[ing] such gaming as a means of generating tribal revenue." 25 U.S.C. § 2702. It therefore establishes a Federal framework that balances various interests on numerous issues including abrogation of sovereign immunity, when states must negotiate, and the permissible subjects of a compact. These and other similar provisions demonstrate that IGRA was not enacted merely "to give the states additional regulatory tools" but rather to address the issue of gaming activities "on Indian lands" in light of the specific set of concerns that motivated the statute's enactment. They therefore further confirm that IGRA is properly construed as authorizing tribe-state compacts that permit gaming only "on Indian lands" and that IGRA cannot be sensibly construed as authorizing Internet gaming where bets are placed off of Indian lands. Such gaming (and the attendant regulatory problems) did not exist when IGRA was enacted, and cannot be squeezed into IGRA's plain language which focuses entirely on gaming "on Indian lands."

Florida is also incorrect that it otherwise would have unlimited authority to authorize online tribal gaming outside of IGRA. As explained above, Florida's Constitution makes clear that it can only authorize casino gambling through (a) a citizens' initiative (which did not happen here) or (b) an IGRA compact. Further, the text and structure of IGRA show that Congress limited the scope of Indian tribal gaming to gaming "on Indian lands," and further circumscribed the scope of even that activity. As this Court has recognized, "IGRA generally prohibits gaming on newly acquired [Indian] land" and only allows it in narrow circumstances that are not in the control of the

State. *See, e.g.*, *Stand Up for California! v. U.S. Dep't of Interior*, 410 F. Supp. 3d 39, 51 (D.D.C. 2019), *aff'd sub nom. Stand Up for California! v. U.S. Dep't of the Interior*, 994 F.3d 616 (D.C. Cir. 2021); *see also* 25 U.S.C. § 2719(b) (providing for the circumstances under which newly acquired land may be used for gaming activity). Such limitations would make no sense if IGRA was simply about expanding state regulatory authority or if tribes and states were intended to have unlimited authority to enter into compacts through IGRA to expand gaming activity beyond Indian lands.

In addition, whatever the scope of states' authority to enact generally applicable laws regulating gambling in state territory, states do not have carte blanche authority to grant Indian tribes exclusive privileges to engage in online gaming activity *off* of Indian lands while also making that same activity a criminal felony if engaged in by anyone else. As Plaintiffs have shown, creating this "monopoly for the Tribe, felony for everyone else" dichotomy for gambling that occurs off of Indian lands violates the Equal Protection Clause. ECF 19 at 34-38. In addition, the Dormant Commerce Clause limits the ability of states to grant exclusive Internet franchises to in-state residents without "unmistakably clear" and "unambiguous" congressional authorization, *Maine v. Taylor*, 477 U.S. 131, 1339 (1986), neither of which exist here. To the contrary, IGRA provides "unmistakably clear" and "unambiguous" language that does *not* allow a state-tribe compact to authorize gambling off of Indian lands.[5]

Florida also ignores that "Congress typically legislates by parts." *Bay Mills Indian Cmty,* 572 U.S. at 782 (rejecting the State of Michigan's argument that by imposing a partial abrogation

---

[5] At a minimum, given the absence of a clear statement of Congressional approval, Florida's assertion of carte blanche authority to grant exclusive privileges to one in-state resident (the Seminole tribe) would trigger close review under the Dormant Commerce Clause. *Yakima Valley Mem'l Hosp. v. Washington State Dep't of Health*, 654 F.3d 919, 935 (9th Cir. 2011).

of tribal sovereign immunity for gaming on Indian lands, Congress implicitly did the same for

gaming off Indian lands). "Congress wrote the statute it wrote—meaning, a statute going so far

and no further." *Id*. (citation and internal quotations omitted). Only Congress has the power

(consistent with the Constitution) to expand IGRA to authorize online gaming from a tribe's

reservation throughout the state, and thereby to eliminate or modify the "on Indian lands"

limitation. The State and Tribe cannot vest themselves with authority that Congress has not

conferred by "deeming" away IGRA's limitations; nor can they rely on assertions as to the statute

they believe Congress should have enacted to supply that missing authority.

