# EXHIBIT 1

# TRIBAL-STATE COMPACT

# BETWEEN

# THE STATE OF CALIFORNIA

# AND THE

# PECHANGA BAND OF LUISEÑO INDIANS

# TABLE OF CONTENTS

PREAMBLE                                                                      1

Sec. 1.0.        Purposes and Objectives.                                     3

Sec. 2.0.        Definitions.                                                 4

Sec. 3.0.        Scope of Class III Gaming Authorized.                        9

Sec. 3.1.        Authorized Class III Gaming.                                 9

Sec. 4.0.        Authorized Location of Gaming Facility, Number of Gaming
                 Devices, Cost Reimbursement, and Mitigation.                10

Sec. 4.1.        Authorized Number of Gaming Devices.                        10

Sec. 4.2.        Authorized Gaming Facility.                                 10

Sec. 4.3.        Special Distribution Fund.                                  10

Sec. 4.3.1.      Use of Special Distribution Funds.                          13

Sec. 4.4.        Quarterly Revenue Contribution Report.                      13

Sec. 4.5.        Effective Date of Revenue Contribution Provisions.         14

Sec. 4.6.        Cost Reimbursement and Mitigation to Local Governments.    14

Sec. 4.7.        Quarterly Payments and Quarterly Contribution Report.      15

Sec. 4.8.        Exclusivity.                                               16

Sec. 5.0.        Revenue Sharing With Non-Gaming and Limited-Gaming
                 Tribes.                                                     17

Sec. 5.1.        Definitions.                                               17

Sec. 5.2.        Payments to the Revenue Sharing Trust Fund or the Tribal
                 Nation Grant Fund.                                         20

Sec. 5.3.      Provision for Local Community Credit Fund.                    20

Sec. 5.4.      California Native American and Education Scholarship
               Fund.                                                         23

Sec. 5.5.      Treatment of Credits Paid by the Tribe in an Economic
               Downturn.                                                     24

Sec. 6.0.      Licensing.                                                    25

Sec. 6.1.      Gaming Ordinance and Regulations.                            25

Sec. 6.2.      Tribal Ownership, Management, and Control of Gaming
               Operation.                                                    25

Sec. 6.3.      Prohibitions Regarding Minors.                               26

Sec. 6.4.      Licensing Requirements and Procedures.                       26

Sec. 6.4.1.    Summary of Licensing Principles.                             26

Sec. 6.4.2.    Gaming Facility.                                             26

Sec. 6.4.3.    Gaming Employees.                                            31

Sec. 6.4.4.    Gaming Resource Suppliers.                                   33

Sec. 6.4.5.    Financial Sources.                                          36

Sec. 6.4.6.    Processing Tribal Gaming License Applications.              40

Sec. 6.4.7.    Suitability Standard Regarding Gaming Licenses.             41

Sec. 6.4.8.    Background Investigations of Applicants.                    42

Sec. 6.4.9.    Temporary Licensing of Gaming Employees.                    44

Sec. 6.5.0.    Tribal Gaming License Issuance.                             45

Sec. 6.5.1.    Denial, Suspension, or Revocation of Licenses.                45

Sec. 6.5.2.    Renewal of Licenses; Extensions; Further Investigation.       46

Sec. 6.5.3.    Identification Cards.                                         47

Sec. 6.5.4.    Fees for Tribal Gaming License.                              48

Sec. 6.5.5.    Suspension of Tribal Gaming License.                         48

Sec. 6.5.6.    State Determination of Suitability Process.                  48

Sec. 6.6.      Submission of New Application.                               51

Sec. 7.0.      Approval and Testing of Gaming Devices.                      52

Sec. 7.1.      Gaming Device Approval.                                      52

Sec. 7.2.      Gaming Test Laboratory Selection.                            53

Sec. 7.3.      Maintenance of Records of Testing Compliance.                54

Sec. 7.4.      State Gaming Agency Inspections.                             54

Sec. 7.5.      Technical Standards.                                         55

Sec. 7.6.      Transportation of Gaming Devices.                            55

Sec. 8.0.      Inspections.                                                 56

Sec. 8.1.      Investigation and Sanctions.                                 56

Sec. 8.2.      Assistance by State Gaming Agency.                           57

Sec. 8.3.      Access to Premises by State Gaming Agency; Notification;
               Inspections.                                                 57

Sec. 8.4.      Inspection, Copying and Confidentiality of Documents.        58

Sec. 8.5.      NIGC Audit Reports.                                          60

Sec. 8.6.      Cooperation with Tribal Gaming Agency.                    60

Sec. 8.7.      Compact Compliance Review.                               61

Sec. 8.8.      Waiver of Materials.                                     61

Sec. 9.0.      Rules and Regulations for the Operation and Management
               of the Gaming Operation and Facility.                   61

Sec. 9.1.      Adoption of Regulations for Operation and Management;
               Minimum Standards.                                      61

Sec. 9.1.1.    Minimum Internal Control Standards ("MICS").             64

Sec. 9.2.      Program to Mitigate Problem Gambling.                    67

Sec. 9.3.      Enforcement of Regulations.                             68

Sec. 9.4.      State Civil and Criminal Jurisdiction.                  68

Sec. 9.5.      Tribal Gaming Agency Members.                           68

Sec. 9.6.      Uniform Tribal Gaming Regulations.                      69

Sec. 10.0.     Patron Disputes.                                        70

Sec. 11.0.     Off-Reservation Environmental and Economic Impacts.     72

Sec. 11.1.     Tribal Environmental Impact Report.                     72

Sec. 11.2.     Notice of Preparation of Draft TEIR.                    75

Sec. 11.3.     Notice of Completion of Draft TEIR.                     75

Sec. 11.4.     Issuance of Final TEIR.                                 76

Sec. 11.5.     Cost Reimbursement to County.                          77

Sec. 11.6.     Failure to Prepare Adequate TEIR.                       77

Sec. 11.7.    Intergovernmental Agreement.                                              77

Sec. 11.8.    Arbitration.                                                              79

Sec. 12.0.    Public and Workplace Health, Safety, and Liability.                       80

Sec. 12.1.    General Requirements.                                                     80

Sec. 12.2.    Tobacco Smoke.                                                            81

Sec. 12.3.    Health and Safety Standards.                                              81

Sec. 12.4.    Tribal Gaming Facility Standards Ordinance.                               85

Sec. 12.5.    Insurance Coverage and Claims.                                            85

Sec. 12.6.    Participation in State Programs Related to Employment.                    88

Sec. 12.7.    Emergency Services Accessibility.                                         91

Sec. 12.8.    Alcoholic Beverage Service.                                               91