### C. Florida's Position on IGRA's "On Indian Lands" Limitation Contradicts Its Own Prior Litigation Position.

Florida's position here also directly contradicts the position it advanced in an amicus brief

that it submitted to the Ninth Circuit Court of Appeals along with 36 other states. Brief for Amicus

Curiae States Supporting Respondent and Affirmance at 906, *AT&T Corp. v. Coeur d'Alene Tribe*,

295 F. 3d 899 (9th Cir. 2002) (No. 99-35088), 1999 WL 33622330 (hereinafter Brief for *Coeur*

*D'Alene* Amici). As that brief correctly explained, "Congress made no provision in IGRA for

games played partially on tribal property. To the contrary, it expressly mandated that **each** Indian

gaming activity actually take place 'on Indian lands.'" Brief for *Coeur D'Alene* Amici, at \*9

(emphasis added). Florida there also properly recognized that "gaming activity" necessarily

included "the player's placing of the wager." *Id.* at \*4. The brief thus concluded that the --

> existence of a phone bank and a centralized computer system on the Coeur D'Alene
> reservation does not change the uncontested fact that the person making the wager is
> located outside of Idaho, and clearly not on the Coeur D'Alene reservation. As a
> consequence, because the wager is placed off the reservation, the gaming activity is not
> conducted "on Indian lands" as plainly required by IGRA.

*Id*. Likewise, the existence of computer servers on Seminole lands, as contemplated by the

Compact here, "does not change the uncontested fact that the person making the wager" is not

located on those reservations. *See id*. Thus, "the gaming activity is not conducted 'on Indian lands' as plainly required by IGRA." *See id.* Florida's position in *Coeur D'Alene* was correct; its position here is not.

## II.     THE COMPACT AUTHORIZES CONDUCT THAT VIOLATES UIGEA.

Florida does not even attempt to address Plaintiffs' argument showing that the Compact's online sports betting portions violate UIGEA, and in particular Florida ignores its own Constitution's constraints on authorizing new gambling in the state. Florida asserts only that the online gaming activity authorized by the Compact is legal in Florida because the Florida legislature authorized the Compact. ECF 28 at 9. But Florida ignores that, as explained previously, the Florida Constitution (art. X, § 30(a)) does not permit the Florida legislature to authorize gaming, but instead requires a "citizens' initiative" to authorize additional casino gambling in Florida. ECF 1 ¶¶ 6-7, 96-103; ECF 19 at 5-8, 30-32. Further, Fla. Stat. § 849.14 provides that sports betting is a third-degree felony. The lone exception is for conduct authorized by gaming compacts "***pursuant to the Federal Indian Gaming Regulatory Act*** for the conduct of casino gambling ***on tribal lands***" (emphasis added). As shown above and previously, IGRA does not authorize gambling off of Indian lands, and thus does not authorize the online sports betting provisions of the Compact.

## III.    THE COMPACT AUTHORIZES CONDUCT THAT VIOLATES THE WIRE ACT.

Florida asserts that the Compact does not authorize violations of the Wire Act, principally arguing that because the Tribe's reservations are located within Florida's borders, the online sports betting portions of the Compact do not implicate "interstate or foreign commerce," as required by the Wire Act. ECF 28 at 10 (quoting 18 U.S.C. § 1084(a)).

As an initial matter, Florida fails to account for intermediate transmissions that cross state lines. The Department of Justice has "consistently argued under the Wire Act that, even if the wire

communication originates and terminates in the same state, the law's interstate commerce requirement is nevertheless satisfied if the wire crossed state lines at any point in the process." *Whether the Wire Act Applies to Non-Sports Gambling*, 35 Op. O.L.C. 134, 136 (2011) (quoting Memorandum for David Barron, Acting Assistant Att'y Gen., Off. of Legal Couns., from Lanny A. Breuer, Assistant Att'y Gen., Crim. Div., U.S. Dep't of Just. (July 12, 2010)).[6] Further, since well before the enactment of the Wire Act, the Electronic Communications Act defined "interstate communication" and "interstate transmission" to encompass communications between points in the same state where (as here) no state commission regulates the communication. 47 U.S.C. § 153(28); *see also* June 19, 1934, ch. 652, title I, § 3, 48 Stat. 1065.