Sec. 12.9.    Possession of Firearms.                                                   91

Sec. 12.10.   Labor Relations.                                                          91

Sec. 13.0.    Dispute Resolution Provisions.                                            91

Sec. 13.1.    Voluntary Resolution; Court Resolution.                                   91

Sec. 13.2.    Arbitration Rules for the Tribe and the State.                            93

Sec. 13.3.    No Waiver or Preclusion of Other Means of Dispute
              Resolution.                                                               93

Sec. 13.4.    Limited Waiver of Sovereign Immunity.                                     93

Sec. 14.0.    Effective Date and Term of Compact.                    95

Sec. 14.1.    Effective Date.                                         95

Sec. 14.2.    Term of Compact; Termination.                          95

Sec. 15.0.    Amendments; Renegotiations.                            96

Sec. 15.1.    Amendment by Agreement.                                96

Sec. 15.2.    Negotiations for a New Compact.                        96

Sec. 15.3     Requests to Amend or to Negotiate a New Compact.       96

Sec. 16.0.    Notices.                                               97

Sec. 17.0.    Changes to IGRA.                                       97

Sec. 18.0.    Miscellaneous.                                         97

Sec. 18.1.    Third Party Beneficiaries.                             97

Sec. 18.2.    Complete Agreement.                                    98

Sec. 18.3.    Construction.                                          98

Sec. 18.4.    Successor Provisions.                                  98

Sec. 18.5.    Ordinances and Regulations.                           98

Sec. 18.6.    Calculation of Time.                                   98

Sec. 18.7.    Force Majeure.                                         99

Sec. 18.8.    Representations.                                       99

APPENDICES

A.    Description and Map of Pechanga Indian Reservation          A-1

B.    Off-Reservation Environmental Impact Analysis Checklist     B-1

C.    Tribal Labor Relations Ordinance                            C-1

D.    Off-Track Satellite Wagering Facilities Compact             D-1

# TRIBAL-STATE COMPACT
# BETWEEN THE STATE OF CALIFORNIA AND THE
# PECHANGA BAND OF LUISEÑO INDIANS

The Pechanga Band of Luiseño Indians (Tribe), a federally recognized Indian tribe, and the State of California (State) enter into this tribal-state class III gaming compact pursuant to the Indian Gaming Regulatory Act of 1988 (IGRA).

## **PREAMBLE**

**WHEREAS**, the Tribe has inhabited the Temecula Valley since time immemorial; and

**WHEREAS**, the Pechanga Band of Luiseño Indians is a customs and traditions tribe; and

**WHEREAS**, the Pechanga Indian Reservation was established by Executive Order of the President of the United States on June 27, 1882, formally recognizing the Tribe's sovereignty and land-base; and

**WHEREAS**, the Tribe is committed to improving the environment, education status, and the health, safety and general welfare of its members and the surrounding community; and

**WHEREAS**, in 1988, Congress enacted IGRA as the federal statute governing Indian gaming in the United States.  The purposes of IGRA are to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments; to provide a statutory basis for regulation of Indian gaming adequate to shield it from organized crime and other corrupting influences; to ensure that the Indian tribe is the primary beneficiary of its gaming operation; to ensure that gaming is conducted fairly and honestly by both the operator and players; and to declare that the establishment of an independent federal regulatory authority for gaming on Indian lands, federal standards for gaming on Indian lands, and a National Indian Gaming Commission are necessary to meet congressional concerns; and

## SECTION 3.0.  SCOPE OF CLASS III GAMING AUTHORIZED.

### Sec. 3.1.  Authorized Class III Gaming.

(a)     The Tribe is hereby authorized and permitted to operate only the following Gaming Activities under the terms and conditions set forth in the Compact:

     (1)     Gaming Devices.

     (2)     Any banking or percentage card games.

     (3)     Any devices or games that are authorized under state law to the California State Lottery, provided that the Tribe will not offer such games through use of the Internet unless others in the state are permitted to do so under state and federal law.

     (4)     Off-track wagering on horse races at a satellite wagering facility pursuant to the requirements in the document attached hereto as Appendix D.

(b)     Nothing herein shall be construed to preclude the Tribe from offering class II gaming at the Tribe's Gaming Facility.

(c)     Nothing herein shall be construed to authorize or permit the operation of any Class III Gaming that the State lacks the power to authorize or permit under article IV, section 19, subdivision (f), of the California Constitution.

(d)     The Tribe shall not engage in Class III Gaming that is not expressly authorized in this Compact.

# APPENDIX D

**WHEREAS**, the State of California permits and regulates pari-mutuel wagering on horse racing at authorized satellite wagering facilities (also known as simulcast wagering facilities) at various locations within the State, under the terms of California Business and Professions Code section 19400 et seq. (California Horse Racing Law); and

**WHEREAS**, the California Horse Racing Board (Board) is the agency established under California state law to administer and enforce all laws, rules, and regulations affecting horse racing and pari-mutuel wagering within the state and has enacted regulations that appear at title 4, California Code of Regulations, article 24 (Board Rules and Regulations); and

**WHEREAS**, operation of a satellite wagering facility is a Class III Gaming activity under IGRA; and

**WHEREAS**, the Tribe has duly enacted its Gaming Ordinance, which permits such gaming activities on and within the Pechanga Indian Reservation if conducted in conformity with an applicable tribal-state compact; and

**WHEREAS**, section 3.1, subdivision (a)(4), of the Compact authorizes and permits the Tribe to offer wagering on horse races at a satellite wagering facility pursuant to the requirements of this Appendix; and

**WHEREAS**, the Tribe and the State each recognize the sovereign authority and interests of the other in regulating gaming activities within their respective areas of jurisdiction and in ensuring that satellite wagering is conducted fairly, honestly, professionally and in a manner that promotes the California horse racing industry;

**NOW, THEREFORE**, in consideration of the mutual promises set forth herein, the parties agree as follows:

**Sec. 1.0    Definitions**.  Except where the context otherwise requires, the terms employed in this Appendix shall have the same meanings ascribed to them in the California Horse Racing Law, the Board Rules and Regulations, and in the Compact, as they may be modified or amended from time to time during the term of the Compact.  Whenever reference to the Compact is made in this Appendix, that reference shall be understood to also include any Class III Gaming compact

between the Tribe and the State to amend or replace the Compact that may hereafter be entered into and that is in effect.  A satellite wagering machine is a device used solely to conduct satellite wagering as authorized by this Appendix, and such a machine shall not be treated as a Gaming Device as defined in the Compact, including for the purpose of calculating the number of Gaming Devices operated by the Tribe under the Compact.