Florida points to nothing that would justify a contrary conclusion. Instead, it primarily relies on cases construing different statutes with different statutory formulations.[7] *See* ECF 28 at 11-12. The one case it cites that involves the Wire Act did not hold that intermediate transmission across state lines is lawful. *See generally United States v. Lyons*, 740 F.3d 702 (1st Cir. 2014). Nor is it otherwise helpful to Florida that the court in *Lyons* observed that the Wire Act does not criminalize intrastate communications concerning "lawful intrastate gambling." *Lyons*, 740 F.3d at 713. As already discussed, there is no basis for Florida's claim that intrastate gambling is lawful

---

[6] The cited OLC opinion concluded that the Wire Act nonetheless did not apply to in-state sales of lottery tickets but only because it concluded that it only applied to sports betting. OLC then subsequently overruled that opinion in 2018, concluding that there was no basis to limit the Wire Act's scope to sports betting and recognizing that as a result, it would disrupt reliance interests of state lotteries established based on the earlier opinion. *See Reconsidering Whether the Wire Act Applies to Non-Sports Gambling*, 2018 WL 7080165, at \*14 (Nov. 2, 2018) ("Nov. 2, 2018 OLC Op.").

[7] *See United States v. Am. Bldg. Maint. Indus.*, 422 U.S. 271, 275-76 (1975) (referring to the "distinct 'in commerce' language of" Section 7 of the Clayton Act, which applies to corporations "engaged in commerce"); *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 109, 117-18 (2001) (applying a narrow interpretation to Section 1 of the Federal Arbitration Act's exclusion clause for "contracts of employment of . . . any other class of workers engaged in foreign or interstate commerce").

in Florida in light of art. X, § 30 of the state Constitution, which Florida ignores entirely. Further, the one case Florida cites that addresses the phrase "use in interstate commerce" (albeit in construing a different statute) supports Plaintiffs' position. Specifically, in *Jones v. United States,* the Supreme Court held that while a rented residential building would be considered a facility "used in interstate … commerce" or "affecting interstate … commerce" (and thus subject to the federal arson statute), an owner-occupied residence would not so qualify. *Jones*, 529 U.S. 848, 853, 855-56 & n.8 (2000).

In addition, Florida argues that UIGEA's inclusion of a safe harbor for wagers placed and received within a single state means that the Wire Act must implicitly include a similar safe harbor. ECF 28 at 12-13. Nothing warrants construing the Wire Act as implicitly adopting a safe harbor contained in a different statute, with a different scope, that was enacted 45 years after the Wire Act. Moreover, UIGEA itself forecloses the argument. *See* 31 U.S.C. § 5361(b) (stating that no provision of UIGEA "shall be construed as altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States"); *see also* Nov. 2, 2018 OLC Op.*,* slip op. at 18, 2018 WL 7080165 at *12 ("UIGEA's definition of 'unlawful Internet gambling simply does not affect what activities are lawful under the Wire Act").

Florida otherwise asserts that the Wire Act cannot be read to apply to online sports betting pursuant to the Compact because to do so would "federalize" what have traditionally been "local concerns," citing *Bond v. United States*, 572 U.S. 844, 857 (2014). ECF 28 at 10. But *Bond* addressed a situation in which an anti-chemical weapons treaty was applied to a domestic assault case in which a jilted wife used chemicals to attempt to cause rashes on her husband's lover. 572 U.S. at 851, 852-53. Unlike the applicability of a weapons treaty to a domestic assault case,

11

unlawful gambling via the Internet is not a purely local concern, as demonstrated by the multiple federal statutes addressing such conduct, including the Wire Act, UIGEA, IGRA, and the Johnson Act, all of which are geared to protecting jurisdictions that have chosen not to legalize gambling from the unwanted intrusion of such conduct. Further, since the enactment of the Federal Communications Act in 1935, federal law has "federalized" intrastate communications and transmissions that, as in the case of Florida, are unregulated by a State commission. 47 U.S.C. § 153(28); *see also* June 19, 1934, ch. 652, title I, § 3, 48 Stat. 1065. If anything, the State and Tribes' contortions to authorize otherwise felonious gambling—including flouting IGRA with wordplay, unlawful fictions about "deeming" activity to occur where it does not, circumvention of the State Constitution, and use of mobile carriers and the Internet to facilitate unlawful gambling—are the types of things the Wire Act is intended to protect against.[8]