Sec. 2.0     **Purpose**.  The purpose of this Appendix is to establish and declare the terms upon which a satellite wagering facility may be established and operated by the Tribe in its Gaming Facility as a means of developing self-sufficiency and generating additional revenues necessary to provide tribal services and programs, while providing the State and the Tribe with an effective means of regulating such activities in accordance with IGRA.

Sec. 3.0     **Authorization to Operate Satellite Wagering Facility**.  The Tribe is authorized to establish and operate a satellite wagering facility (Satellite Facility) upon the Pechanga Indian Reservation within its Gaming Facility, provided that the Tribe completes and submits to the Board an Application for Authorization to Operate a Simulcast Wagering Facility (Form CHRB-25, or such form as may be revised) and such Satellite Facility is operated in conformity with IGRA, this Appendix, and the Compact, except to the extent there may be provisions in the Compact that are in conflict with provisions in the California Horse Racing Law or the Board Rules and Regulations specific to the conduct of satellite wagering, in which case the California Horse Racing Law and the Board Rules and Regulations shall control.

(A)     Satellite Facility.  For purposes of this Appendix, a site within the Tribe's Gaming Facility, located at 45000 Pechanga Parkway, Temecula, CA 92592, which shall be clearly demarcated, shall be approved as the Pechanga Satellite Facility, provided that upon inspection by the Board, the Board finds that the Satellite Facility is suitable for satellite wagering activities.  References to the Pechanga Satellite Facility in this Appendix shall refer only to the portion of the Gaming Facility that has been demarcated as the Pechanga Satellite Facility and shall not refer to any other portion of the Gaming Facility.

(B)     Continuing Obligation to Maintain Satellite Facility.  The Tribe agrees to maintain its Satellite Facility in a manner that complies with all applicable satellite wagering facility requirements made applicable by



FILED

DEC 5 1996

OKLAHOMA SECRETARY
OF STATE

# IOWA

# OFF-TRACK WAGERING

# COMPACT

# TABLE OF CONTENTS

SECTION 1. **TITLE**. . . . . . . . . . . . . . . . . . . . . . 1

SECTION 2. **DEFINITIONS**. . . . . . . . . . . . . . . . . . . 1

SECTION 3. **DURATION** . . . . . . . . . . . . . . . . . . . . 3

      a.   Effective Date . . . . . . . . . . . . . . . . . 3

      b.   Term . . . . . . . . . . . . . . . . . . . . . . 3

      c.   Duration . . . . . . . . . . . . . . . . . . . . 3

SECTION 4. **AUTHORIZED CLASS III GAMING** . . . . . . . . . 4

SECTION 5. **LOCATIONS** . . . . . . . . . . . . . . . . . . . . 4

SECTION 6. **SERVICE AGREEMENTS** . . . . . . . . . . . . . . 4

SECTION 7. **CLAIMS** . . . . . . . . . . . . . . . . . . . . . 4

      a.   Procedure . . . . . . . . . . . . . . . . . . . 5

      b.   Tort Claim . . . . . . . . . . . . . . . . . . . 6

      c.   Wager Claim . . . . . . . . . . . . . . . . . . 7

      d.   Posting . . . . . . . . . . . . . . . . . . . . 7

SECTION 8. **REGULATIONS** . . . . . . . . . . . . . . . . . . 7

      a.   Logs . . . . . . . . . . . . . . . . . . . . . . 7

      b.   Debarred Lists . . . . . . . . . . . . . . . . . 7

      c.   Audit . . . . . . . . . . . . . . . . . . . . . 8

      d.   Rule Display . . . . . . . . . . . . . . . . . . 8

SECTION 9. **ENFORCEMENT** . . . . . . . . . . . . . . . . . . 8

      a.   Iowa  Gaming Director . . . . . . . . . . . . . 8

      b.   Investigation and Sanctions . . . . . . . . . . 9

      c.   Reporting . . . . . . . . . . . . . . . . . . . 9

      d.   Meetings . . . . . . . . . . . . . . . . . . . . 9

SECTION 10. **MONITORING** . . . . . . . . . . . . . . . . . . 10

i

    a.    Access to Records . . . . . . . . . . . . . 10

    b.    Notification . . . . . . . . . . . . . . . 10

SECTION 11. **CRIMINAL JURISDICTION**. . . . . . . . . 11

SECTION 12. **EMPLOYEES** . . . . . . . . . . . . . . 11

    a.    Applications. . . . . . . . . . . . . . . 11

    b.    Probation . . . . . . . . . . . . . . . . 12

    c.    Disqualification . . . . . . . . . . . . . 12

    d.    Background Investigations . . . . . . . . . 13

    e.    Identification Cards . . . . . . . . . . . 13

SECTION 13. **PUBLIC HEALTH AND SAFETY** . . . . . . . 13

    a.    Compliance . . . . . . . . . . . . . . . . 13

    b.    Emergency Service Accessibility . . . . . . 13

    c.    Minors . . . . . . . . . . . . . . . . . . 14

    d.    Alcohol . . . . . . . . . . . . . . . . . 14

SECTION 14. **DISPUTE RESOLUTION** . . . . . . . . . . 14

    a.    Voluntary Resolution . . . . . . . . . . . 14

    b.    Non-binding Arbitration . . . . . . . . . . 14

    c.    Declaratory Judgment . . . . . . . . . . . 15

SECTION 15. **RESERVATION OF RIGHTS**. . . . . . . . . 15

    a.    Additional Compacts . . . . . . . . . . . 15

    b.    Status of Class II Gaming . . . . . . . . . 16

    c.    Taxation . . . . . . . . . . . . . . . . . 16

    d.    Preservation of Iowa  Self-Government . . . . 16

SECTION 16. **REIMBURSEMENT FOR EXPENSES INCURRED BY OKLAHOMA.** . . . . . . . . . . . . . . . 16

    a.    Payments . . . . . . . . . . . . . . . . . 17

b.   Procedure . . . . . . . . . . . . . . . . .   17

c.   Escrow Draws . . . . . . . . . . . . . . . .   18

SECTION 17. **SEVERABILITY** . . . . . . . . . . . . . . . .   18

SECTION 18. **AMENDMENTS** . . . . . . . . . . . . . . . .   19

SECTION 19. **AUTHORITY TO EXECUTE** . . . . . . . . . . .   19

SECTION 20. **NOTICES** . . . . . . . . . . . . . . . . . .   19

SECTION 21. **SUCCESSORS AND ASSIGNS** . . . . . . . . . .   20

SECTION 22. **GOVERNING LAW** . . . . . . . . . . . . . . .   21

## APPENDICES

Appendix A - Parimutuel Standards

Appendix B - Gaming Facilities Locations

Appendix C - Gaming Ordinance

This is a cooperative agreement made and entered into by and between the Iowa Tribe of Oklahoma ("Iowa "), a federally-recognized Indian tribe, and the State of Oklahoma ("Oklahoma"), pursuant to the provisions of the Indian Gaming Regulatory Act.