Finally, this case involves communications between a state and an Indian tribe, which independently satisfies the interstate commerce provision of the Wire Act. Florida resists this by invoking a Supreme Court case from 1831 holding that the Cherokee Nation is not a "foreign state" as that term is used in the Constitution, but that is inapposite as it does not address the question of interstate commerce.  Florida also points to the Wire Act's definition of "State," which does not include Native American reservations. ECF 28 at 10 (citing *Cherokee Nation v. Georgia,* 30 U.S. 1, 20 (1831) and 18 U.S.C. § 1084(e)). But the term "State" in the Wire Act applies only in determining whether the Wire Act's safe harbor applies—*i.e.*, whether a communication is exempt because it occurred between two states where gambling is legal. *See* 18 U.S.C. § 1084 (b).[9] A Wire

---

[8]  The fact that the Compact is purportedly entered into and approved pursuant to federal law further defeats any suggestion that the conduct at issue is purely of local concern.

[9]  "Nothing in this section shall be construed to prevent the transmission in interstate or foreign commerce of information for use in news reporting of sporting events or contests, or for the transmission of information assisting in the placing of bets or wagers on a sporting event or contest

Act violation, by contrast, does not require a State-to-State communication but rather requires only

the use of a wire communication facility for the transmission of a sports bet "in interstate or foreign

commerce." 18 U.S.C. § 1084(a).[10] A transmission between a person in a State but off Indian lands

to a person on an Indian reservation should be considered a transmission "in interstate or foreign

commerce" as should transmissions that occur via intermediate routing through other states, as

discussed above.

Nor does *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163 (1989), stand, as Florida

claims, for the proposition that activity between a State and a tribal reservation can never implicate

interstate commerce. ECF 28 at 10. Instead, that case held only that New Mexico could impose

severance taxes on an oil and gas production taking place on a reservation, on top of severance

taxes imposed by the Tribe. 490 U.S. at 186-87, 191. Further, the Court made clear that the taxation

scheme could have impacted "interstate commerce" if the State had attempted to levy taxes that

were "in excess of what 'the State's contact with the activity would justify.'" *Id.* at 169 (emphasis

removed) (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 158-59 n.26 (1982)). Here,

the transmission of such wagers and payments between the Tribe's reservations and other locations

in Florida, as well as the transmission of information assisting such wagers between the Tribe's

reservations and other states (for example, the location of an NCAA basketball game located in

---

from a State or foreign country where betting on that sporting event or contest is legal into a State
or foreign country in which such betting is legal."

[10] "Whoever being engaged in the business of betting or wagering knowingly uses a wire
communication facility for the transmission in interstate or foreign commerce of bets or wagers or
information assisting in the placing of bets or wagers on any sporting event or contest, or for the
transmission of a wire communication which entitles the recipient to receive money or credit as a
result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined
under this title or imprisoned not more than two years, or both."

Oklahoma[11]), and the intermediate, interstate transmission of bets, wagers, and information assisting such bets, all are properly viewed as communications made "in interstate commerce."

## CONCLUSION

For the reasons set forth in this filing and in Plaintiffs' motion for summary judgment and reply, Plaintiffs are entitled to summary judgment, and the Federal Defendants' motion to dismiss should be denied.

Respectfully submitted,


By: /s/ *Hamish P.M. Hume*
**BOIES SCHILLER FLEXNER LLP**

Hamish P.M. Hume
Amy L. Neuhardt
Samuel C. Kaplan
Chloe M. Houdre
1401 New York Avenue, N.W.
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
aneuhardt@bsfllp.com
skaplan@bsfllp.com
choudre@bsfllp.com

Jon L. Mills (*pro hac vice*)
100 SE Second Street
Suite 2800
Miami, FL 33131
Tel: (305) 357- 8449
Fax: (305) 539-1307

---

[11] There is no indication that online sports betting under the Compact will be limited to wagers placed on sporting activities occurring in states and countries in which sports betting is legal.

14