SECTION 1. **TITLE**. The title of this document is the "Iowa Off-Track Wagering Compact."

SECTION 2. **DEFINITIONS**. For the purposes of this compact:

a.    "Act" means the Indian Gaming Regulatory Act, Pub.L. 100-497, Oct. 17, 1988, 102 Stat. 2467 codified at 25 U.S.C.A. § 2701 et seq. 18 U.S.C.A. §§ 1166 to 1168.

b.    "Class III Gaming" means all forms of gaming defined in 25 U.S.C.A. § 2703(8).

c.    "Commission" means the National Indian Gaming Commission established pursuant to 25 U.S.C.A. § 2704.

d.    "Compact" means this document and any appendices attached hereto.

e.    "Gaming Employee" means any natural person employed in the management of the gaming operation.

f.    "Gaming Facility" means the room or rooms where off-track bets authorized by this compact are placed.

g.    "Gaming Operation" means the gaming authorized in Iowa  Indian country by this compact.

h.    "Off-Track Betting" means pari-mutuel betting on races into an interstate common pari-mutuel pool consisting of the pari-mutuel wagers placed at track(s), its intrastate betting locations, other jurisdictions, and the pari-mutuel wagers placed at the Iowa Gaming Facilities authorized by this compact.

i.   "Iowa Indian country" means any lands as defined by 25 U.S.C.A. § 2703, ¶ (4)(A) and ¶ (B) over which the Iowa exercise jurisdiction.

j.   "OSBI" means the Oklahoma State Bureau of Investigation, the organization now tasked by Oklahoma law to monitor and oversee compacts relating to Indian gaming [74 O.S.Supp.1995, § 1223], or such other entity that the Oklahoma Legislature may hereafter designate by law to perform these or related tasks.

k.   "Oklahoma" means the State of Oklahoma, its authorized officials, agents, and representatives.

l.   "Iowa " means the Iowa Tribe of Oklahoma, its authorized officials, agents and representatives.

m.   "Iowa  Gaming Director" means the person so designated by the Iowa  as primarily responsible for regulatory oversight of the off-track wagering authorized and governed by this compact.

n.   "Iowa  Law Enforcement Agency" means the police force established and maintained by the Iowa  pursuant to the Iowa powers of self-government to carry out law enforcement within Iowa Indian country.

SECTION 3. **DURATION**.

a.   <u>Effective Date</u>. After execution by the parties hereto, this compact shall become effective when notice of approval by the Secretary of the Interior is published in the <u>Federal Register</u>.

2

b.  Term.  This  Compact  shall  have  a  three-year automatically-renewable term from the effective date. The three-year term will automatically renew unless a party gives notice of intent to terminate before 30 days prior to expiration of the three-year term.

c.  Duration. Once effective, this Compact will remain in full force and effect until one of the following shall occur:

(1)  The term expires pursuant to a notice of an intent to terminate;

(2)  The Compact is terminated by mutual consent of the parties;

(3)  The Iowa duly adopt an ordinance or resolution revoking authority to conduct Class III Gaming in Iowa  Indian country as provided by 25 U.S.C.A. § 2710(d)(2)(D);

(4)  Pursuant to a final, non-appealable judgment by a court of competent jurisdiction determining that:

(a)  this Compact is invalid; or

(b)  a party has committed a material breach that has not been timely cured.

SECTION 4. **AUTHORIZED CLASS III GAMING**. The Iowa  may conduct off-track  wagering  consistent  with  this  compact,  with  all applicable federal laws, and with the standards of operation and management for parimutuel gaming described in Appendix A.

SECTION 5. **LOCATIONS**. All gaming authorized herein shall be conducted in gaming facilities located on land held in trust by the United States for the Iowa  and situated within the borders of the

3

State of Oklahoma. Enumerated in Appendix B is a current list of authorized locations. Additional locations may be added to this list by the Iowa  with the concurrence of the Governor of Oklahoma who shall approve the additional site unless the site is: (a) not on land held in trust by the United States for the Iowa  within the borders of the State of Oklahoma, or (b) within 300 feet of a school or of a church.

SECTION 6. **SERVICE AGREEMENTS**. The Iowa will enter into a Pari-Mutuel and Racewire Service Agreement for the off-track wagering authorized by this compact.

SECTION 7. **CLAIMS**. To protect third-parties, the Iowa  have adopted a gaming ordinance consistent with 25 U.S.C.A. § 2710. A copy of this ordinance is attached hereto as Appendix C. This ordinance provides dispute resolution procedures that shall apply to tort and wagering claims unless change is required by federal law:

a. Procedure.  In the event of an alleged personal injury or property damage suffered by a patrol of the gaming facility, or in the event of a dispute between a patron and the gaming enterprise regarding the payment of bet or distribution of winnings, the patron may make a claim against the gaming enterprise as follows:

(1) Making Claim.  Any patron having a claim against the gaming enterprise shall present a claim to the gaming enterprise for any appropriate relief including the award of money damages.  Claims against the gaming enterprise are to be presented

4




# TRIBAL-STATE COMPACT
# FOR CLASS III GAMING

**Between the**

## Squaxin Island Tribe

**and the**

## State of Washington

# SQUAXIN ISLAND TRIBE
## AND THE
# STATE OF WASHINGTON
## CLASS III GAMING COMPACT

## TABLE OF CONTENTS

| Section | Subject Matter | Page |
|---|---|---|
| | INTRODUCTION | 1 |
| | PARTIES | 1 |
| | DECLARATION OF POLICY AND PURPOSE | 1 |
| I | TITLE | 3 |
| II | DEFINITIONS | 3 |
| III | NATURE, SIZE AND SCOPE OF CLASS III GAMING | 5 |
| | A. Scope of Class III Gaming Activities | 5 |
| | B. Punchboard and Pull Tabs and Washington State Lottery | 6 |
| | C. Lottery-type Games | 6 |
| | D. Other Class III Table Games | 6 |
| | E. Authorized Gaming Operation and Facility | 6 |
| | F. Forms of Payment | 7 |
| | G. Size of Gaming Floor | 7 |
| | H. Number of Gaming Stations | 7 |
| | I. Wagering Limitations | 7 |
| | J. Hours of Operation | 8 |
| | K. Ownership of Gaming Facility and Gaming Operation | 8 |

L.      Prohibited Activities ............................................................ 8

M.      Age Limitations ................................................................... 8

N.      Prohibition on Firearms ...................................................... 9

IV      LICENSING AND CERTIFICATION REQUIREMENTS ............................ 9

A.      Gaming Operation and Facility ........................................... 9

B.      Gaming Employees ............................................................. 9

C.      Manufacturers and Suppliers of Gaming Services .......................... 9

D.      Financiers ........................................................................ 10

V       LICENSING AND STATE CERTIFICATION PROCEDURES .................. 10

A.      Procedures for Tribal License Applications and State Certification 10

B.      Background Investigations of Applicants ....................................... 10

C.      Grounds for Revocation, Suspension or Denial of State Certification 10

D.      Right to Hearing for Revocation, Suspension, or Denial of State
        Certification ..................................................................... 11

E.      Denial, Suspension, or Revocation of Licenses Issued by Tribal
        Gaming Agency ................................................................ 11

F.      Duration and Renewal of Tribal Issued Licenses and
        StateCertifications .......................................................... 11

G.      Identification Cards ........................................................... 12

H.      Exchange of Licensing and State Certification Information ........... 12

I.      Fees for State Certification ................................................. 12

J.      Fees for Tribal License ...................................................... 13

K.      Temporary Certification of Gaming Employees ........................... 13

L.    Summary Suspension of Tribal License or State Certification ...... 13

M.    Submission to State Administrative Process ................................. 13

N.    Tribal Certification ........................................................................ 13

VI    TRIBAL ENFORCEMENT OF COMPACT PROVISIONS........................ 14

A.    Tribal Gaming Agency.................................................................... 14

B.    Tribal Gaming Agents/Inspectors ................................................. 15

C.    Reporting of Violations ................................................................. 15

D.    Investigation and Sanctions ......................................................... 15

E.    Reporting to State Gaming Agency............................................... 15

F.    Quarterly Meetings....................................................................... 15

VII    STATE COOPERATIVE ENFORCEMENT OF COMPACT PROVISIONS15

A.    Monitoring ..................................................................................... 15

B.    Access to Records ......................................................................... 16

C.    Tribal Gaming Agency Notification ................................................ 16

D.    Cooperation with Tribal Gaming Agency ....................................... 16

E.    Jurisdictional Issues ...................................................................... 16

VIII    REGULATORY JURISDICTION RELATING TO ENFORCEMENT OF THE

        PROVISIONS OF THIS COMPACT........................................................... 16

        A.    Concurrent Jurisdiction ................................................. 16

IX      LAW ENFORCEMENT JURISDICTION RELATING TO GAMBLING...... 17

        A.    Investigative Authority .................................................. 17

        B.    Jurisdictional Forums .................................................... 17

        C.    Consent to Application of State Law and Incorporation in Tribal

              Ordinance ................................................................... 17

        D.    Exception to Consent .................................................... 17

        E.    Law Enforcement Coordination ....................................... 18

X       ENACTMENT OF COMPACT PROVISIONS .......................................... 18

        A.    State Gaming Agency Rules or Regulations ................................. 18

        B.    Tribal Gaming Agency Regulations................................. 18

XI      REGULATIONS FOR OPERATION AND MANAGEMENT .................... 18

        A.    Adoption of Regulations for Operation and Management ............. 18

        B.    Additional Operational Requirements Applicable to Class III Gaming

              ................................................................................. 18

XII     REMEDIES FOR BREACH OF COMPACT PROVISIONS...................... 20

        A.    Injunction Against the State ......................................... 20

        B.    Injunction Against the Tribe, the Tribal Gaming Operation or any

              Individual.................................................................. 20

        C.    Dispute Resolution ...................................................... 20

        D.    Sanctions/Civil Fines ................................................... 21

E.     Method of Collection and Payment to Washington State Council on Problem Gambling ........................................................... 23

XIII     TRIBAL REIMBURSEMENT FOR EXPENSES INCURRED BY THE STATE GAMING AGENCY ................................................................. 23

XIV     PUBLIC HEALTH AND SAFETY .............................................. 24

A.     Compliance ...................................................................... 24

B.     Emergency Service Accessibility...................................... 24

C.     Community and Enforcement Impact Contribution......................... 24

D.     Community Relations ........................................................ 25

E.     Alcoholic Beverage Service.............................................. 25

XV     AMENDMENTS, DURATION AND EFFECTIVE DATE ........................... 25

A.     Effective Date................................................................... 25

B.     Voluntary Termination ...................................................... 25

C.     Other Termination – Change of State Law................................... 26

D.     Amendments/Renegotiations .......................................... 26

XVI     LIMITATION OF LIABILITY .................................................... 27

XVII     NOTICES................................................................................ 27

XVIII     SEVERABILITY ...................................................................... 27

SIGNATURES ......................................................................... 28

## INTRODUCTION

THIS COMPACT is entered into pursuant to the Indian Gaming Regulatory Act of 1988, P.L. 100-497, codified at 25 USC §2701-2721 and 18 USC §1166-1168 (hereafter I.G.R.A. or Act).

## PARTIES

THIS TRIBAL-STATE COMPACT is made and entered into by and between the SQUAXIN ISLAND TRIBE (hereafter "Tribe"), a federally-recognized Indian Tribe, possessed of all sovereign powers and rights thereto pertaining; and the STATE OF WASHINGTON (hereafter "State"), as a sovereign state of the United States, with all rights and powers thereto pertaining.

## DECLARATION OF POLICY AND PURPOSE

IGRA provides for the negotiation of compacts between States and Tribes to govern the conduct of Class III gaming.  Indian tribes have rights under IGRA to regulate gaming activities on Indian lands if the gaming activity is not specifically prohibited by federal law and is conducted within a state which does not, as a matter of criminal law and public policy, prohibit such gaming activity.  The overarching policy of IGRA is to provide a framework for the operation of gaming by Indian tribes as a means of promoting Tribal economic development, self-sufficiency and strong Tribal governments, as well as providing a basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation and to assure that gaming is conducted fairly and honestly by both the operator and players.  The terms and conditions set forth below to regulate Class III gaming conducted by the Tribe have been agreed to pursuant to that congressional mandate.

It is the stated intention of the parties hereto to foster full cooperation between the Tribe and the State on the basis of a shared concern for the welfare and protection of all the members of the Tribe and citizens of the State as a result of gaming on the Squaxin Island Reservation.  Through the partnership of this Compact, the parties desire to further the purposes of IGRA for the benefit of the Tribe and the protection of the State, by creating a cooperative means through which the Tribe may lawfully conduct Class III gaming activities on the Squaxin Island Reservation in conjunction with the State, which permits such gaming for any purpose by any person, organization or entity. To that end, this Compact defines the manner in which laws regulating the conduct of Tribe's Class III gaming activities are to be applied in order that the respective Tribal and State interests may be met.

The Tribe and the State have mutually agreed, within the parameters established by the Act, to the following provisions governing the conduct of Class III gaming activities on the lands of the Tribe, which are designed to (a) protect the health, welfare and safety of the citizens of the Tribe and the State, (b) develop and implement a means of regulating Class III gaming on the Squaxin Island Reservation in order to ensure the fair and honest operation of such gaming, (c) minimize the possibility of corruption or illegal practices in conjunction with such activities, and (d) maintain the integrity of Class III gaming within the State.

The policy of the State, as set forth in Chapter 9.46 RCW, is to allow limited and highly regulated casino gaming for non-profit organizations, and to restrain persons from seeking profit from professional gambling activities.  The provisions of Chapter 9.46 RCW and Title 230 WAC

regulate gambling activities; the provisions of Chapter 67.16 RCW and Title 260 WAC authorize and regulate horse racing activities, including parimutuel satellite wagering, in Washington State. The State agrees that the Tribe is authorized, as a result of the provisions of IGRA and the terms of this Compact, to engage in the Class III gaming activities expressly permitted herein.

The Tribe and the State believe the conduct of Class III gaming under the terms and conditions set forth below will, from a regulatory perspective, benefit the Tribe and the State and protect the members of the Tribe and the citizens of the State consistent with the objectives of IGRA.

NOW, THEREFORE, in consideration of the foregoing and the mutual benefits to be derived, the Tribe and State do enter into this Compact as provided for herein.

## I.  TITLE

This document shall be cited as "The Squaxin Island Tribe - State of Washington Gaming Compact."

## II.  DEFINITIONS

For purposes of this Compact:

A.      "Act" means the Indian Gaming Regulatory Act, Pub.L. 100-497, 25 USC §2701 et seq. and 18 USC §1166 et seq. (also IGRA).

B.      "Applicant" means any individual who has applied for a tribal license or state certification, whether or not such license or certification is ultimately granted.

C.      "Class III Gaming" means all forms of gaming as defined in 25 USC §2703(8) and by regulations of the National Indian Gaming Commission and are authorized under this Compact as Class III games.  Pull tabs and punchboards, even though discussed herein, are specifically deemed to be Class II games when operated in conjunction with bingo.

D.      "Commission" means the Washington Horse Racing Commission, a State agency.

E.      "Compact" means the Squaxin Island Tribe - State of Washington Gaming Compact.

F.      "Gambling Device" means any device or mechanism by the operation of which a right to money, credits, deposits or other things of value may be created, in return for a consideration, as the result of the operation of an element of chance and any device or mechanism which, when operated for a consideration, does not return the same value or thing of value for the same consideration upon each operation thereof.

G.      "Gaming Employee" means any individual employed in the operation or management of gaming in connection with the Tribe's gaming operation or facility, whether employed by or contracted to the Tribe or by or to any person or enterprise providing gaming operation or management services to the Tribe, including but not limited to, gaming operation managers and assistant managers; accounting personnel; surveillance and security personnel; cashiers; supervisors; dealers or croupiers, box men; floormen; pit bosses; shift bosses; cage personnel; collection personnel; gaming consultants; parimutuel clerks; management companies and their principals; and any person whose employment duties require or authorize access to areas of the gaming facility related to gaming which are not otherwise open to the public, or to areas designated by the Tribal and State Gaming Agencies.

H.      "Gaming Facility" means the building in which Class III Gaming activities as authorized by this Compact are conducted on the Squaxin Island Reservation.

I.      "Gaming Operation" means the enterprise operated by the Tribe on the Squaxin Island Reservation for the conduct of any form of Class III gaming in any gaming facility.

J.      "Gaming Services" means the providing of any goods or services to the Tribe, whether on or off site, directly in connection with the operation of Class III gaming in a gaming

facility, including equipment, maintenance or security services for the gaming facility.  Gaming services shall not include professional legal and accounting services.

K.     "Gaming Station" means a gaming table of the same general size and as is commonly used in Nevada for similar games.

L.     "Individual" means, but is not limited to, natural persons and business entities including business sole-proprietorships, partnerships, corporations, joint ventures, organizations and associations.

M.     "Local Law Enforcement Agency" means any non-Tribal law enforcement agency in the vicinity of the gaming operation and which has jurisdiction to enforce state laws on the Squaxin Island Reservation, or is subject to the terms of a cross deputization agreement.  Except as specifically provided in this Compact, nothing in this definition or in any provision set forth herein, however, is intended to expand, waive or confer or limit any jurisdiction upon any law enforcement agency on the Squaxin Island Reservation.

N.     "Management Entity" means any individual with whom, or other business entity with which, the Tribe has entered into a contractual agreement for financing, development or operation of any Class II or Class III gaming establishment on the Squaxin Island Reservation.

O.     "Net Win" means the total amount of gaming station income (gross gaming revenue) after prizes or winnings have been paid out; i.e., the difference between the total amount wagered or played and the amounts repaid to winners.

P.     "Principal" means with respect to any entity:  (i) each of its officers and directors; (ii) each of its principal management employees, including any chief executive officer, chief financial officer, chief operating officer, or general manager; (iii) each of its owners or partners, if an unincorporated business; (iv) each of its shareholders who own more than ten percent of the shares of the corporation, if a corporation; and (v) each person or entity other than a banking institution who has provided financing for the enterprise constituting more than ten percent of the start-up capital or operating capital over a twelve month period, or a combination thereof.  For purposes of this definition, where there is any commonality of the characteristics identified in (i) through (iv) above between any two or more entities, those entities shall be deemed to be a single entity.

Q.     "RCW" means the Revised Code of Washington, as amended.

R.     "State" means the State of Washington, its authorized officials, agents and representatives.

S.     "State Certification" means the process utilized by the State Gaming Agency to assist the Tribe and ensure that all individuals or other entities persons required to be licensed or certified are qualified to hold such license or certification in accordance with this Compact and the provisions of Chapters 9.46 and 67.16 RCW.

T.     "State Gaming Agency" means the Washington State Gambling Commission.

U.     "Tribal Gaming Agency" means the Squaxin Island Tribal Gaming Commission or such other agency of the Tribe as the Tribe may from time to time designate by written notice to the State as the Tribal agency primarily responsible for independent regulatory oversight of Class III

Gaming as authorized by this Compact.  No employee of the gaming operation may be a member or employee of the Tribal Gaming Agency.

V. "Tribal Law Enforcement Agency" means any police force which may be established and maintained by the Tribe pursuant to the Tribe's powers of self-government to carry out law enforcement within the Squaxin Island Reservation.

W. "Tribal Licensing" means the licensing process utilized by the Tribe to ensure all individuals and other entities required to be licensed are qualified to hold such license in accordance with provisions of the Squaxin Island Tribal Gaming Ordinance.

X. "Tribe" means the Squaxin Island Tribe, its authorized officials, agents and representatives.

Y. "Squaxin Island Tribal Lands" means Indian lands as defined by 25 USC §2703(4)(A) and (B), subject to the provisions of 25 USC §2719, which lands are subject to the jurisdiction of the Tribe.

Z. "WAC" means the Washington Administrative Code, as amended.

## III.  NATURE, SIZE AND SCOPE OF CLASS III GAMING

A. <u>Scope of Class III Gaming Activities.</u>  The Tribal gaming operation may utilize in its gaming facility, subject to the provisions of this Compact, any or all of the following Class III activities:

1. Baccarat;
2. Beat My Shake;
3. Beat the Dealer;
4. Blackjack
5. Chemin De Fer;
6. Chuck-a-luck;
7. Craps;
8. 4-5-6;
9. Horses (stop dice);
10. Horse Race;
11. Money-wheel;
12. Satellite (off-track) wagering on horse races, subject to Appendix B;
13. Over/Under Seven;
14. Poker, including Pai-gow;
15. Red Dog;
16. Roulette;
17. Ship-Captain-Crew;
18. Sic-Bo;
19. Sweet Sixteen;
20. Punchboards and Pull Tabs, subject to Appendix B; and
21. Tribal Lottery Systems.  Notwithstanding anything in this Compact which could be construed to be to the contrary, Tribal Lottery Systems operated in conformity with Appendix X are hereby authorized.

B.     Punchboards and Pull Tabs and Washington State Lottery - Separate Locations.  In addition to the games authorized by Section III.A, the Tribe may utilize punchboards and pull tabs in the facility and at other locations within the Squaxin Island Tribal Lands subject to regulation by the Tribe.  Punchboards and pull tabs operated outside of the Tribal gaming facility shall be operated in a manner consistent with the sale of punchboards and pull tabs in the Tribal bingo facility.  The operation of State lottery retail locations within Squaxin Island Tribal Lands shall be subject to the provisions of RCW 67.70, WAC 315, and Tribal Ordinance.

C.     Lottery-type Games.  For games including keno and keno-type games, instant tickets, on-line games, or other lottery-type games ** but authorized for play for any purpose by any person, organization, or entity in the State of Washington that are not otherwise treated as Class II gaming in Washington pursuant to 25 USC §2703(7), the Tribe will submit the proposed rules, manner of regulation and manner of play to the State Gaming Agency at least sixty (60) days prior to time play shall begin.  If the State takes no action within the 60 days, the Tribe may begin offering the game.  If a dispute arises between the Tribe and the State with respect to the nature of the game, security issues, rules of play, or training and enforcement associated with regulation, the State and Tribal Gaming Agencies shall meet and resolve the dispute prior to the time play of that game can begin.  If the dispute cannot be resolved by the parties through discussion, then the Tribe may initiate formal negotiations subject to the provisions of the Indian Gaming Regulatory Act.  Provided further, that upon mutual agreement of the Tribal and State Gaming Agencies, some or all of the unresolved issues may be submitted to arbitration under Section XII.C.

D.     Other Class III Table Games.  With respect to any other Class III table games similar to those set forth above that would also be authorized for play for any purpose by any person, organization, or entity in the State and which are not otherwise treated as Class II gaming in Washington pursuant to 25 USC §2703(7), the Tribe shall provide the game regulations thereof to the State Gaming Agency at least thirty (30) days prior to the time play shall begin.  If the State Gaming Agency takes no action within the 30 days, the Tribe may begin offering the game.  If a dispute arises between the Tribe and the State Gaming Agency with respect to issues including, but not limited to, the rules of the game, legality of the game, manner of play, or training and enforcement associated with the regulation thereof, the State and Tribal Gaming Agencies shall meet and attempt to resolve the dispute through good faith negotiations prior to the time play of that game can begin.  If either party believes, after such negotiations have commenced, that a resolution by the parties cannot be achieved, then either or both parties shall be entitled to have the dispute resolved pursuant to the dispute resolution provisions of Section XII.C.

E.     Authorized Gaming Operation and Facility.  The Tribe may establish one Class III gaming operation and gaming facility, to be located on the Squaxin Island Reservation, for the operation of any Class III games authorized pursuant to this Compact.

**APPENDIX B**

**SQUAXIN ISLAND TRIBE – STATE OF WASHINGTON**
**CLASS III GAMING COMPACT**

**RULES GOVERNING CLASS III GAMING**
**on the**
**SQUAXIN ISLAND RESERVATION**

| Section | Subject Matter | Page |
|---------|----------------|------|
| 1 | Punchboards and Pull-Tabs | B-1 |
| 2 | Satellite (Off-Track) Wagering on Horse Races | B-1 |
| 2.1 | Definitions | B-1 |
| 2.2 | Applicability of Laws | B-2 |
| 2.3 | Regulation of Satellite (Off-Track) Wagering | B-2 |

**APPENDIX B**

**SQUAXIN ISLAND TRIBE - STATE OF WASHINGTON
CLASS III GAMING COMPACT**

**RULES GOVERNING CLASS III GAMING
on the
SQUAXIN ISLAND RESERVATION**

## SECTION 1.  PUNCHBOARDS AND PULL-TABS

The Tribe may sell punchboards and pull-tabs in the facility and at other locations on the Squaxin Island Reservation subject to regulation by the Tribe and other than at a location where bingo is played.  Such punchboards and pull-tabs shall be sold in a manner consistent with the sale of punchboards and pull-tabs at any location on the Squaxin Island Reservation where bingo is played.

## SECTION 2.  SATELLITE (OFF-TRACK) WAGERING ON HORSE RACES

2.1  DEFINITIONS.

2.1.1  "Conventional parimutuel pool"  means the total wager under the parimutuel system on any horse or horses in a particular race to win, place, or show.

2.1.2  "Commission Regulations" means Title 260 WAC.

2.1.3  "Exotic parimutuel pool" means the total wagers under the parimutuel system on the finishing position of two or more horses in a particular race, such as Quinella or Exacta wagers, or on horses to win two or more races, such as Daily Double wagers, Pick Six wagers, or on other wagers other than conventional parimutuel pool wagers.

2.1.4  "Horse Racing Law" means Chapter 67.16 RCW.

2.1.5  "Parimutuel wagering" means a form of wagering on the outcome of horse races in which those who wager purchase tickets of various denominations on a horse or horses in one or more races.  When the outcome of the race or races has been declared official, there is a distribution of the total wagers comprising each pool, less any amounts permitted to be retained by law or under this Compact, to holders of winning

tickets on the winning horse or horses.

2.1.6   "Satellite Wagering" means parimutuel wagering on simulcast results.

2.1.7   "Satellite wagering facility" means any facility in which satellite wagering is conducted.

2.1.8   "Simulcast" means the simultaneous television or radio transmission of a race to a facility other than where the race meet is being held.

2.1.9   "Wagering employee" means any person who is employed by the Tribe or at any satellite wagering facility hereunder to handle any monies, materials, records or equipment related to the satellite wagering permitted herein, or who supervises any person who does so or supervises any such supervisor.

2.1.10 Except as otherwise provided herein, meanings ascribed to terms used in the Horse Racing Law and the Commission Regulations are hereby adopted by reference wherever such terms are used in this Compact.

2.2   <u>APPLICABILITY OF LAWS.</u>   Wagering at the Squaxin Island tribal satellite wagering facility will be conducted in accordance with this Compact, the Indian Gaming Regulatory Act, the Interstate Horseracing Act, any ordinances or regulations adopted by the Tribe, and Washington Horse Racing Laws as made applicable herein.  Nothing herein shall otherwise be deemed a prohibition upon or limitation upon tribal operation of a satellite wagering facility by the Tribe or on behalf of the Tribe.

2.3   <u>REGULATION OF SATELLITE (OFF-TRACK) WAGERING.</u>

2.3.1   <u>Wagering Permitted.</u>   The Tribe is entitled to operate a single satellite wagering facility pursuant to this Compact subject to the following terms and conditions:

a.   Unless permitted in accordance with subparagraph c., below, Tribe may conduct satellite wagering only on events simulcast from any Washington State track (whether of a live race, or an authorized simulcast of an out-of-state signal) on the same terms and conditions permitted any other satellite wagering facility in the State without limitation on the distance such tribal facility is from a live race meet, <u>provided</u>, the Tribe is entitled to receive simulcast signals from each Washington State track on terms at

least as advantageous as those made available by such track to any other satellite facility operated at a track holding a Class A or Class B Washington Horseracing Commission license or at any other facility operated or leased by an entity holding such a license. Negotiations conducted between the Tribe and the track shall cover areas including, but not limited to, the following:  percent of handle received; equipment required and who provides such equipment; who provides wagering employees; and how and on what schedule funds will be transferred.  All wagers accepted at the tribal facility on such events shall be made into the parimutuel pool of the Washington State track which provides the simulcast signal, and shall be deemed to have been made at the location of such pool for the purposes of assessment of fees, charges, taxes or other assessments.  Nothing herein shall prohibit assessment by the Tribe of taxes, fees or other charges for wagering conducted at the tribal facility, nor shall the State or any of its political subdivisions be authorized to impose any taxes, fees, charges or assessments upon the Tribe or any person or entity authorized to conduct such activities on behalf of the Tribe for the satellite wagering activities regulated hereunder, other than those generally applicable to the parimutuel pool.

b.      In the event the Tribe believes it is not offered simulcast signals from a Washington State track on terms at least as advantageous as those made available by such track to the other satellite wagering operators as set forth in subparagraph a., above, the Tribe may request a formal determination from the Commission.  The sole issues in such determination will be whether the Washington State track provides terms to those other satellite wagering operators which are more advantageous than those offered to the Tribe and, if so, what terms are less advantageous to the Tribe.  Provided, the Commission shall conduct a hearing and render a decision within ninety (90) days after receipt of the request for a determination from the Tribe, and further provided, that if the Commission decision is not rendered within that time, the Tribe is entitled to conduct satellite wagering in accordance with the provisions of subparagraph c., below.  If the Commission determines that the terms offered Tribe are less advantageous, the Washington State track shall have thirty (30) days to offer terms that are at least as advantageous to the Tribe, or the Tribe will be entitled to conduct satellite wagering in accordance with subparagraph c., below.  If the Tribe disputes the determination of the Commission regarding whether the terms offered to the Tribe are less advantageous, the Tribe or State may request arbitration under Section XII.C of this Compact.

c.      If, following an adverse determination from the Commission, the Washington State track does not offer the terms identified by the Commission in accordance with subparagraph b., above, the Tribe shall be entitled to negotiate for and receive simulcast signals from out-of-state races for an equivalent number of races, to be offered within the subsequent twelve (12) month period, on such terms and conditions as it

may obtain.  Acceptance of signals from out-of-state tracks shall be made in compliance with the Interstate Horseracing Act, 15 USC §3001, et seq..   Nothing in this section (Section 4) shall be deemed to limit acceptance of satellite wagers to the extent permitted under the Interstate Horseracing Act.  Consent of the Commission, as required under the Interstate Horseracing Act shall not be unreasonably withheld.  For disputes concerning whether the Commission has unreasonably withheld its consent, the Tribe or the State may request arbitration under Section XII.C of this Compact.

2.3.2   Hours of Operation.   The wagering authorized in the Tribe's satellite wagering facility shall be conducted within the eighty (80) hours per week, averaged annually, as authorized for Class III gaming under Section III.I of this Compact.  Provided, however, when a track providing a simulcast to the tribal facility operates outside the Tribe's regularly scheduled 80 hours of operation, then the satellite wagering portion of the Class III facility authorized under this Compact may be open to the public during the time the sending track is open to the general public.

2.3.3   Approval of Facility.   Subject to approval of the physical adequacy of the facility, the Squaxin Island Reservation is hereby approved as location for the conduct of satellite wagering as permitted under this Compact.   The right of Tribe to conduct satellite wagering from a facility at such location shall not be affected by its distance from any live race meet being broadcast to such facility, and statutes and regulations imposing distance limitations on the location of satellite wagering facilities relative to live race meets, including but not limited to RCW 67.16.200(c), shall not be applicable to Tribe.

2.3.4   Wagering Rules.   All of the rules set forth in Chapter 260-48 WAC ("Mutuels") are hereby incorporated by reference as being applicable to any satellite wagering facility authorized hereunder, subject to the following qualifications:

2.3.4.1        References therein to "racing associations" shall mean the Tribe.

2.3.4.2        References therein to "enclosure of any race track" shall mean the satellite wagering facilities authorized hereunder.

2.3.4.3        Parimutuel machines shall be locked at the time and by the same means as are applicable to parimutuel machines at other satellite wagering facilities within the State or as otherwise required by the parimutuel pool operator at the host race track or other authorized source, if different therefrom, but in all cases prior to the start of any race for which bets are being accepted.